No. 23-60316

---

In the United States Court of Appeals for the Fifth Circuit

---

Joseph Papin,

Plaintiff—Appellant/Cross-Appellee,

v.

University of Mississippi Medical Center,

Defendant—Appellee/Cross-Appellant.

---

Appeal from the United States District Court for the
Southern District of Mississippi; No. 3:17-CV-763

---

**Brief of Appellant**

---

C. Ryan Morgan
Gregory R. Schmitz
Jolie N. Pavlos
Morgan & Morgan P.A.
20 N. Orange Avenue
15th Floor
Orlando, FL 32801-0000
(407) 204-2170

Chad Flores
Flores Law PLLC
917 Franklin Street, Suite 600
Houston, Texas 77002
(713) 893-9440

Russell S. Post
Beck Redden LLP
1221 McKinney Street, Suite 4500
Houston, TX 77010
(713) 951-6292

## Certificate of Interested Persons

The undersigned counsel of record certifies that, in addition to the persons already certified by parties to this action, the following listed persons and entities as described in the fourth sentence of Fifth Circuit Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

| | |
|---|---|
| Plaintiff—Appellant | Joseph Papin |
| Counsel | Morgan & Morgan, PA |
| | C. Ryan Morgan |
| | Gregory R. Schmitz |
| | Jolie N. Pavlos |
| | Martin Jelliffe |
| | John A. Waits |
| | |
| | Flores Law PLLC |
| | Chad Flores |
| | |
| | Beck Redden LLP |
| | Russell S. Post |
| | |
| | Joel F. Dillard, PA |
| | Joel F. Dillard |
| Defendant—Appellee | University of Mississippi Medical Center |
| Counsel | Mayo Mallette PLLC |
| | J. Cal Mayo, Jr. |
| | John Andrew Mauldin |
| | Paul Watkins, Jr. |
| | |
| | Whitfield Law Group PLLC |

Thomas E. Whitfield-State Gov Jr.
John T. Kitchens

Watkins & Eager PLLC
Katherine K. Smith

Butler Snow LLP
Robert V. Greenlee

s/ Chad Flores
Chad Flores

## Statement Regarding Oral Argument

The Court should decide this appeal with oral argument.  The first issue presents a question of evidentiary sufficiency that briefs can resolve efficiently because the key witness testified to the exact fact in question in clear terms:

> Q.   And you have authority to enter into remediation
> agreements with residents; correct?
> A.   I do.

ROA.6153.  Still, oral argument can explain this jury trial's full evidentiary context to show the wealth of other proof on the authority issue in question.

In addition, the second issue presents an important and recurring question of statutory construction about Mississippi law: Whether (and if so, when) the Mississippi Tort Claims Act gives state entities sovereign immunity from a contract action's punitive damages award.  The district court's view departs from the statute's text.  It also conflicts with both the leading Mississippi state court decision on point and federal district court decisions following it.  Divisive holdings like that should be examined with the full scrutiny oral argument provides.

Finally, this appeal raises an important issue regarding consequential damages in professional services contracts.  The general principle is recognized in Mississippi and the First and Fourth Circuits have applied it to professional services contracts. The Court will benefit from an oral argument focused on those key authorities.

## Table of Contents

Statement Regarding Oral Argument ........................................................iii

Table of Contents........................................................................... iv

Table of Authorities ......................................................................vii

Jurisdictional Statement ................................................................. 1

Issues Presented ............................................................................ 2

Statement of the Case ................................................................... 3

I.    Facts............................................................................................. 4

    A.    Dr. Papin worked long and hard to build a dream medical career. ........ 4

    B.    UMMC hired Dr. Papin as a resident.................................................. 5

    C.    Dr. Papin performed well despite interpersonal friction. ..................... 5

    D.    UMMC vested Dr. Earl with the authority to conduct remediation. .......................................................................................... 8

    E.    Dr. Earl made UMMC's Remediation Agreement with Dr. Papin. ...................................................................................................... 9

    F.    UMMC fired Dr. Papin in violation of the Remediation Agreement. ...............................................................................................11

    G.    The termination destroyed Dr. Papin's career....................................11

II.   Procedural History. ....................................................................... 12

    A.    Dr. Papin sued for breach of contract................................................. 12

    B.    The district court limited Dr. Papin's lost-income damages. ............. 14

    C.    The district court excluded key liability evidence. ..............................15

D.      Dr. Papin won the verdict. ................................................17

E.      The district court disregarded the verdict and granted UMMC
        judgment as a matter of law..........................................20

        1.      The district court held that no contract existed. ......................20

        2.      The district court held that Mississippi law does not
                allow for punitive damages on this claim. ................................22

        3.      The district court conditionally previewed its view that
                the jury's award of emotional distress damages was
                excessive. ................................................................23

Summary of the Argument........................................................24

Argument ...........................................................................27

I.      The Court should render a judgment on the verdict for Dr. Papin's
        claim that UMMC breached the Remediation Agreement, including
        the verdict's full amounts of punitive and emotional damages.....................27

        A.      The Remediation Agreement was a contract. ....................................28

                1.      Dr. Earl had authority to make the Remediation
                        Agreement. ..............................................................29

                2.      The district court's authority analysis was wrong....................33

                3.      The backup ruling about consideration was wrong. ..................36

        B.      Punitive damages are available. ...........................................38

                1.      Punitive damages are available unless the MTCA
                        provides immunity. ..................................................38

                2.      The MTCA provides no immunity for actions asserting
                        breach of an express contract. .....................................39

                3.      Dr. Papin's action is for breach of an express contract. ...........42

       4.     The district court's analysis was incorrect ............................... 43

   C.    Emotional distress damages were proven ............................................. 45

II.   The Court should reverse the decision to limit Dr. Papin's lost-income damages to year one alone and order a new trial on that issue ...................... 48

   A.    All foreseeable damages are recoverable. ............................................. 49

   B.    The correct remedy is a new trial on this element of damages. ........... 54

III.   Alternatively, the Court should order a new trial on liability that accounts for wrongly excluded liability evidence .......................................... 55

   A.    The evidence was highly relevant. ....................................................... 56

       1.     The excluded evidence proved the meaning of "malfeasance, inefficiency, or contumacious conduct." .......... 57

       2.     The excluded evidence proved that UMMC fabricated its given reason for firing Dr. Papin. ............................................. 58

   B.    Confusion concerns did not warrant exclusion. ................................... 59

Conclusion ....................................................................................................... 63

Certificate of Compliance ................................................................................ 64

# Table of Authorities

## Cases

*Aetna Casualty & Surety Co. v. Day*,
    487 So. 2d 830 (Miss. 1986) ........................................................... 50

*Aries Bldg. Sys., LLC v. Pike Cnty., Miss.*,
    No. 5:16-CV-16-DCB-MTP, 2017 WL 4678225
    (S.D. Miss. Oct. 17, 2017) ...................................................... 25, 42

*Bailets v. Pennsylvania Tpk. Comm'n*,
    645 Pa. 520 (2018) .................................................................. 25, 48

*Beaty v. Kansas Athletics, Inc.*,
    No. CV 19-2137-KHV, 2020 WL 1862563 (D. Kan. Apr. 14, 2020) ............. 58

*Board of Trustees of State Institutions of Higher Learning v. Peoples Bank of Miss.*,
    538 So.2d 361 (Miss. 1989) (en banc) .......................................... 34

*City of Grenada v. Whitten Aviation, Inc.*,
    755 So.2d 1208 (Miss. Ct. App. 1999) ................................... *passim*

*City of Jackson v. Estate of Stewart ex rel. Womack*,
    908 So. 2d 703 (Miss. 2005) ....................................................... 44

*Davis v. Mann*,
    882 F.2d 967 (5th Cir. 1989) ........................................................ 51

*Dukes v. City of Lumberton*,
    NO. 2:17-CV-150, 2018 WL 1612199 (S.D. Miss. Apr. 3, 2018) ............. 41, 42

*Empiregas, Inc. of Kosciusko v. Bain*,
    599 So. 2d 971 (Miss. 1992) ..................................................... 36. 37

*Epperson v. SOUTHBank*,
    93 So. 3d 10 (Miss. 2012) ........................................................... 57

*Frierson v. Delta Outdoor, Inc.*,
    794 So.2d 220 (Miss. 2001) ........................................................... 36

*Green v. Faurecia Auto. Seating, Inc.*,
    No. 2:11CV173, 2012 WL 2367698 (N.D. Miss. June 21, 2012) ................... 36

*Gross v. GGNSC Southaven, L.L.C.*,
    817 F.3d 169 (5th Cir. 2016) ........................................................ 29

*Guzman v. Jones*,
    804 F.3d 707 (5th Cir. 2015) ........................................................ 56

*Hadra v. Herman Blum Consulting Engineers*,
    632 F.2d 1242 (5th Cir. 1980) ....................................................... 55

*Harrison v. Walker*,
    91 So. 3d 41 (Miss. Ct. App. 2011). ............................................... 50

*Humphries v. CBOCS W., Inc.*,
    474 F.3d 387 (7th Cir. 2007) ........................................................ 59

*Idom v. Natchez-Adams Sch. Dist.*,
    115 F. Supp. 3d 792 (S.D. Miss. 2015) ........................................... 41

*J.O. Hooker & Sons, Inc. v. Roberts Cabinet Co.*,
    683 So. 2d 396 (Miss. 1996) ........................................................ 52

*Lovett v. E.L. Garner, Inc.*,
    511 So. 2d 1346 (Miss. 1987) ....................................................... 52

*McFarland v. McFarland*,
    105 So. 3d 1111 (Miss. 2013) ....................................................... 57

*Montano v. Orange Cnty., Tex.*,
    842 F.3d 865 (5th Cir. 2016) .................................................. 28, 38

*Nissan N. Am., Inc. v. Tillman*,
    273 So. 3d 710 (Miss. 2019) ........................................................ 40

*Pagan v. Shoney's, Inc.*,
    931 F.2d 334 (5th Cir. 1991) ....................................................54, 55

*Perry v. Sindermann*,
    408 U.S. 593 (1972) ..................................................................... 54

*Pruett v. City of Rosedale*,
    421 So. 2d 1046 (Miss. 1982) ................................................38, 39

*Reeves v. Sanderson Plumbing Products, Inc.*,
    530 U.S. 133 (2000).................................................28, 60, 61, 62

*Redgrave v. Boston Symphony Orchestra, Inc.*,
    855 F.2d 888 (1st Cir. 1988) ........................................................ 52

*Rice v. Community Health Association*,
    203 F.3d 283 (4th Cir. 2000) ............................................ 51, 52, 55

*Simpson v. Alcorn State Univ.*,
    27 F. Supp. 3d 711 (S.D. Miss. 2014)............................................ 41

*Stelluti Kerr, L.L.C. v. Mapei Corp.*,
    703 F. App'x 214 (5th Cir. 2017) ................................................. 29

*Stewart v. Gulf Guar. Life Ins. Co.*,
    846 So. 2d 192 (Miss. 2002) ........................................................ 48

*Univ. of S. Miss. v. Williams*,
    891 So. 2d 160 (Miss. 2004)................................................... 46, 47

*Wilson v. Clark Atlanta Univ., Inc.*,
    794 S.E.2d 422 (Ga. Ct. App. 2016)............................................. 54

## Statutes

28 U.S.C. 1291 ............................................................................ 1

28 U.S.C. § 1331 ......................................................................... 1

28 U.S.C. § 1343 ......................................................................... 1

28 U.S.C. § 1367 ......................................................................... 1

Miss. Code. § 11-46-3 ......................................................25, 39, 42

## Rules

Fed. R. Evid. 403 ................................................................. 59, 60

Fed. R. Evid. 705 ...................................................................... 33

## Treatises

Restatement (Second) of Contracts § 351 (1981) ....................... 50

Restatement of Employment Law § 9.01 (2015) ........................ 50

## Jurisdictional Statement

The district court had subject-matter jurisdiction because the complaint, ROA.466, invoked federal question and supplemental jurisdiction. *See* 28 U.S.C. §§ 1331, 1343, 1367. After the district court dismissed the federal claims, it exercised supplemental jurisdiction over the remaining claims. ROA.4638-4643.

This Court derives appellate jurisdiction from 28 U.S.C. § 1291 because a timely notice of appeal, ROA.4997 (June 12, 2023), challenges the district court's final decision in the case—the Final Judgment of October 24, 2022, ROA.4997.

## Issues Presented

This appeal comes from a contract action under Mississippi law. Dr. Joseph Papin sued the University of Mississippi Medical Center ("UMMC") for wrongly terminating his residency in violation of both a "Remediation Agreement" and a "House Officer Contract," ending a promising medical career. The case went to a jury trial that Dr. Papin won. The jury found a breach of the Remediation Agreement (but not the other contract) and awarded damages. But the district court nullified the verdict, granting judgment as a matter of law. The questions presented are:

I.A. Liability: Did sufficient proof show that the Remediation Agreement (i) was made by a person with authority, and (ii) had consideration? Yes. The district court's rejection of these jury findings should be reversed.

I.B. Punitive Damages: Does Mississippi allow for punitive damages on Dr. Papin's breach-of-contract action? Yes. The district court's refusal to award this category of damages should be reversed.

I.C. Actual Damages: Does sufficient evidence support the jury's award of noneconomic actual damages? Yes. The district court's possible rejection of the noneconomic damage findings should be reversed.

II. Damages: Did the district court wrongly limit the scope of economic damages for both actions? Yes. The Court should order a new trial on economic damages using the appropriate measure of lost income.

III. Liability: Did the district court wrongly limit evidence about liability on the House Officer Contract action? Yes. The Court should order a new trial with full proof of liability.

## Statement of the Case

Dr. Joseph Papin dedicated his life to a career of service practicing medicine, and by 2017 was well on his way to achieving the dream. After graduating from a top medical school and completing a prestigious fellowship, Dr. Papin began residency at the University of Mississippi Medical Center. But within just a few months, UMMC wrongly fired Dr. Papin and destroyed his entire medical career.

Dr. Papin tried two breach-of-contract claims against UMMC and won one. The jury found that the firing breached the "Remediation Agreement" but not the "House Officer Contract," that the breach of caused Dr. Papin substantial actual damages, and that the breach warranted punitive damages. Dr. Papin should have gotten a judgment on that verdict and more damages. But the court below refused.

The district court granted a Rule 50 motion for judgment as a matter of law and held that the "Remediation Agreement" did not constitute a contract. It also held that Mississippi does not allow for punitive damages on this claim and suggested that the jury's award of actual damages was excessive. Dr. Papin appeals to challenge that nullification of the verdict. He also challenges a key decision restricting the actual damages that went to trial. And in the event that the Remediation Agreement claim is not upheld, he challenges the erroneous exclusion of evidence that kept him from winning liability on the "House Officer Contract" action.

## I.    Facts.

### A.    Dr. Papin worked long and hard to build a dream medical career.

Known to friends and family as Joe, a career practicing medicine in service of others was a "lifelong dream" for Dr. Papin.  ROA.5639.  He grew up in small-town Florida and knew by age 8 that his future was in medicine.  ROA.5638.  Family roots made the practice of medicine especially important for Dr. Papin.  ROA.5639.  His formative exposure came when a surgeon saved a close family member's life.  ROA.5639.  Every summer in high school, young Joe helped his grandmother run a free medical clinic in El Salvador.  ROA.5639.

Academically, Dr. Papin excelled at every level in pursuit of his dream career.  He graduated from the University of Florida with special accolades, ROA.5638-39, and "did everything [he] could do just kind of to be around the hospital, be around doctors, be around patients, and learn as much as [he] possibly could."  ROA.5640.  Next, Dr. Papin graduated from a highly selective and prestigious medical school, the University of Michigan Medical School.  ROA.5641-42.  He then completed a highly selective and prestigious postdoctoral fellowship at the University of Michigan's Center for Health Outcomes and Policy.  ROA.5645.  For residency, Dr. Papin beat out hundreds of candidates to match into the University of Mississippi Medical Center's General Surgery residency program.  ROA.5648-54.

### B.    UMMC hired Dr. Papin as a resident.

In 2016, Dr. Papin signed his original "House Officer Contract" with UMMC for the residency. ROA.5662-5663, 6447. UMMC did not draft this contract just for Dr. Papin; all residents received essentially the same contract. ROA.5663.

The House Officer Contract used an initial term of one year, with further annual renewals being technically optional. ROA.6447; ROA.5685-86. But in fact, a full *five years* was the normal track for Dr. Papin's position. ROA.5407; ROA.5685-86; ROA.6061-62. For Dr. Papin's role, the "expectation is -- as a categorical resident is that you will be at the university for five years." ROA.5686.

Another key element of the House Officer Contract addressed termination. It allowed UMMC to terminate the residency only for conduct amounting to "malfeasance, inefficiency, or contumacious conduct." ROA.6448.

### C.    Dr. Papin performed well despite interpersonal friction.

Like many employment disputes, this case turned on credibility judgments about what ruptured the employment relationship. As the verdict-winner, Dr. Papin is entitled to the benefit of all favorable inferences. He made a good first impression. ROA.5208-09. Supervisors knew him to be "bright," ROA.5209, "motivated," ROA.5208, and "pleasant," ROA.5631, and to have "lots of potential." ROA.5208.

The "consensus" was that he "desires to become an excellent surgeon." ROA.5209. UMMC coworkers expected him stay for all five years. ROA.5685-5686.

During his first year at UMMC, Dr. Papin encountered interpersonal friction with some nurses, due to what was best labeled "cultural differences." ROA.5246; ROA.5303. Dr. Papin was "not a southerner" like many coworkers, so he sometimes fell short of supplying daily "pleasantries" to the coworkers' liking. ROA.5246. Although he tried "not to step on any toes" and "really want[ed] to be a team player," ROA.5675, interpersonal friction generated complaints to the resident supervisors.

Often the difficulties arose from innocent mistakes. For example, Dr. Papin drew staff ire when he broke an internal policy by taking a coffee cup into a patient's room, but Dr. Papin had never been given the policy manual stating that rule; once informed of the rule, it never happened again. ROA.5204-05; ROA.5444.

Other complaints were wholly unfounded. For example, coworkers reported that Dr. Papin broke a rule by taking a break to go on a run; but a supervisor had given Dr. Papin express permission to do so. ROA.5296; ROA.5533; ROA.5712. Some complaints concerned patient treatment, with Dr. Papin facing vague accusations after the fact via hearsay. *See, e.g.*, ROA.5800.

Over time, incidents like these devolved into a classic "blame game." ROA.5209. For virtually every issue, Dr. Papin supplied a legitimate explanation for his course of action. ROA.5245-46. Time and time again, the complaints were completely disproven. Evidence revealed that the original complaints were baseless, and that the witnesses' falsities were exposed on the stand.

In particular, the jury learned that UMMC did *not* conduct the investigations one would expect if UMMC were *really* concerned about performance deficiencies. ROA.5231-33; ROA.5305-5304. And in the investigations that UMMC did conduct, witnesses admitted after the fact to being "not exactly accurate" as to very important matters. ROA.5616 ("Q. So after we went through your appeals transcript and your deposition testimony, would you agree that your testimony at Dr. Papin's appeal hearing was not exactly accurate? A. I guess so."). The picture that emerged at trial was that Dr. Papin was the victim of an internal whisper campaign motivated not by performance concerns but by personal spite

One key example (of many) was the complaint lodged by the Chief Resident, Dr. Megan Mahoney. According to her complaint to Dr. Papin's supervisor, Dr. Mahoney knew nothing about a particular patient's status at a key time and Dr. Papin was to blame for this ignorance. ROA.5524-5526; ROA.5524-5526 ROA.5578; ROA.5589-5590. But at trial this complaint's veracity was torn to pieces, with proof

showing that Dr. Mahoney (and others) had been treating this patient for a month and "rounding" on him twice per day. ROA.5714-5734; ROA.7053-7343 (the actual patient records). Indeed, UMMC's own audit trail shows Dr. Mahoney herself accessing the patient's electronic medical file 73 times during the relevant time period. ROA.6968-6991 (the audit trail).

Despite all of these contrived complaints, Dr. Papin remained on track for a successful five year stint. ROA.6095. Around the half-way mark of the first year, UMMC "wanted him to finish out five years' worth of residency." ROA.6095.

### D.     UMMC vested Dr. Earl with the authority to conduct remediation.

Dr. Truman Earl served as UMMC's "General Surgery Program Director"— the supervisor of all General Surgery Program residents, including Dr. Papin. ROA.5207-08; ROA.5207-08; ROA.6042. UMMC's Program Director role is highly systematized in accordance with policies prescribed by the Accreditation Council for Graduate Medical Education ("ACGME"). ROA.5432-33; ROA.5865; ROA.6044-45; ROA.6240.[1]

---

[1] ACGME "governs" "the structure of the program" and its "reporting relationships." ROA.6248-49. ACGME's proscribed policies are what "provides the program director with the authority to determine" both "whether a resident is promoted" and "the resident's progress within the program." ROA.6249. The whole process of "graduate medical education and the formalized study and education of a surgeon is under the institutional requirements that ACGME uses." ROA.6253. UMMC is required to and has agreed to follow ACGME policies. ROA.5366-67; ROA.5374.

In accordance with ACGME, Dr. Earl as Program Director took charge of "remediation" plans. ROA.5430-33; ROA.6242-44. "Obviously residents matriculate and progress at different speeds, and oftentimes there is a need to provide remediation or additional services, additional time and attention to assisting that resident in completing that postgraduate training." ROA.5432. Hence the need for formalized "remediation" plans, which are common. ROA.586.

Dr. Earl's overall remediation authority included the power to make formal remediation agreements. ROA.5432-33. Formal remediation agreements function as additional contracts that establish "a documented plan and approach to identifying the issues at hand, creating a timeline in which these issues will be under additional scrutiny, and provid[ing] whatever resourced – additional resources that may or may not be needed to assist in achieving that remediation process." ROA.5432-33. On January 10, 2017—about halfway through Dr. Papin's first year—Dr. Earl called a meeting to initiate formal remediation. ROA.5240-41; ROA.5792-97.

### E.    Dr. Earl made UMMC's Remediation Agreement with Dr. Papin.

Dr. Earl and Dr. Papin were the January 10 meeting's only participants. ROA.5240-41. At this meeting, Dr. Earl recited complaints about Dr. Papin, ROA.5240-41; ROA.5793-97, and proposed a "formal remediation" in the form of a contractual "Remediation Agreement" that Dr. Earl had drafted. ROA.6641-6642;

ROA.5240-41; ROA.5792-97; ROA.5310; ROA.6115; ROA.6154.  Both Dr. Earl and

Dr. Papin agreed to undertake the proposed "formal remediation" process by

executing the "Remediation Agreement."  ROA.6642; ROA.5269; ROA.5793-97.

The Remediation Agreement established a structured, contractual path

forward with obligations for both sides.  ROA.6641-6642; ROA.5793-97.  The key

clause established a period of "formal remediation" lasting 60 days:

> Therefore, as we discussed, you are now on formal remediation and
> have 60 days from today January 10, 2017 to show significant
> improvement in the areas and competency domains mentioned above.

ROA.6641.  The contract then spelled out the obligations in further detail.

Specifically, the Remediation Agreement required Dr. Papin to spend the next

sixty days completing not just his usual duties, but also a series of additional remedial

measures designed to solve the perceived problems.  *Id.*; ROA.5793-5794;

ROA.6136-6137.  In exchange, the Remediation Agreement required UMMC to

continue Dr. Papin's residency through the sixty-day remedial period and continue it

thereafter if the remedial measures were satisfied.  ROA.6641-6642; ROA.5269 ("60

days to show improvement").  Dr. Earl considered this document a "contract,"

ROA.6152, and executed it as the UMMC "Program Director":

Program Director        Date            Resident            Date

ROA.6642; *see also* ROA.5162-63 (UMMC's Rick Barr approved as well).

### F.   UMMC fired Dr. Papin in violation of the Remediation Agreement.

UMMC did not comply with the Remediation Agreement.  Instead, UMMC breached the contract by firing Dr. Papin.  ROA.5797-98.  The breach occurred immediately.  Just *one day* after entering into the Remediation Agreement, Dr. Earl reported Dr. Papin to Human Resources, and then UMMC placed Dr. Papin on "administrative leave" and ordered him to cease working.  ROA.5238; ROA.5309.  Dr. Earl admitted *he knew* that he had entered into a contract with Dr. Papin and chose to pursue the path of termination anyways.  ROA.7011-12.

UMMC completed its termination process of Dr. Papin on February 20, 2017.  ROA.5802-03.  But for all intents and purposes, the firing of Dr. Papin happened on January 10, after which he never worked another day at UMMC.  ROA.5798.

### G.   The termination destroyed Dr. Papin's career.

UMMC's wrongful termination of Dr. Papin destroyed his medical career.  ROA.5811-12; ROA.6264-65.  Critically, the termination made obtaining a new residency impossible.  Though he tried to secure one, the scarlet letter of UMMC's termination kept him from even interviewing.  ROA.5811-12; ROA.5824-25.  The firing left Dr. Papin with a worthless medical degree and hundreds of thousands of dollars of debt. ROA.5811-12; ROA.5824-31.

To mitigate the damage, Dr. Papin was forced to change professions. ROA.5811-12; ROA.5818-23. Instead of pursuing his highest and best use as a doctor, he pursued a career in business. ROA.5811-12; ROA.5818-23. After moving back in with his parents, ROA.5820, Dr. Papin went back to school for an MBA and began working as a healthcare strategy consultant, ROA.5811-12; ROA.5818-23. Deprived of real emotional fulfillment, Dr. Papin is now relegated to a professional life that will always be lacking. ROA.5823-24.

Severe emotional damages resulted from UMMC's wrongdoing. ROA.5823-24; ROA.5831-34. The destruction of Dr. Papin's medical career—both *that* it happened and *how*—continues to impact him individually and in his relationships. ROA.5823-24; ROA.5831-34. It is an injury that "touches on every aspect of [Dr. Papin's] life." ROA.5833.

## II.    Procedural History.

### A.    Dr. Papin sued for breach of contract.

Dr. Papin sued UMMC in the Southern District of Mississippi. *See* ROA.446 (live complaint). As the heart of the case, Dr. Papin's complaint pleaded his claims for breach of the Remediation Agreement's express provisions and breach of the House Officer Contract's express provisions. ROA.480-481. Dr. Papin's other pleaded claims are no longer pursued.

For the breach-of-contract action about the House Officer Contract, the parties disagreed mostly about the claim's breach element. UMMC argued that Dr. Papin's conduct met the threshold of "malfeasance, inefficiency, or contumacious conduct." Dr. Papin argued that no "malfeasance, inefficiency, or contumacious conduct" had occurred and that UMMC fired him for other, illegitimate reasons. The district court confronted this issue on summary judgment and rightly held that factual disputes warranted sending it to the jury. ROA.4201-03.

For the breach-of-contract action about the Remediation Agreement, the parties disagreed mostly about contract existence. UMMC argued that Dr. Earl lacked the authority to enter into the Remediation Agreement on UMMC's behalf, while Dr. Papin argued that he had it. UMMC tried to press this issue on summary judgment as well, but did not succeed. *See* ROA.4198.

For damages, the main dispute concerned whether Dr. Papin's contract claims could give rise to punitive damages. UMMC argued that the Mississippi Tort Claims Act immunized it from punitive damages on such claims, but on summary judgment, the district court correctly held that "the MTCA does not bar punitive damages against UMMC for these claims." ROA.4206.

### B.    The district court limited Dr. Papin's lost-income damages.

Before trial, the district court rendered a key damages ruling.  Instead of letting Dr. Papin pursue all the consequential damages that Mississippi law allows, the district court limited his economic damages to one year.  ROA.4490-4493.

For both of his contract actions, Dr. Papin had sought (among other remedies) an award of all the lost income caused by UMMC's wrongdoing—*i.e.*, the money Dr. Papin would have earned if UMMC had not wrongfully terminated his entire medical career.  *See* ROA.484-85; ROA.4490-93.  Specifically, Dr. Papin requested lost income damages for (1) the income Dr. Papin would have received in year one of the residency, (2) the income Dr. Papin would have received in subsequent years of residency, and (3) the income Dr. Papin would have earned during his career as a surgeon thereafter. *See id*.  By contrast, UMMC argued that Mississippi law allowed Dr. Papin to recover *only* the income Dr. Papin would have received in year one. ROA.4490-93.

The district court adopted UMMC's restrictive position. ROA.4490-4493.  In a pretrial matter-of-law ruling, it held that Mississippi law allowed Dr. Papin to recover *only* the income he would have received in year one of the residency. ROA.4493.  It refused to let Dr. Papin recover the income he would have earned in

years 2-5 of the residency and the income he would have earned as a surgeon thereafter. *Id.*

## C.    The district court excluded key liability evidence.

During trial, the district court confronted an important evidentiary issue about Dr. Papin's breach-of-contract action regarding the House Officer Contract. The issue concerned Dr. Papin's effort to introduce evidence about UMMC residents who had experienced allegations of misconduct and/or deficient performance like Dr. Papin, *none of whom had been fired*. *See* ROA.5213-5222, 5392-95. Dr. Papin sought to admit this proof for two purposes, both of which were highly relevant.

First, Dr. Papin sought to admit this proof as extrinsic evidence of the House Officer Contract's meaning. *See* ROA.4762-63; ROA.5215-16. The provision at issue concerned termination, allowing UMMC to fire residents only in cases of "malfeasance, inefficiency, or contumacious conduct." ROA.5287. Mississippi law allows extrinsic evidence to inform the meaning of these provisions, so Dr. Papin offered this evidence to show the correct meaning of these terms. ROA.4762-63; ROA.5215-16. The fact that UMMC did *not* treat comparable residents as having engaged in "malfeasance, inefficiency, or contumacious conduct" served as proof that the threshold was not met by their situations; and since the comparable residents' situations were analogous to Dr. Papin's, the evidence about them proved

that Dr. Papin's situation did not meet the threshold of "malfeasance, inefficiency, or contumacious conduct" either. ROA.4762-63; ROA.5215-16.

Second, Dr. Papin offered this proof as evidence that UMMC fabricated its reasons for his termination. ROA.4764-66; ROA.5215-16. With UMMC claiming that complaints about Dr. Papin had motivated his firing, Dr. Papin sought to prove that UMMC had not taken these complaints seriously—*i.e.*, that they were not the real reason for firing him. *Id.* To do this, Dr. Papin had already shown that UMMC did *not* seriously investigate the complaints against *him*. *Id.* Dr. Papin also needed to show that UMMC *did* seriously investigate complaints that it *did* care about. *Id.* Evidence of the comparable residents' experience was that proof. *Id.* They had been accused of analogous wrongdoing, and UMMC showed that it actually cared about (and believed) those complaints by seriously investigating them. *Id.* By contrast, UMMC's lack of investigation of the complaints against Dr. Papin showed that these complaints could not have been UMMC's true motivation for the firing. *Id.*

UMMC objected to Dr. Papin's proof of comparable residents' experiences. *See* ROA.5214. It objected that the evidence was irrelevant and confusing under Rule 403. The district court granted those objections and excluded the evidence, refusing to let Dr. Papin show the jury proof about comparable residents' specific experiences despite the fact that it would have proven UMMC's reasons for firing Dr. Papin were

pretextual. *See* ROA.5213-5222, 5392-95. This ruling profoundly hampered Dr. Papin's ability to obtain a liability finding on the claim about the House Officer Contract.

### D.    Dr. Papin won the verdict.

For the purposes that matter on appeal, Dr. Papin won the trial. Even though Dr. Papin did not obtain a finding that UMMC breached the House Officer Contract, ROA.5040, he succeeded in full as to the Remediation Agreement. For that breach of contract action, the jury sided with Dr. Papin on all three key issues—liability, actual damages, and punitive damages. ROA.5040-5041.

Question one concerned the House Officer Contract and its termination threshold of "malfeasance, inefficiency, or contumacious conduct." A jury note proves that this verdict was likely driven by confusion. During deliberations the jury sent a note to the court: "What is the meaning of contumacious conduct?" ROA.6385. No additional guidance was given. So the confusion remained, with the jury later reporting being "deadlocked" on that question. ROA.6389. Eventually the jury answered Question 1 "no" after scratching out "yes":

1.  Do you find that Dr. Joseph Papin has proven, by a preponderance of the evidence, that the Defendant University of Mississippi Medical Center breached the House Officer Contract?



_____YES                 _____NO

ROA.5040. Technically, that "no" answer represents a failure to find a breach of the House Officer Contract (not a finding of no breach)—and it would have been very different if the jury had known that other residents in comparable situations were not fired for similar conduct.

The jury then turned to the Remediation Agreement in Questions 2 and 3. ROA.5040. Question 2's answer found that the Remediation Agreement constituted a contract and Question 3's answer found that UMMC breached the Remediation Agreement:

2. Do you find that the January 10, 2017 remediation document is a contract?


_____✓_____ YES            _____NO

If you answered, "NO," to both Question #1 and Question #2, then you are finished. If you answered, "YES," to Question #1, but, "NO," to Question #2, then proceed to Question #4. If you answered, "YES," to Question #2, then proceed to Question #3.

3. Do you find that Dr. Joseph Papin has proven, by a preponderance of the evidence, that the Defendant University of Mississippi Medical Center breached the January 10, 2017 remediation document?


_____✓_____ YES            _____NO

ROA.5040.

For actual economic damages—lost income—the jury assessed Dr. Papin's damages for *past* lost earnings as $14,651. ROA.5041. Because the district court had ruled before trial that no other lost-income damages were available, ROA.4490-4493,

Dr. Papin was not allowed to prove and the jury was not allowed to find any lost income damages beyond that initial one-year period (which only had $14,651 in pay remaining). *See id.*

The jury then assessed Dr. Papin's non-economic damages—"physical pain and suffering, mental suffering, or emotional distress." ROA.5041. It found $660,000 for the past and $886,000 for the future:

4. If you answered "YES" to Question #1 or Question #3, provide the amount of damages that would compensate Dr. Joseph Papin for harm caused by Defendant University of Mississippi Medical Center's breach of contract.

   A.  Past lost earnings                                $ 14,651 ᵒᵒ

   B.  Past physical pain and suffering,                 $ 660,000 ᵒᵒ
       mental suffering, or emotional distress

   C.  Future physical pain and suffering,               $ 886,000 ᵒᵒ
       mental suffering, or emotional distress

ROA.5041. The total noneconomic damages amounted to $1,486,000. *Id.*

For punitive damages, the jury found that Dr. Papin was entitled to punitive damages and assessed the amount as $5,000,000:

1. Do you find that Dr. Joseph Papin has proven, by clear and convincing evidence, that he is entitled to punitive damages?



   ___✓___YES                    _____NO

If you answered, "NO," then you are finished. If you answered, "YES," then proceed to Question #2.

2. If you answered "YES" to Question #1, provide the amount of punitive damages you award Dr. Papin.



ROA.5042.

### E. The district court disregarded the verdict and granted UMMC judgment as a matter of law.

After the verdict arrived, UMMC filed an extensive Rule 50(b) renewed motion for a judgment as a matter of law.  ROA.4775 (motion); ROA.4800 (brief).  Dr. Papin responded.  ROA.4868 (response); ROA.4889 (brief).  UMMC replied.  ROA.4935.

The district court granted UMMC's Rule 50 motion and "set aside the jury's verdict in its entirety."  ROA.4996.  To do so, it rendered three rulings.

### 1. The district court held that no contract existed.

First, the district court held as a matter of law that the Remediation Agreement did not constitute a valid contract.  ROA.4969-77.  The main reasoning held that the Remediation Agreement did not constitute a valid contract because Dr. Earl lacked "capacity" to contract with Dr. Papin on UMMC's behalf.  ROA.4969-76.  The district court conducted that analysis over several pages and summarized it as follows:

> Based on the IHL Bylaws, UMMC's employment policies, and trial testimony, there was not a legally sufficient evidentiary basis for the jury to conclude that Dr. Earl had the legal capacity to enter a contract on UMMC's behalf. Dr. Papin failed to establish the first breach-of-contract element: the existence of a valid, binding contract. UMMC is therefore entitled to judgment as a matter of law.

ROA.4976.

The district court also held, with analysis it conducted only "briefly," that the Remediation Agreement lacked consideration. ROA.4976-78. The district court's entire analysis on that point is as follows:

> Because Dr. Earl did not have the legal capacity to enter a contract on UMMC's behalf, the Court will only briefly address UMMC's arguments that the Remediation Agreement was not sufficiently definite and lacked consideration. The Court, however, finds the agreement terms were sufficiently definite, but the agreement lacked new consideration. When a subsequent agreement modifies a written contract, the "agreement must be supported by new or additional consideration." *Thompson v. First Am. Nat. Bank*, 19 So. 3d 784, 787 (Miss. Ct. App. 2009). A promise to fulfill a legal obligation or a preexisting duty under the original contract is not valid consideration for the new agreement. *E.g., id.* Courts, including the Fifth Circuit, are hesitant to apply this rule. *See Johnson v. Seacor Marine Corp.,* 404 F.3d 871, 875 (5th Cir. 2005) ("A court should no longer accept this rule as fully established. It should never use it as the major premise of a decision, at least without giving careful thought to the circumstance of the particular case, to the moral desserts of the parties, and to the social feelings and interests that are

> involved."). Still, the Court finds it applies here because the Remediation
> Agreement was merely a performance-improvement plan to measure Dr. Papin's
> compliance with the educational requirements he had already agreed to fulfill
> under the House Contract.

ROA.4976-77 (page break omitted).

Based on those two holdings—no capacity and no consideration—the district
court ruled that "UMMC is entitled to judgment as a matter of law on whether the
Remediation Agreement is a contract." ROA.4977. The court saw that this "ruling
effectively sets aside the entire jury verdict, including the emotional distress and
punitive damage awards." ROA.4977. But because the district court realized that
that ruling might not survive appellate review, it "address[ed] UMMC's alternative
arguments for judgment as a matter of law in case the Fifth Circuit reverses or vacates
its finding that the Remediation Agreement is not a contract." ROA.4978.

### 2. The district court held that Mississippi law does not allow for punitive damages on this claim.

Second, the district court held that the Mississippi Tort Claims Act barred the
jury's award of punitive damages. ROA.4980-85. The ruling turned on a pure
question of law about what kind of claim Mississippi allows punitive damages for. In
this ruling, the district court reasoned that (1) even though the MTCA does *not* bar
punitive damages for "pure" breach of contract actions, it *does* bar punitive damages

for a "tortious breach-of-contract claim," and (2) Dr. Papin's claim for breach of the Remediation Agreement with punitive damages "is necessarily a claim for tortious breach of contract." ROA.4980-85. Thus, the district court held that "the MTCA bars punitive damages against UMMC." ROA.4984-85.

### 3. The district court conditionally previewed its view that the jury's award of emotional distress damages was excessive.

After granting UMMC judgment as a matter of law on those two grounds, the district court supplied conditional rulings on UMMC's requests for a new trial. ROA.4985-4996. It rejected most of those requests, but previewed its intention to accept UMMC's excessiveness challenge if the issue becomes ripe.

Specifically, the district court found that the jury's award for Dr. Papin's emotional damages was excessive. ROA.4989-4994. The jury's finding of $1,486,000 in emotional damages was, according to the court, "disproportionate to the injuries sustained by Dr. Papin and contrary to the overwhelming weight of evidence presented at trial." ROA.4990. So the district court said that, "if the Fifth Circuit vacates or overturns the Court's judgment setting aside the entire verdict, the Court would remit Dr. Papin's emotional damages or order a new trial on the issue." ROA.4993. But the court did not actually suggest a remittitur, reserving that question for later proceedings if necessary. ROA.4989-4994

Dr. Papin appealed. ROA.4997.

## Summary of the Argument

**I.**     Dr. Papin rightly earned favorable jury findings on all submitted aspects of his claim against UMMC for breaching the Remediation Agreement's express obligations. The district court should have upheld the verdict's findings and awarded the full amount of noneconomic and punitive damages that the jury found. Instead, though, the district court nullified the verdict with a multi-part post-trial decision. All controlling aspects of that decision constitute reversible error.

First, the district court erroneously held that Dr. Earl lacked authority to enter into the Remediation Agreement. ROA.4969-78. That is plainly wrong because Dr. Earl himself testified to having that exact authority:

```
Q.   And you have authority to enter into remediation
agreements with residents; correct?
A.   I do.
```

ROA.6153. That proof alone sufficed. And it was corroborated by more evidence, such as proof showing that UMMC followed ACGME guidelines requiring UMMC to vest Dr. Earl, as program director, with authority to make remediation agreements. The jury was entitled to credit all of that evidence and find that authority existed.

Second, the district court erroneously held the Mississippi Tort Claims Act gives UMMC sovereign immunity from the jury's punitive damages award. ROA.4980-85. That is wrong because the MTCA supplies no immunity where, as

here, the action is for breach of a contract's express provisions. The district court's opposing statutory construction violates the MCTA's text, Miss. Code § 11-46-3, the leading Mississippi state court decision construing that text, *City of Grenada v. Whitten Aviation, Inc.*, 755 So.2d 1208 (Miss. Ct. App. 1999) ("The provisions of MTCA have no application to a pure breach of contract action as is the subject of the case at bar."), and federal decisions rightly deeming it "well-settled that the MTCA does not apply to suits for breach of an express contract." *Aries Bldg. Sys., LLC v. Pike Cnty., Miss.*, No. 5:16-CV-16-DCB-MTP, 2017 WL 4678225, at *4 (S.D. Miss. Oct. 17, 2017). UMMC has no immunity here.

Third, the district court previewed its intention to accept an excessiveness challenge to the jury's award of noneconomic damages if the issue becomes ripe. ROA.4985-4996. The Court need not analyze the excessiveness issue now because the issue is premature. But if it does, the Court should hold that Dr. Papin's evidence proved this aspect of damages with sufficient detail, yielding a damage finding that is safely within the accepted range, *see, e.g.*, *Bailets v. Pennsylvania Tpk. Comm'n*, 645 Pa. 520, 540–41 (2018) ($1.6 million for distress related to termination).

For these reasons, the Court should reverse and render a judgment upholding the current jury verdict's findings as to liability for UMMC's breach of the Remediation Agreement and as to both noneconomic and punitive damages.

**II.**    Additionally, the Court should hold that a limited new trial is warranted as to the issue of Dr. Papin's lost-income damages.  The district court erroneously kept this issue out of the trial by holding that Dr. Papin could recover *only* the income he would have received in year one of the residency.  But Mississippi's law of consequential damages lets Dr. Papin recover lost income for the residency's first year *and* subsequent House Officer Contract years *and* his surgery career thereafter. Since no such chance was provided below, the Court should order a new trial limited to the issue of Dr. Papin's lost income damages, as properly defined.

**III.**    Alternatively, if the Court does *not* uphold the verdict's findings as to liability for UMMC's breach of the Remediation Agreement, the Court should hold that a new trial is warranted by the erroneous exclusion of key liability evidence for the claim regarding the House Officer Contract—namely, proof about comparable residents' specific experiences.  Far from causing confusion, that evidence was highly relevant to the issue of breach.  Indeed, the excluded proof spoke directly to the question the jury posed by note—"What is the meaning of contumacious conduct?" ROA.6385—before failing to give a finding on this claim.  So if this issue is reached, the Court should hold that this key evidentiary error warrants a new trial on Dr. Papin's claim regarding the House Officer Contract.

## Argument

I. **The Court should render a judgment on the verdict for Dr. Papin's claim that UMMC breached the Remediation Agreement, including the verdict's full amounts of punitive and emotional damages.**

Dr. Papin first challenges the district court's resolution of UMMC's post-trial motion for relief under Rules 50(b) and 59. The district court granted UMMC mixed relief via both rules. It used Rule 50(b) to grant UMMC judgment as a matter of law on issues of liability and punitive damages and used Rule 59 to conditionally say that it might later order either a remittitur of the verdict's award for emotional damages or a new trial on damages. ROA.4996.

The district court committed reversible error in all aspects of that decision. First, the district court should not have held that no contract existed as a matter of law; it instead should have accepted the jury's finding in Question 2 that a contract existed. Second, the district court should not have held that punitive damages were unavailable as a matter of law; it instead should have held that Mississippi law makes punitive damages available here and accepted the jury's assessment of them. Third, the district court should not have suggested that the verdict's amount of emotional damages was excessive; it instead should have accepted that finding as supported by sufficient evidence. Thus, the Court should reverse and render a judgment on the

verdict for Dr. Papin's claim that UMMC breached the Remediation Agreement, including the verdict's full amounts of punitive and emotional damages.

### A.    The Remediation Agreement was a contract.

The district court's first key ruling held that the Remediation Agreement did not constitute a valid contract because Dr. Earl lacked the "capacity" to enter into a binding contract with Dr. Papin on UMMC's behalf.  ROA.4969-76.  It also held ("briefly") that the Remediation Agreement did not constitute a valid contract because the remediation contract lacked consideration.  ROA.4976-78.

*De novo* appellate review applies to Rule 50 decisions.  *See, e.g.*, *Montano v. Orange Cnty., Tex.*, 842 F.3d 865, 877 (5th Cir. 2016).  The analysis of evidentiary sufficiency "must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence."  *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 150 (2000).

The Court should reverse this first key ruling because legally sufficient proof showed both that (1) Dr. Earl had capacity to enter into the Remediation Agreement with Dr. Papin, and that (2) the Remediation Agreement had consideration.

Both of these conclusions are driven by the same foundational rule about how to resolve disputes regarding contract formation.  Where there is competing evidence about an aspect of contract formation—such as authority and consideration—the

factual dispute goes to the jury. *E.g.*, *Stelluti Kerr, L.L.C. v. Mapei Corp.*, 703 F. App'x 214, 229 (5th Cir. 2017) ("The jury was presented with two alternative, but plausible, accounts of the formation and authorization of a contract. The jury reasonably selected one of those alternatives. Therefore, we discern no basis for setting aside the jury's verdict on [the] breach of contract claim."); *Gross v. GGNSC Southaven, L.L.C.*, 817 F.3d 169, 177 (5th Cir. 2016) ("The district court's requirement of a formal legal device to create the authority to contract thus runs contrary to this general rule in Mississippi agency law. . . . The existence and scope of an actual agency relationship is a question of fact . . . .").

That rule applies both to complicated disputes about authority and formation and to "relatively uncomplicated" disputes. *Stelluti Kerr*, 703 F. App'x at 232. It should have been applied here to let the jury resolve all factual disputes about contract formation, including those about authority and consideration.

### 1. Dr. Earl had authority to make the Remediation Agreement.

Proof of Dr. Earl's authority to enter into the Remediation Agreement came first and foremost from Dr. Earl's own testimony. The testimony happened in the midst of a cross-examination that focused intensely on the January 10 meeting. ROA.6150-56. At that point, Dr. Earl—the witness with full knowledge of both the delegated authority he possessed as "Program Director" and the full details of Dr.

Papin's situation—testified in perfectly clear and direct terms that he had "authority to enter into remediation agreements with residents":

```
Q.   You are tasked with knowing the ACGME requirements?
A.   I'm tasked with -- I'm tasked with -- yes, I am tasked
with ensuring that the program is compliant with the ACGME.
Q.   And you have authority to enter into remediation
agreements with residents; correct?
A.   I do.
```

ROA.6153.  That alone should have convinced the district court to deny this part of the Rule 50 motion.  Yet Dr. Earl's testimony did not stand alone.  It was accompanied by additional proof detailing the nature of his authority to make the Remediation Agreement on UMMC's behalf.

For example, UMMC's "Guidelines for Academic Remediation" stated that remediation is always at the discretion of the Program Director, and that residents were to "meet with the Program Director (PD). . . to . . . participate in formulating a remediation plan." ROA.6600-6602; *see also* ROA.6595-6598 (under duties of the Program Director, UMMC references the Program Director's authority to enter into a remediation agreement with a medical resident).  Accordingly, UMMC's applicable policies devolved contracting power to any written UMMC "designee," ROA.4898-99, which Dr. Earl clearly was in the role of "Program Director."

If Dr. Earl's authority was lacking, the supervisor he met with just minutes after making the Remediation Agreement would have objected. But upon learning that Dr. Earl had contracted on UMMC's behalf, the supervisor (Dr. Barr) did not bat an eye. ROA.6118-6119. His knowing acceptance of what Dr. Earl did is proof of authority.

Additionally, the jury learned that (1) UMMC always implemented policies in accordance with the standards of the Accreditation Council for Graduate Medical Education ("ACGME"), and (2) ACGME guidelines required UMMC to vest Dr. Earl with contractual remediation authority. The jury therefore could infer that UMMC had in fact given Dr. Earl the authority to make remediation agreements that UMMC was required to give him.

To the first point, a wealth of evidence showed that UMMC crafted its policies in accordance with ACGME standards. ROA.5366. UMMC did what ACGME prescribed not just in general, but in every particular. *See, e.g.*, ROA.5252; ROA.5432.[2] It did so as a matter of retaining accreditation. ROA.5367 ("they have to follow the ACGME rules"); ROA.5374 ("they would have to follow this common program requirement"). And it did so because its contracts with residents (including

---

[2] *See also* ROA.5195 ("The rules apply to all employees. As a resident, that person is involved in a training program, so there are specific requirements from the ACGME that details what they do. So that would be in addition to whatever employees are bound by through the faculty/staff employee handbook.").

Dr. Papin) obligated them to implement ACGME policies.   ROA.6447-6448; ROA.5380-81.

To the second point, evidence also showed that ACGME standards require each institution's Program Director to possess the authority to make "remediation" agreements.  ROA.5401-5403.  In other words, "the program director ultimately is the one person that the ACGME invests that responsibility" of conducting any and all "remediation" efforts.   ROA.5422; *see* ROA.5864-65 ("remediation is at the discretion of the program director…as mandated by ACGME").

Evidence also showed that Dr. Earl had, in fact, executed other contracts to bind UMMC—namely, the contracts between UMMC and residents that resulted from the National Resident Matching Program.  Dr. Earl explained the process and conceded that contracting authority for UMMC belonged to Dr. Earl "in my responsibility as program director."  ROA.6060.

Last, expert testimony confirmed that, at institutions employing ACGME policies, authority to enter into remediation agreements lies with Program Directors:

> Q.   Thank you.  Now, Dr. Leitman, in regards to program
> directors, DIOs, ACGME, and all that, do program directors
> have authority to enter into remediation agreements with
> residents?
> A.   Yes, they do.

ROA.6247; *accord* ROA.6260-6261; ROA.6266-67.[3]

## 2.   The district court's authority analysis was wrong.

The district court disregarded Dr. Earl's testimony by reasoning that "authorization to enter into a remediation agreement differs from authorization to execute employment contracts." ROA.4976 ("UMMC correctly notes that, although 'Dr. Earl may have been granted authority to write up remediation plans for his surgical residents, there was no proof that he had authority to override UMMC's employment policies . . . or to bind UMMC to a contract.'"). That makes no sense. Because the Remediation Agreement was the very contract being sued upon, proof of authority to enter into the Remediation Agreement was all that was needed.

Proof of Dr. Earl's authority to enter into other categories of contracts would have been sufficient, but was not necessary. It is as though the district court faulted Dr. Papin's proof for being *too precise and too specific*, which is no fault at all. UMMC was obligated to conform to the ACGME guidelines and those guidelines explicitly authorize a program director to enter into remediation agreements, so they *do* authorize Dr. Earl to "bind UMMC to a contract" of this type. And they do not "override UMMC's employment policies," but simply set forth employment

---

[3] UMMC could not nullify that expert testimony by saying that it failed to deliver a basis in detail. Federal Rule of Evidence 705 expressly permits expert witnesses to give "an opinion--and give the reasons for it--without first testifying to the underlying facts or data." Fed. R. Evid. 705.

policies that apply to remediation agreements.  The evidence detailed above speaks

directly to this issue, and the jury was entitled to credit it.  The district court's

reliance on two snippets of evidence contrary to the verdict, ROA.4976, is plainly

incorrect, as the jury was not required to credit that testimony.

Furthermore, it is no answer to say that Dr. Earl's authority to make the

Remediation Agreement came from UMMC's internal policies, as opposed to

directly from a statute or regulation.  The Mississippi Supreme Court has expressly

rejected that argument in a case about UMMC, holding that the test for contracting

authority is met by whomever UMMC's *internal policies* give that authority to.  *Board*

*of Trustees of State Institutions of Higher Learning v. Peoples Bank of Miss.*, 538 So.2d

361, 365-366 (Miss. 1989) (en banc).

This principle is not an exception to the rule requiring legislative support for

contracting authority; it is a specific and correct application of that rule.  At UMMC,

the legislatively-created authority to enter into contracts has been properly delegated

to whomever UMMC deems it proper to give that authority by way of internal policy.

*See id.*[4]  UMMC's policies gave Dr. Earl the authority to make the Remediation

Agreement on UMMC's behalf.  So the test for authority is met.  *See id.*

---

[4] *See also* ROA.6600-6602 ("Guidelines for Academic Remediation" stating that remediation is
always at the discretion of the Program Director, and that residents were to "meet with the Program

The district court's opinion also focused on UMMC Bylaws 707 and 801, which if applied to the Remediation Agreement would allow it to be executed by the "program director" or a "designee" subject to approval of the appropriate budget officer or associate dean for graduate medical education. ROA.4974-75. The court said that authority was lacking because "Dr. Papin presented no evidence that either the Vice Chancellor [Bylaw 707] or the Associate Dean for Graduate Medical Education [Bylaw 801] delegated their signatory power to Dr. Earl." ROA.4975. But Dr. Earl, as the "program director," was authorized to enter into the agreement; doing so was explicitly within his "responsibilities" under the express terms of the Faculty and Staff Handbook, which qualified as "written employment and/or hiring procedures" for purposes of Bylaw 801 (as well as the other internal documents referenced in this section). *See* ROA.4974. The fact that such authority might be "subject to approval" by another officer did not divest the program director of his "responsibilities;" so the district court was wrong to believe the evidence was legally insufficient simply because there was no proof that "the Associate Dean for Graduate Medical Education delegated their signatory power to Dr. Earl." ROA.4975.

---

Director (PD). . . to . . . participate in formulating a remediation plan ROA.6595-6598 ("Evaluation Policy and Grievance Algorithm" showing the Program Director's authority to enter into a remediation agreement with a medical resident).

Hence, Dr. Earl's direct testimony plus the other corroborating proof supplied legally sufficient evidence of his authority to make the Remediation Agreement. Although the district court's reasoning might have permitted the jury to reach a different conclusion, it does not support judgment as matter of law. The jury was entitled to find that Dr. Earl was authorized to enter into the Remediation Agreement. So the first ground for the no-contract holding was invalid.

### 3.   The backup ruling about consideration was wrong.

The district court also held, with analysis it conducted only "briefly," that the Remediation Agreement was not a valid contract because it lacked consideration. ROA.4976-78. That conclusion is wrong as well.

"[U]nder Mississippi law, '[a]ll that is needed to constitute valid consideration to support a contract is a benefit to the promisor or a detriment to the promisee.'" *Green v. Faurecia Auto. Seating, Inc.*, No. 2:11CV173, 2012 WL 2367698, at *1 (N.D. Miss. June 21, 2012) (quoting *Frierson v. Delta Outdoor, Inc.*, 794 So.2d 220, 224 (Miss. 2001)). The Remediation Agreement satisfied that requirement with ease.

Dr. Papin's main consideration was UMMC's promise of a sixty-day improvement period in which to secure continued employment. ROA.6641-6642; ROA.5269 ("60 days to show improvement"); *see Empiregas, Inc. of Kosciusko v. Bain*, 599 So. 2d 971, 977 (Miss. 1992) (continued employment may constitute

consideration).  He also received consideration in the form of additional resources, such as special opportunities to "Meet with Senior Associate Dean for GME" and to "Meet with office of Academic Development."  ROA.6641.  None of this had been promised to Dr. Papin in the House Officer Contract.  It was promised to him only by the Remediation Agreement, meeting the test for contractual consideration.

UMMC got consideration as well.  For his part, Dr. Papin promised to spend the next sixty days completing not just his usual duties, but also the additional remedial measures that had not otherwise been part of the job or required previously.  ROA.6641.  He promised to submit a "Personal Study and Action Plan by Jan 17," and to attend "meetings with the PD to discuss progress and feedback." ROA.6641.  None of this had been promised to UMMC in the House Officer Contract.  It was promised to UMMC only by the Remediation Agreement, meeting the test for consideration just as easily as Dr. Papin's side.

For these reasons, the district court erred by ruling that no contract existed as a matter of law.  It instead should have accepted the jury's finding in Question 2 that a contract existed.  The Court should reverse and enter a judgment regarding liability that accepts the jury's answer to Question 2.

**B.    Punitive damages are available.**

Having found UMMC liable for breaching the Remediation Agreement and causing actual damages, ROA.5040-41, the jury went on to award punitive damages against UMMC.  ROA.5042.  Recognizing that its no-contract liability ruling might not withstand review by this Court, the district court conditionally ruled on UMMC's Rule 50 challenge to punitive damages.  The court granted UMMC judgment as a matter of law by holding that the Mississippi Tort Claims Act made UMMC immune from Dr. Papin's claim for punitive damages.  ROA.4980-85, 4996.

*De novo* appellate review applies because the decision was on a Rule 50 motion and turned on a pure question of law about construing the MTCA.  *See, e.g.*, *Montano*, 842 F.3d at 877.  Once the liability findings are reinstated, the Court should hold that UMMC is not immune from Dr. Papin's punitive damages award.

### 1.    Punitive damages are available unless the MTCA provides immunity.

In Mississippi, state sovereign immunity used to be a judicial creature.  *See Pruett v. City of Rosedale*, 421 So. 2d 1046, 1046-51 (Miss. 1982).  In 1982, though, the Mississippi Supreme Court abolished that judicial doctrine as a matter of common law and held that Mississippi's state sovereign immunity exists only to the extent that the Mississippi Legislature provides for it.  *Id.*  From then on, liability became the

rule and sovereign immunity the exception, with the sovereign immunity exception existing only to the extent that the Legislature provides for it. *Id.*

If the MTCA supplied the requisite immunity, then the decision below would be correct. But because the MTCA does *not* supply the requisite immunity, the district court's decision to disallow a punitive damages award should be reversed.

### 2. The MTCA provides no immunity for actions asserting breach of an express contract.

The MTCA supplies limited sovereign immunity. It does *not* establish sovereign immunity for *all* causes of action. It establishes sovereign immunity only for certain causes of action expressly identified by the statute. Namely, the MTCA re-established sovereign immunity for any "suit at law or in equity on account of any wrongful or tortious act or omission or breach of implied term or condition of any warranty or contract." Miss. Code § 11-46-3(1).

As a matter of law, MTCA Section 11-46-3 does not supply sovereign immunity for actions asserting breach of an *express* contractual term or condition. It supplies sovereign immunity for certain actions asserting a *tort* and certain actions asserting breach of an *implied* contractual term or condition. (And the statute then waives that immunity in certain cases, with exceptions and other complications.) But with respect to claims for breach of an *express* contractual term or condition, the MTCA says nothing and therefore supplies no sovereign immunity. It is not that the

MTCA supplies sovereign immunity for such claims and then waives it (as the common law used to sometimes hold). The statute supplies no sovereign immunity for such claims in the first place, hence there is nothing to waive.[5] The rule that the MTCA does *not* supply any sovereign immunity for actions asserting breach of an *express* contractual obligation correctly applies Mississippi's rules of statutory construction and conforms to Mississippi caselaw.

Textually, the MCTA covers only contract actions about "implied" provisions—not contract actions about express provisions. So that is the end of the matter, and there is no need to engage in subsidiary methods of statutory construction. *See, e.g.*, *Nissan N. Am., Inc. v. Tillman*, 273 So. 3d 710, 714 (Miss. 2019) ("When a statute is unambiguous and conveys a clear and definite meaning, the Court follows its plain terms.").

Mississippi state courts have upheld this construction of the MTCA. The leading case is *City of Grenada v. Whitten Aviation, Inc.*, 755 So.2d 1208 (Miss. Ct. App. 1999), which rightly held that the "provisions of MTCA have no application to a pure breach of contract action." *Id.* at 1214. The opinion's full context shows that,

---

[5] The same is true of punitive damages. The MTCA supplies no sovereign immunity against punitive damages, generally. Had the Mississippi Legislature intended to erect a blanket restriction against punitive damage claims against the State, it could have done so when it passed the MTCA. The Mississippi Legislature also could have included a separate section of the MTCA to state any and all punitive damage claims whatsoever against the state in any form or fashion are not allowed. It did not do so and these statutes cannot now be read to have done so.

by "pure breach of contract action," the decision means to refer to actions for breach of a contract's *express* term or condition. *Id.*

Federal courts applying Mississippi law uphold this construction as well. They too have correctly held that the MTCA does *not* supply sovereign immunity for actions asserting breach of an *express* contractual obligation. The decision below is out of step with these federal authorities applying Mississippi law.

*Simpson v. Alcorn State Univ.*, 27 F. Supp. 3d 711, 720 (S.D. Miss. 2014), is on point and correct: "While a claim for breach of an implied contract provision is covered by the MTCA and thus would be subject to the MTCA's pre-suit notice provision, this requirement does not apply to actions for breach of the express terms of a contract." *Id.* at 720 (citation omitted).

*Idom v. Natchez-Adams Sch. Dist.*, 115 F. Supp. 3d 792, 805 (S.D. Miss. 2015), is another applicable decision that uses this same construction: "The Court finds that both contract claims are based on express rather than implied contracts and are therefore not subject to the MTCA." *Id.* at 806.

*Dukes v. City of Lumberton*, NO. 2:17-CV-150, 2018 WL 1612199 (S.D. Miss. Apr. 3, 2018), is on point and correct as well: "While the MTCA maintains the sovereign immunity of the State and its political subdivisions against claims for claims of 'breach of implied term or condition of any warranty or contract,,' Miss.

Code. Ann. § 11-46-3(1), its provisions do not apply to 'actions for breach of the express terms of a contract.'" *Id.* at *4.

The district court did not cite—and counsel has not located—any contrary holding regarding breach of an *express* contractual obligation. It is therefore "well-settled that the MTCA does not apply to suits for breach of an express contract." *Aries Bldg. Sys., LLC v. Pike Cnty., Miss.*, No. 5:16-CV-16-DCB-MTP, 2017 WL 4678225, at *4 (S.D. Miss. Oct. 17, 2017). That rule should control this case.

### 3.     Dr. Papin's action is for breach of an express contract.

The final step of MTCA immunity analysis is straightforward. *If* Dr. Papin's successful claim had asserted a *tort* cause of action or a breach-of-contract action *about an implied contractual term or condition*, then an argument about MTCA immunity could be made (subject to further debates about statutory waiver, etc.). But Dr. Papin's successful claim about the Remediation Agreement did *not* assert a *tort* cause of action and did *not* assert a breach-of-contract action *about an implied contractual term or condition*. His claim asserted a classic breach-of-contract action about *express terms and conditions*. Just as in the leading *City of Grenada* decision, "[t]he provisions of MTCA have no application to a pure breach of contract action as is the subject of the case at bar." *City of Grenada*, 755 So.2d at 1214. As such, the MTCA supplies no immunity and the Rule 50 motion should have been denied.

### 4.    The district court's analysis was incorrect.

The district court misunderstood the statute and *City of Grenada*'s rationale. It saw them as establishing these two propositions about the MTCA's coverage:

> Although [1] '[t]he provisions of [the] MTCA have no application to a pure breach of contract action,' [2] they do apply to a tortious breach-of-contract claim.

ROA.4981 (citing *City of Grenada*) (bracketed numbers added).

Assertion [1] is correct. *City of Grenada* did indeed correctly show that the MTCA does *not* supply sovereign immunity for a pure breach of contract action. *See City of Grenada*, 755 So.2d at 1210-14 ("breach of contract claims are clearly unaffected by the provisions of MTCA").

Assertion [2] is wrong. *City of Grenada* does not establish that the MTCA necessarily gives sovereign immunity for *any* "tortious breach-of-contract claim." ROA.4981. *City of Grenada* certainly did not *hold* that the MTCA applies to any "tortious breach-of-contract claim." ROA.4981. Its only MTCA holding was that the statute did *not* cover the claim at issue. *City of Grenada*, 755 So.2d at 1210-14. It never held that the MTCA covered any claim in that case, let alone a claim that meets the district court's description. *Id.*

*City of Grenada*'s dicta actually says that the MTCA covers actions for "tortious breach of implied term or condition of any warranty or contract." *City of Grenada*, 755 So.2d at 1210-14. The emphasis belongs not on "tortious" but on "implied," as the federal decisions cited above correctly realize. What matters to the MTCA is whether the breach is of a contract's *implied* obligations—as opposed to those that are *express*. If the claim is for breach of a contract's *implied* obligations, the statute covers it whether or not the breach is tortious.[6]

By contrast, if the claim is for breach of a contract's *express* obligations, the MTCA does not cover it regardless of whether or not the breach is tortious. Correctly understood, *City of Grenada* shows that the MTCA supplies no immunity whatsoever where, as here, the action is for breach of an *express* contract.

For these reasons, the district court should not have held that punitive damages were unavailable as a matter of law. It instead should have held that Mississippi law makes punitive damages available here and accepted the jury's assessment of them. The Court should reverse and render a judgment that allows Dr. Papin to recover the verdict's punitive damages.

---

[6] *See City of Jackson v. Estate of Stewart ex rel. Womack*, 908 So. 2d 703, 709-11 (Miss. 2005) ("there is nothing in the language of the statute to lead us to conclude that a 'breach of an implied term or condition of any warranty or contract' must be tortious").

### C.     Emotional distress damages were proven.

In the last key part of its post-verdict order, the district court said that the jury's finding of $1,486,000 in past and future emotional damages (combined) was "disproportionate to the injuries sustained by Dr. Papin and contrary to the overwhelming weight of evidence presented at trial." ROA.4990. The court therefore said that, "if the Fifth Circuit vacates or overturns the Court's judgment setting aside the entire verdict, the Court would remit Dr. Papin's emotional damages or order a new trial on the issue." ROA.4993. Critically, though, the district court did not yet actually pose the remittitur-or-new-trial choice. Footnote 13 shows that the district court reserved that crucial step until later:

[13] Setting remittitur requires the Court to examine relevant caselaw in Mississippi to find an "analogous, published decision." *See Longoria v. Hunter Express, Ltd.*, 932 F.3d 360, 365 (5th Cir. 2019). The parties have not had an adequate opportunity to brief the Court on this issue. Accordingly, if the Fifth Circuit vacates or overturns the Court's judgment, the Court will allow both parties to file briefs before setting remittitur.

ROA.4993 n.13.

For this reason, the excessiveness question regarding the emotional damages is *not* yet ripe for appellate review. The occasion for appellate review will only occur if and when the district court actually carries out that forecast to identify the acceptable amount of emotional damages and put the choice (remittitur vs. new trial) to Dr. Papin. Unless and until that happens, there is no true excessiveness decision capable of effective appellate review.

Alternatively, if the issue is deemed ripe for review now or never, Dr. Papin submits that the jury's verdict regarding emotional damages is not excessive. Sufficient evidence supported all of that award, which is safely within the range that precedent accepts for comparable harms.

Dr. Papin had to prove these damages with "more than general declarations of emotional distress." *Univ. of S. Miss. v. Williams*, 891 So. 2d 160, 173 (Miss. 2004). In the filings below, UMMC pressed Dr. Papin for proof of "specific suffering" in a "specific time frame" ROA.4814-15. Dr. Papin met the challenge. The proof at trial did not merely show that "it made me feel bad" or "it upset me." *Williams*, 891 So.2d at 173. It went far beyond that to supply all the detail that was required.

With respect to "specific suffering," in the immediate aftermath of the firing, Dr. Papin's emotional distress was severe enough to make communicating with family difficult, warranting therapy that is still needed today. ROA.5832-33. Evidence linked UMMC's wrongdoing to permanent deprivations of professional "pride" and "accomplishment." ROA.5824. Its "isolating" impact "touches on every aspect of [Dr. Papin's] life," especially in light of the reputational damage UMMC caused. ROA.5833.

With respect to the "specific time frame," the Remediation Agreement was made in January 2017, and in February 2017 Dr. Earl announced the firing that breached it. ROA.5793-5803. Dr. Papin suffered severe emotional distress as soon as he began looking for a new job, when the reputational impact of UMMC's false accusations materialized. ROA.5810-11. The emotional distress then continued over the long term, impacting Dr. Papin substantially on a daily basis at the end of each workday. ROA.5824. Because news of his residency's termination became widely available on the internet, Dr. Papin was forced to withdraw and isolate from a variety of relationships that he otherwise would have been a full participant in. ROA.5833-34.[7] At present, the harms still recur frequently because conversations raise the issue "every day." ROA.5833-34.

The district court faulted Dr. Papin for lacking "expert medical testimony to support his emotional distress claim." ROA.4992. But Mississippi law has no problem with plaintiffs explaining their own emotional damages, especially given the precedent holding that (1) plaintiffs can "recover such damages without proof of a physical manifestation" and (2) "expert testimony showing actual harm to prove mental injury is not always required." *Williams*, 891 So. 2d at 172.

---

[7] In particular, the jury was shown "how it affected him in business school and that he didn't join clubs and things of that sort because of this, that he was afraid people will Google him and still will Google him today to see this." ROA.6026 (referring to the testimony at ROA.5833-34).

Finally, the jury's award for Dr. Papin's damages was well within bounds. Awards of this magnitude are upheld on analogous facts regularly, both in courts across the nation, *see Bailets v. Pennsylvania Tpk. Comm'n*, 645 Pa. 520, 540–41, (2018) ($1.6 million for emotional distress related to termination in retaliation), and in Mississippi, *see, e.g.*, *Stewart v. Gulf Guar. Life Ins. Co.*, 846 So. 2d 192, 200 (Miss. 2002) ($500,000) (the *Stewart* verdict, "rendered in May 2000, would equal about $868,839.65 in October 2022." ROA.4991). The district court had no right to second-guess the jury's determination of Dr. Papin's emotional suffering.

*　　*　　*

For these reasons, if the issue is reached, the Court should hold that the district court should not have deemed the verdict's amount of emotional damages excessive. It instead should have accepted that finding as supported by sufficient evidence and entered a judgment accordingly. The Court should reverse and render a judgment that accepts the jury's amount of noneconomic damages.

## II. The Court should reverse the decision to limit Dr. Papin's lost-income damages to year one alone and order a new trial on that issue.

In addition to reinstating the original verdict, the Court should correct the district court's error regarding the scope of lost income damages that Mississippi law makes available. Before trial, the district court ruled against Dr. Papin on a matter-of-law damage issue applying to both contract actions. ROA.4490-93;

ROA.4965; ROA.5050-51.  At issue was *which period of time* an award of lost-income damages could account for: just the first year of Dr. Papin's House Officer Contract, or more?  ROA.4490-4493.  The district court sided with UMMC, limiting Dr. Papin's lost-income damages to year one of the House Officer Contract and no more.  ROA.4490-93; ROA.4965; ROA.5050-51; ROA.5827.  That decision was error.

Mississippi law does *not* limit Dr. Papin's lost-income damages to merely the House Officer Contract's first year.  UMMC had embraced that per se legal rule, arguing that Mississippi law always limits an employment contract's lost-income damages to the contract term. *See* ROA.4278; ROA.4289-90.  And UMMC had also embraced a narrow view of the contract, arguing that its only real term was for a single year. *Id*. But as Dr. Papin argued below, ROA.4432-39, UMMC was wrong in both respects.  The first error was legal, and the district court simply got it wrong.  The second error was factual, and was a matter for the jury.  The correct appellate remedy is a limited new trial that allows evidence of the full amount of economic damages without the erroneous year-one limitation.

## A.    All foreseeable damages are recoverable.

Well-established authorities set the applicable legal rule.  For contract actions, the essential question is one of foreseeability: Consequential damages are recoverable to the extent that the contracting parties foresaw them as a reasonably probable result

of breach.    This consensus rule is reflected in multiple Restatements.    *See* Restatement (Second) of Contracts § 351 (1981); Restatement of Employment Law § 9.01 (2015).  Mississippi has long adhered to it.

*Aetna Casualty & Surety Co. v. Day*, 487 So. 2d 830 (Miss. 1986), is one of the leading Mississippi cases recognizing this rule: "In a contract action, generally a plaintiff may recover consequential damages reasonably foreseeable at the time the contract was made and established at trial, where properly pled and supported by substantial evidence."  *Id.* at 834 (citing Restatement (Second) of Contracts § 351). Many other Mississippi cases recognize the same rule.  *See, e.g.*, *Harrison v. Walker*, 91 So. 3d 41, 47 (Miss. Ct. App. 2011).

The district court simply ignored this rule.  Instead of looking to whether the parties should have foreseen lost-income damages beyond the first year of residency, the district court mechanically limited the damages to year one.  Critically, though, the duration of the contract is *not* the same as the duration of the harm caused by the contract's violation.  Although one year of lost income was certainly foreseeable, that is not all that was foreseeable.

The district court's one-year limitation contradicted the evidence about what was foreseeable for Dr. Papin's job.  The parties both expected this contract to last more than a year and expected this job to serve as the gateway to a long-term career

as a surgeon.  It should have surprised no one—i.e., it was reasonably foreseeable—that UMMC's firing of Dr. Papin would cause economic damages in the form of lost income that far exceeded the House Officer Contract's first year.

All parties to Dr. Papin's House Officer Contract knew and expected that the financial benefits would arrive not so much in the first year (or even the first five), but in the decades of successful medical practice that could not be accomplished without first completing a successful residency.  *See* ROA.4432-33.  In other words, both UMMC and its residents realized that "[w]hen a medical resident is terminated, he not only loses a job *but he loses the opportunity to complete his training program and the academic certification to practice as a physician*."  ROA.4435 (citing both expert testimony and *Davis v. Mann*, 882 F.2d 967, 974 (5th Cir. 1989)).  "Hence, when Defendant breached Plaintiff's House Officer Contract and improperly terminated him, not only did Defendant deprive Plaintiff of the salary/stipend he expected to receive, Defendant forevermore deprived him of the training that is necessary to work as a practicing physician that the parties both expected Defendant would provide, and forever hindered his ability to practice medicine."  *Id.*

*Rice v. Community Health Association*, 203 F.3d 283 (4th Cir. 2000), is instructive.  It held that "a plaintiff may receive consequential damages if"—as is the case with Dr. Papin's clearly identified career as a surgeon—"the plaintiff proves

with sufficient evidence that a breach of contract proximately caused the loss of identifiable professional opportunities." *Id.* at 894. The rule is so strong that *Rice* made it a point to say that "no court—anywhere—has held that a plaintiff cannot recover consequential damages if he has alleged and proved that breach of an employment contract resulted in the loss of future 'identifiable professional opportunities,' which the parties could have anticipated at the time they entered into the contract." *Id.* at 288-89 (citation omitted). Dr. Papin did just that below.

*Redgrave v. Boston Symphony Orchestra, Inc.*, 855 F.2d 888 (1st Cir. 1988), confirms the point. It rightly concluded that "a plaintiff may receive consequential damages if the plaintiff proves with sufficient evidence that a breach of contract proximately caused the loss of identifiable professional opportunities." *Id.* at 89-94. So too here.[8] The evidence cited above would be sufficient for a reasonable jury to find that the lost income from Dr. Papin's career as a surgeon was foreseeable, and thus recoverable as consequential damages.

Second and alternatively, even if lost-income damages must be limited to the contract's expected duration, the district court erred in identifying the relevant duration here. For purposes of lost-income damages, the House Officer Contract

---

[8] *See also J.O. Hooker & Sons*, 683 So. 2d at 405 ("The jury's awarding of Roberts' direct expenses in partially performing the contract in addition to lost profits was entirely proper . . ."); *Lovett v. E.L. Garner, Inc.*, 511 So. 2d 1346, 1353 (Miss. 1987) ("may recover for loss of future profits in a breach of contract action as long as such profits are proved with reasonable certainty").

should not have been considered a mere one-year deal. It instead should have been considered as lasting through the *five year* period that all parties expected contracts of this type to last.

Evidence of that key fact—that the House Officer Contract was expected to last for a full five years—was overwhelming. Trial testimony repeatedly confirmed that everyone expected Dr. Papin's House Officer Contract to last not just one year, but five. ROA.5407 ROA.5683; ROA.5685; ROA.5686.

The testimony from Dr. Papin was crystal clear, showing his expectation that the House Officer Contract's expected duration was "five years":

```
Q.   When you matched with UMMC, you matched as a categorical
resident; is that true?
A.   That's true.
Q.   And the expectation is -- as a categorical resident is
that you will be at the university for five years?
A.   That's right.
```

ROA.5686; *see also* ROA.5683. Everyone at UMMC agreed. One coworker stated that Dr. Papin would be there "for the next five years" again, ROA.5685, and again, ROA.5686. Another agreed that "the idea is that you're there for the full five years." ROA.5407. "Categorical residents" like Dr. Papin were hired to stay "five years."

ROA.5430. Dr. Earl himself confirmed this expectation. He testified that he wanted

Dr. Papin to "finish out five years' worth of residency." ROA.6095.

This evidence accords with the existing precedent regarding contracts for

medical residencies. On issues of duration, medical resident contracts are similar to

the continuous contracts given to tenure and tenure-track professors. *See Wilson v.*

*Clark Atlanta Univ., Inc.*, 794 S.E.2d 422, 426 (Ga. Ct. App. 2016). Renewal is the

norm—what all expect. *See id.*; *Perry v. Sindermann*, 408 U.S. 593, 602 (1972)

("there may be an unwritten 'common law' in a particular university that certain

employees shall have the equivalent of tenure").

For all these reasons, the district court was wrong to rule that Dr. Papin could

not recover lost-income damages beyond year one of the House Officer Contract. Dr.

Papin's evidence proved conclusively that his future lost income was foreseeable (or

at least raised a material question of fact for the jury to resolve). Either way, the

district court was wrong to limit the duration of the lost income damages at trial.

**B.     The correct remedy is a new trial on this element of damages.**

The remedy for errors of this kind is a new trial on just the matter at issue—

the amount of lost income. "Because the jury's findings on liability were not

compromised, but were based on sufficient evidence and made in accordance with

law, a new trial on the issue of damages alone is proper." *Pagan v. Shoney's, Inc.*, 931

F.2d 334, 340 (5th Cir. 1991) (citing *Hadra v. Herman Blum Consulting Engineers*, 632

F.2d 1242, 1246 (5th Cir. 1980)).  The Fourth Circuit's decision in *Rice* is both correct

about what constitutes a recoverable consequential damage and correct about the

proper remedy.  Its analysis of the remedy question translates cleanly to this case and

should be followed:

> In this case, we believe it clear that the issue of whether [the plaintiff] is entitled to consequential damages for "loss of identifiable professional opportunities" is distinct and separable from questions related to his entitlement to direct breach of contract damages.  Because these two forms of damages not only require distinct elements of proof, but also focus on different time frames, a partial new trial on the consequential damages issue alone will not result in jury confusion and uncertainty.

*Rice*, 203 F.3d at 290 (citations omitted).  "This is such a case." *Id.*  Accordingly, the

new trial that Dr. Papin requests regarding this issue should be "limited solely to the

issue of consequential damages." *Id.*

## III.    Alternatively, the Court should order a new trial on liability that accounts for wrongly excluded liability evidence.

If the Court as to Argument Part I.A upholds liability for the Remediation

Agreement claim, it need not resolve this issue.  But if the Court does *not* uphold the

verdict's findings as to liability for UMMC's breach of the Remediation Agreement,

the Court should order a new trial on the House Officer Contract claim because of a

decisive evidentiary error.

During trial, the district court refused to let Dr. Papin admit proof about the specific experiences of comparable residents—namely, UMMC residents who had experienced allegations of misconduct and/or deficient performance like Dr. Papin, *none of whom had been fired*. *See* ROA.5213-5222, 5392-95. The district excluded that evidence based on (1) relevance, and (2) Rule 403 concerns for "confusion." *See* ROA.5213-14. Because both objections lacked merit, the district court erred in excluding this proof.

Admissibility rulings are generally reviewed for abuse of discretion. *See, e.g.*, *Guzman v. Jones*, 804 F.3d 707, 710 (5th Cir. 2015). But to the extent that "the question of admissibility first involves a legal determination, this [C]ourt begins by reviewing the underlying legal analysis de novo." *Id.*

## A.    The evidence was highly relevant.

When Dr. Papin sought to prove comparable residents' specific experiences, UMMC's main objection was lack of relevance. ROA.5214 ("that evidence is really irrelevant"). The district court took that bait and made relevance its primary basis for exclusion. ROA.5213-5222, 5392-95. But the relevance objection did not justify the decision below. Dr. Papin met that objection with two arguments demonstrating the proof's high relevance, *see* ROA.2922-23, and both were valid.

### 1.    The excluded evidence proved the meaning of "malfeasance, inefficiency, or contumacious conduct."

First, Dr. Papin sought to admit the proof about comparable residents' specific experiences as extrinsic evidence of the House Officer Contract's correct meaning. ROA.4762-63; ROA.5215-16.    The provision at issue concerned termination, allowing UMMC to fire residents only if their conduct amounted to "malfeasance, inefficiency, or contumacious conduct":

> IV.    Both parties further agree that:
>
> 1. In accordance with the Mississippi Constitution (Article B, Section 213-A), UMMC is empowered to terminate this contract at any time for malfeasance, inefficiency or contumacious conduct by Physician.

ROA.6448.

The phrase "malfeasance, inefficiency, or contumacious conduct" is not clear. It is ambiguous.    Neither the House Officer Contract nor any other governing document defines those terms.  ROA.5383-84.  Indeed, as trial testimony showed, even longtime UMMC staff had no idea what the terms meant.  ROA.5287.

Because of this ambiguity in the House Officer Contract's key provision, Mississippi law allowed extrinsic evidence to inform its meaning. *See, e.g.*, *McFarland v. McFarland*, 105 So. 3d 1111, 1119 (Miss. 2013) ("if the contract's meaning remains ambiguous, the Court will consider extrinsic evidence"); *Epperson v. SOUTHBank*, 93 So. 3d 10, 17 (Miss. 2012) (same)

Dr. Papin's proof about comparable residents' specific experiences would have provided compelling extrinsic evidence of the meaning of these critical terms. ROA.4762-63; ROA.5215-16.   By showing what comparable residents had done without warranting termination, this evidence would have proven with granularity exactly where the contractual "malfeasance, inefficiency, or contumacious conduct" threshold was—or at least where it *wasn't*.   The proof about comparable residents' specific experiences was therefore highly relevant to prove the contract's meaning. *See*, *e.g.*, *Beaty v. Kansas Athletics, Inc.*, No. CV 19-2137-KHV, 2020 WL 1862563, at *1 (D. Kan. Apr. 14, 2020) ("Given the claims and defenses in this case, it is not farfetched to believe a reasonable jury might find Beaty's conduct did not constitute a true default of his employment contract because defendant did not consider similar actions by other coaches a default.").   The district court's decision to deem this evidence irrelevant was therefore wrong as a matter of law.

### 2.     The excluded evidence proved that UMMC fabricated its given reason for firing Dr. Papin.

Second, Dr. Papin sought to prove comparable residents' specific experiences as evidence that UMMC fabricated its given reason for Dr. Papin's firing.  ROA.4764-66; ROA.5215-16.   With UMMC saying that complaints about Dr. Papin had motivated its termination decision, Dr. Papin sought to disprove that explanation by showing that UMMC had not taken these complaints seriously—*i.e.*, that they were

not the real reason for firing him. *Id.* Dr. Papin had already shown that UMMC did *not* seriously investigate the complaints against him, but he also needed to show that UMMC *did* seriously investigate complaints that it *did* care about. *Id.* The proof about comparable residents' specific experiences would have served that purpose. *Id.* For example, in another case UMMC investigated analogous wrongdoing by "Resident 76" much more seriously than in Dr. Papin's case. *Id.* By comparison, UMMC's lack of investigation into Dr. Papin's complaints would have shown that these complaints could not have been UMMC's true motivation for the firing. *Id.*

The proffered evidence was therefore relevant to the dispute about whether UMMC's given reason for Dr. Papin's termination was fabricated. *See Humphries v. CBOCS W., Inc.*, 474 F.3d 387, 401 (7th Cir. 2007) (lack of investigation proves that reasons for termination are a fabrication). The district court's decision to deem this evidence irrelevant was wrong as a matter of law.

### B.    Confusion concerns did not warrant exclusion.

The district court's other basis for excluding this evidence was a "confusion" rationale rooted in Rule 403, *see* ROA.5214 ("that evidence is . . . barred by Rule 403"), which allows the exclusion of evidence if its "probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing

the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403. That rationale is wrong for several reasons.

First, the district court's Rule 403 confusion rationale was infected with its antecedent matter-of-law errors about relevance. The district court conducted its Rule 403 balancing on the erroneous premise that the evidence in question had *zero* relevance. *See* ROA.5219-21; ROA.5392. Because the evidence was highly relevant, the court's legal error infected its Rule 403 balancing decision, rendering it erroneous as a matter of law.

Second, the district court's Rule 403 "confusion" rationale was backwards. The district court's confusion concern was that the jury should not be distracted from its real task by an inquiry into the details of residents' specific experiences. But far from being a distraction, an inquiry into the details of residents' specific experiences was the inquiry's whole point. A granular comparison of Dr. Papin's situation and that of analogous residents was a feature of this inquiry—not a bug.

This sort of proof is commonplace in employment discrimination trials and other contexts where the fact-finder must discern whether a defendant was motivated by unlawful animus. One way to prove that is with evidence that the stated reason for action was a pretext, which allows a jury to infer that the real reason was unlawful. Indeed, *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 143

(2000), arises from precisely this doctrine.  There, as here, the district court "misconceived the evidentiary burden borne by plaintiffs who attempt to prove intentional discrimination through indirect evidence." *Id*. at 146.

If it were allowed to stand, the district court's "confusion" rationale would mean that any evidence offered to show pretext could be excluded under Rule 403—circumventing the core holding of *Reeves*.  Obviously, that would prove too much. "In appropriate circumstances, the trier of fact can reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose." *Id*.at 147.  This proposition is not limited to employment discrimination. "Such an inference is consistent with the general principle of evidence law that the factfinder is entitled to consider a party's dishonesty about a material fact as 'affirmative evidence of guilt.'" *Id*. (citation omitted).  This is such a case, and the district court erred by excluding classic proof of pretext under Rule 403.

On this record, therefore, confusion concerns did not justify excluding proof about residents' specific experiences; that evidence was central to the case regarding the House Officer Contract.  And the decision to exclude this evidence kneecapped Dr. Papin in a critical fashion.  Both of the issues in question were hotly contested, and both played a key role in the jury's answer to Question 1 – the only question that Dr. Papin did not secure a successful finding on.

Indeed, the jury demonstrated a need for this very evidence in the note asking "What is the meaning of contumacious conduct?" ROA.6385. They likewise expressed a need for more proof by reporting being "deadlocked" on that question. ROA.6389. The proof Dr. Papin tried to admit—more granular evidence about the House Officer Contract's breach question—would not have confused the jury at all. It would have supplied precisely the kind of highly relevant evidence the jury needed to make a decision it was clearly torn about, and in the words of *Reeves*, it would have given the jury a proper foundation "to consider a party's dishonesty about a material fact as 'affirmative evidence of guilt.'" *Reeves*, 530 U.S. at 147.

For these reasons, if it reaches this alternative issue, the Court should hold that the district court committed harmful error in excluding the proof about residents' specific experiences and order a new trial on Dr. Papin's breach of contract action regarding the House Officer Contract.

## Conclusion

The Court should reverse and render a judgment on the verdict for Dr. Papin's claim that UMMC breached the Remediation Agreement, including the full amounts of punitive and emotional damages, and order a new trial as to the issue of lost-income damages.  Alternatively, if the Court does *not* uphold liability for UMMC's breach of the Remediation Agreement, the Court should order a new trial for the claim regarding the House Officer Contract.

<table>
<tr><td></td><td>Respectfully submitted,</td></tr>
<tr><td>C. Ryan Morgan</td><td>/s/ Chad Flores</td></tr>
<tr><td>Gregory R. Schmitz</td><td>Chad Flores</td></tr>
<tr><td>Jolie N. Pavlos</td><td>cf@chadfloreslaw.com</td></tr>
<tr><td>Morgan & Morgan P.A.</td><td>Flores Law PLLC</td></tr>
<tr><td>20 N. Orange Avenue, 15th  Floor</td><td>917 Franklin Street, Suite 600</td></tr>
<tr><td>Orlando, FL 32801-0000</td><td>Houston, Texas 77002</td></tr>
<tr><td>(407) 204-2170</td><td>(713) 893-9440</td></tr>
<tr><td></td><td></td></tr>
<tr><td></td><td>Russell S. Post</td></tr>
<tr><td></td><td>Beck Redden LLP</td></tr>
<tr><td></td><td>1221 McKinney Street, Suite 4500</td></tr>
<tr><td></td><td>Houston, TX 77010</td></tr>
<tr><td></td><td>(713) 951-6292</td></tr>
</table>

## Certificate of Compliance

This filing complies with the type-volume limitation of Federal Rule of Appellate Procedure 32 because it contains 12,992 not-exempted words.

This filing complies with the typeface and typestyle requirements of Federal Rule of Appellate Procedure 32 and Fifth Circuit Rule 32 because it has been prepared in a proportionally spaced typeface in 14-point font using Microsoft Word for Mac Version 16.74.

/s/ Chad Flores
Chad Flores