NO. 23-60316

_____

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

_____

JOSEPH PAPIN

*Plaintiff – Appellant / Cross – Appellee*

v.

UNIVERSITY OF MISSISSIPPI MEDICAL CENTER

*Defendant – Appellee / Cross – Appellant*

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
CIVIL ACTION NO. 3:17-CV-00763-KHJ-FKB

_____

**BRIEF OF APPELLEE/CROSS-APPELLANT**

_____

Paul B. Watkins, Jr. (MB No. 102348)
J. Andrew Mauldin (MB No. 104227)
Mayo Mallette PLLC
2094 Old Taylor Road, Suite 200
Oxford, Mississippi 38655
Telephone:  (662) 236-0055
Facsimile:  (662) 236-0035
pwatkins@mayomallette.com
dmauldin@mayomallette.com

NO. 23-60316

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

JOSEPH PAPIN                    Plaintiff – Appellant / Cross – Appellee

v.

UNIVERSITY OF MISSISSIPPI
MEDICAL CENTER                  Defendant – Appellee / Cross – Appellant

## CERTIFICATE OF INTERESTED PERSONS

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

University of Mississippi          Defendant – Appellee / Cross – Appellant
Medical Center

Mayo Mallette PLLC                 Attorneys for Defendant – Appellee
                                   and Cross – Appellant

Paul B. Watkins, Jr.
J. Andrew Mauldin
J. Cal Mayo, Jr.

Whitfield Law Group PLLC
Thomas E. Whitfield
John T. Kitchens

Watkins & Eager PLLC
Katherine K. Smith

Butler Snow LLP
Robert V. Greenlee

Joseph Papin                          Plaintiff – Appellant / Cross – Appellee

Morgan & Morgan, PA                   Attorneys for Plaintiff – Appellant
C. Ryan Morgan                        and Cross – Appellee
Gregory R. Schmitz
Jolie N. Pavlos
Martin Jelliffe
John A. Waits

Flores Law PLLC
Chad Flores
Beck Redden LLP
Russell S. Post

Joel F. Dillard, PA
Joel F. Dillard

Judge Kristi H. Johnson               U.S. District Judge for the Southern District
                                      of Mississippi

SO CERTIFIED, this the 19th day of October 2023.


                                      */s/ Paul B. Watkins, Jr.*
                                      Paul B. Watkins, Jr.
                                      Attorney for Appellee and Cross – Appellant

## STATEMENT REGARDING ORAL ARGUMENT

Oral argument is not necessary in this case. While the parties have preserved numerous issues for review following a relatively lengthy trial, the outcome turns on a single legal issue arising from a simple state law breach of contract claim.

# **TABLE OF CONTENTS**

Certificate of Interested Persons ................................................................. i

Statement Regarding Oral Argument .................................................... iii

Table of Contents ................................................................................. iv

Table of Authorities .............................................................................. vi

Statement of the Issues .......................................................................... 1

Statement of the Case ............................................................................ 2

    A.  Statement of Relevant Facts ...................................................... 2

    B.  Procedural History .................................................................... 5

Summary of the Argument ..................................................................... 8

Argument ............................................................................................. 11

    1.  The remediation letter was not an enforceable contract ........... 11

        a.  Dr. Earl lacked authority to enter a contract on behalf of UMMC ...... 11

        b.  The remediation letter lacked essential terms of a contract ............... 19

    2.  Papin may not collect punitive damages against UMMC ......... 24

        a.  Punitive damages are not available against the State .......... 24

        b.  The proof did not support an award of punitive damages ............. 29

    3.  Papin offered insufficient proof for emotional distress damages ............. 31

    4.  The jury's award of emotional distress damages was excessive ............... 34

    5.  The District Court did not err in excluding future lost income damages .. 36

6.  The District Court did not err in excluding irrelevant evidence about other residents ................................................................................................42

Cross Appeal ..................................................................................................45

1.  The District Court erred in admitting certain evidence ...........................46

2.  The District Court incorrectly instructed the jury.....................................51

Conclusion .......................................................................................................54

Certificate of Compliance ...........................................................................55

# TABLE OF AUTHORITIES

**CASES:**

*Alexander v. Taylor*, 928 So. 2d 992 (Miss. Ct. App. 2006) ..................................27

*Alkhawaldeh v. Dow Chemical Company*, 851 F.3d 422 (5th Cir. 2017) ..............44

*Bailey v. Daniel*, 967 F.2d 178 (5th Cir. 1992) ......................................................45

*Bird v. PSC Holdings I, LLC*, 2013 WL 12108106 (S.D. Cal. Apr. 5, 2013) .........44

*Black v. Ansah*, 876 So. 2d 395 (Miss. Ct. App. 2003) ..........................................25

*Board of Trustees of State Institutions of Higher Learning v. Peoples Bank of Mississippi*, 538 So. 2d 361 (Miss. 1989)....................................................11, 13, 52

*Bruner v. University of Southern Mississippi*, 501 So. 2d 1113 (Miss. 1987) ..11, 12

*City of Jackson v. Estate of Stewart ex rel. Womack*, 908 So. 2d 703 (Miss. 2005) ....................................................................................................................................25

*City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247 (1981) .................................26

*DiBonaventura v. Consolidated Rail Corp.*, 539 A.2d 865 (Pa. 1988)...................22

*Empiregas, Inc. of Kosciusko v. Bain*, 599 So. 2d 971 (Miss. 1992) .....................21

*Eselin-Bullock & Associates Ins. Agency, Inc. v. National General Ins. Co.*, 604 So. 2d 236 (Miss. 1992)...........................................................................................27

*F.W. Woolworth Co. v. Miscellaneous Warehousemen's Union, Local No. 781*, 629 F.2d 1204 (7th Cir. 1980) ........................................................................................43

*Finkelburg v. Luckett*, 608 So. 2d 1214 (Miss. 1992) .......................................25, 29

*Green v. Administrators of Tulane Educational Fund*, 284 F.3d 642 (5th Cir. 2002) ....................................................................................................................................11

*Green v. Faurecia Automotive Seating, Inc.*, 2012 WL 2367698 (N.D. Miss. June 21, 2012) ........................................................................................................21

*Gutierrez v. Excel Corp.,* 106 F.3d 683 (5th Cir. 1997) ..........................................45

*Harrison v. Walker*, 91 So. 3d 41 (Miss. Ct. App. 2011) ..................................37, 38

*Harstad v. Whiteman*, 338 S.W.3d 804 (Ky. Ct. App. 2011) ..................................44

*Hoffman v. Board of Trustees, East Mississippi Junior College*, 567 So. 2d 838 (Miss. 1990) ..........................................................................................................42

*Humana, Inc. v. Fairchild*, 603 S.W.2d 918 (Ky. Ct. App. 1980) ..........................45

*Idom v. Natchez-Adams School Dist.*, 115 F. Supp. 3d 792 (S.D. Miss. 2015) ......28

*Jones v. Mississippi Institutions of Higher Learning*, 264 So. 3d 9 (Miss. Ct. App. 2018) ........................................................................................................27

*Kelley, LLC v. Corinth Public Utilities Com'n*, 200 So. 3d 1107 (Miss. Ct. App. 2016) ........................................................................................................28

*Kincaid v. Wells Fargo Securities LLC*, 2012 WL 13186918 (N.D. Okla. May 1, 2012) ........................................................................................................44

*Laverson v. Macon Bibb County Hosp. Authority*, 487 S.E.2d 621 (Ga. Ct. App. 1997) ........................................................................................................22

*MEDS, Inc. v. Mississippi Dept. of Employment Sec.*, 130 So. 3d 148 (Miss. Ct. App. 2014)......................................................................................................19

*Moore v. University Mississippi Medical Center*, 719 Fed. Appx. 381 (5th Cir. 2018) ........................................................................................................12

*Morris Newspaper Corp. v. Allen*, 932 So. 2d 810 (Miss. Ct. App. 2005) .............53

*Morrison v. Means*, 680 So. 2d 803 (Miss. 1996) ..................................................33

*Morrison v. Nana Worleyparsons, LLC*, 314 P.3d 508 (Ak. 2013)........................22

*Newsome v. People Bancshares*, 269 So. 3d 19 (Miss. 2018)................................11

*Oprenchak v. American Family Mut. Ins. Co.*, 2013 WL 5918807 (D. Minn. Nov. 4, 2013) ................................................................................................................22

*Parsons v. Walters*, 297 So. 3d 250 (Miss. 2020) ...................................................35

*Pasco v. Knoblauch*, 566 F.3d 572 (5th Cir. 2009) .....................................11, 25, 31

*Perry v. Sindermann*, 408 U.S. 593 (1972) ............................................................41

*Pierce v. Office Depot, Inc.*, 2014 WL 6473630 (D.S.C. Nov. 18, 2014)..............22

*Rath v. Gallup, Inc.*, 1999 WL 1059758 (Neb. Ct. App. Nov. 2, 1999).................43

*Redgrave v. Boston Symphony Orchestra, Inc.*, 855 F.2d 888 (1st Cir. 1988) .......39

*Rice v. Community Health Ass'n*, 203 F.3d 283 (4th Cir. 2000) ............................38

*SED Holdings, LLC v. TM Property Solutions, LLC*, 6 F.4th 595 (5th Cir. 2021) .51

*Simpson v. Holmes County Bd. of Educ.*, 2 So. 3d 799 (Miss. Ct. App. 2009).......43

*Southwest Mississippi Regional Medical Center v. Lawrence*, 684 So. 2d 1257 (Miss. 1996) ........................................................................................................26

*Springer v. Ausbern Construction Co., Inc.*, 231 So. 3d 980 (Miss. 2017).......27, 28

*Stewart v. Gulf Guar. Life Ins. Co.*, 846 So. 2d 192 (Miss. 2002) ....................35, 36

*Strickland v. Rossini*, 589 So. 2d 1268 (Miss. 1991)...............................................33

*Swartzfager v. Saul*, 213 So. 3d 55 (Miss. 2017) ...................................................53

*Thompson v. First American Nat. Bank*, 19 So. 3d 784 (Miss. Ct. App. 2009)......19

*U.S. v. Daniels*, 281 F.3d 168 (5th Cir. 2002) .......................................................52

*U.S. v. Jackson*, 636 F.3d 687 (5th Cir. 2011).......................................................37

*U.S. v. Towns*, 718 F.3d 404 (5th Cir. 2013) ...............................................37, 42, 45

*University of Southern Mississippi v. Williams*, 891 So. 2d 160 (Miss. 2004) .31, 32

*Wallace v. Texas Tech University,* 80 F.3d 1042 (5th Cir. 1996) ..........................45

*Ward v. Tranzact Payment Services, Inc.*, 2002 WL 31426660 (N.D. Ill. 2002)....22

*Weible v. University of Southern Mississippi*, 89 So. 3d 51 (Miss. Ct. App. 2011)....
...................................................................................................................................12

*Weinhoffer v. Davie Shoring, Incorporated*, 23 F.4th 579 (5th Cir. 2021) .......46, 47

*Whiting v. University of Southern Mississippi*, 62 So. 3d 907 (Miss. 2011)...........28

*Williams v. Hargrove*, No. 2018 WL 310043 (S.D. Miss. Jan. 5, 2018).................28

*Wilson v. Clark Atlanta University, Inc.*, 794 S.E.2d 422 (Ga. Ct. App. 2016)......40

**STATUTES:**

MISS. CODE ANN. § 11-1-60.....................................................................................36

MISS. CODE ANN. § 11-46-3......................................................................................25

MISS. CODE ANN. § 11-46-15..............................................................................25, 29

MISS. CODE ANN. § 37-101-15.................................................................................13

**RULES:**

FED. R. CIV. P. 50 ....................................................................................................11

# STATEMENT OF THE ISSUES

1. Whether a remediation plan signed only by a medical resident and his supervisor was a valid and binding contract that amended the resident's written employment contract with a public hospital and guaranteed him continued employment.

2. Whether Mississippi law allows punitive damages against an arm of the State for a breach of contract claim.

3. Whether the proof at trial was legally sufficient to support an award of emotional distress damages for a breach of contract claim.

4. Whether the District Court erred in excluding evidence of Papin's future lost wages, including purported wages he attributed to his future career as a surgeon.

5. Whether the District Court erred in excluding proof related to the performance of other "comparator" residents in a breach of contract claim.

6. Whether the District Court erred in failing to exclude evidence from an electronic "audit trail" about which no witness had direct knowledge.

7. Whether the District Court erred in failing to exclude evidence about Papin's educational expenses and student loan balance for education received before and after his employment at UMMC.

8. Whether the District Court incorrectly instructed the jury.

# STATEMENT OF THE CASE

## A.    Statement of Relevant Facts

After he finished medical school, Dr. Joseph Papin applied for a slot in the competitive general surgery residency program (the "Program") at the University of Mississippi Medical Center in 2016. ROA.5651. Dr. Mark Earl, the director of the Program, was responsible for selecting a few dozen applicants for interviews out of 500 or 600 residency applications and ultimately submitting a list of preferred applicants to the National Resident Matching Program. ROA.6060-68. Papin "matched" into UMMC's Program along with four other categorical residents. ROA.5651; 7014.

Before his July 1 start date, Papin signed a "House Officer Contract" that spelled out his salary ($47,738.00), the term of his employment (one year), and his responsibilities (to "fulfill the educational requirements of the program" and "use best efforts to provide safe and effective patient care"). ROA.6447-48. UMMC also reserved the right to terminate the Contract "at any time for malfeasance, inefficiency, or contumacious conduct by Physician." *Id.* While the Program takes five years to complete, residents are employed by virtue of a series of one-year contracts. ROA.6448. Reappointment for subsequent years is not guaranteed; rather, it is based on evaluation of residents' performance. *Id*. The House Officer Contract was signed by UMMC's Vice Chancellor for Health Affairs, its highest-

ranking official, "for the Board of Trustees, Institutions of Higher Learning,"

UMMC's Associate Dean for Graduate Medical Education, and Papin. *Id*. Papin

had no other employment contract with UMMC.

UMMC's Faculty and Staff Handbook, which applied to Papin and all other

UMMC employees, provided that UMMC "reserves the right to discipline,

suspend, or terminate an employee for cause." ROA.6737. While the Handbook

provided that employees "should be counseled" about deficiencies, it also provided

that "serious misconduct or problems in performance could result in disciplinary

action, including termination, without prior counseling." *Id.* Some examples of

misconduct that could warrant discipline were "inefficiency, negligence in the

performance of duty or lack of attention to work; incompetence, inefficiency, or

conduct detrimental to patient care or general safety; [and] refusal to perform

duties as required by supervisors, insubordination, neglect of or inattention to

duty." ROA.6737-38.

Dr. Earl received complaints from UMMC staff members about Papin's

attitude and performance from his very first month. ROA.6071-74. Dr. Earl

received numerous reports, in person and through emails, that Papin was

disrespectful to non-physician co-workers and was not interested in performing

tasks he viewed as beneath him. ROA.6075-80. Papin also received an unusually

high number of negative written evaluations. ROA.6076-77.

Dr. Earl counseled Papin repeatedly about these deficiencies and later told him he needed to show improvement during the 2016-2017 holiday season, when the hospital would be short-staffed. ROA.6074-77; 80-82; 84-85; 89-90; 93-95. However, Dr. Earl continued to receive complaints about Papin during the holiday season. ROA.6100-08; 7473-78. Most troubling to Dr. Earl, though, was a statement from Dr. Megan Mahoney, a senior resident, that Papin had lied to her about having examined a paralyzed patient's skin for developing wounds. Dr. Mahoney told Dr. Earl she had instructed Papin to check the patient, that Papin had told her the patient had no wounds, and that the patient had in fact developed a significant decubitus ulcer that required multiple surgeries. ROA.6110-6115; 7480.

Dr. Earl drafted a formal remediation plan for Papin on January 10, 2017. The remediation plan outlined Papin's performance and behavior issues, noted that no improvement had been made after the prior meetings and that "most concerning, we may have serious issues with truthfulness." ROA.6641-42. The plan stated Papin was "now on formal remediation and ha[d] 60 days from today January 10, 2017, to show significant improvement in the areas and competency domains mentioned above." *Id.* The document further noted that "[m]any of the above behaviors are serious threats to patient safety and therefore grounds for immediate action." *Id.* Papin and Dr. Earl signed the document. *Id.*

Dr. Earl then spoke to Dr. Richard Barr, UMMC's designated institutional official for all its residency programs, about his concerns. When Dr. Earl told Dr. Barr he had concerns about patient safety, Dr. Barr told him to pull Papin from duty immediately and refer the matter to Human Resources as a professionalism issue rather than an academic issue. ROA.6118; 7483. After meeting with Papin and giving him an opportunity to respond to the issues Dr. Earl had raised, an HR representative recommended termination. ROA.7487; 7534.

After his termination, Papin requested and was given an appeal hearing before an independent panel of physicians. The panel unanimously decided to uphold the termination, and the Vice Chancellor agreed. ROA.7507-10.

## B.   **Procedural History**

Papin filed this suit alleging numerous causes of action, all of which were withdrawn or dismissed except his breach of contract claim arising under Mississippi law. Before trial, the District Court ordered Papin's potential lost income damages for the alleged breach of his House Office Contract were limited to the amount of his salary remaining unpaid at the time of his termination, which the parties stipulated at trial was $14,650.47. ROA.4490-93; 6445.

The District Court tried Papin's breach of contract claim between October 11 and 20, 2022. The parties agreed a primary issue for trial was whether UMMC breached Papin's House Officer Contract when it terminated his employment.

5

Papin also contended the January 2017 remediation letter was an enforceable contract and that UMMC also breached that contract when it terminated his employment.

During trial, the Court allowed Papin to introduce an "audit trail" document consisting of twenty-three pages taken from a computer printout totaling around 3,000 pages. UMMC objected to the introduction of that exhibit because Papin offered no witness who could testify as to the meaning of the data reflected on the document. ROA.5657-62; 6968-90. The Court also allowed Papin to introduce evidence that his student loan balance was more than $600,000 because of medical school expenses incurred before he was employed at UMMC and business school expenses incurred after he was terminated. UMMC also objected to the introduction of that evidence. ROA.5828-31; 6216-17; 6674-90.

After the presentation of Papin's case in chief, UMMC moved for judgment as a matter of law, arguing in pertinent part that the remediation letter was not a valid and binding contract, that punitive damages were not available, and that emotional distress damages were not available. The District Court denied that motion. ROA.6017-6038. UMMC renewed its motion after the close of all proof, and the District Court again denied it. ROA.6277-6294.

The verdict form asked the jury (1) whether Papin had proven UMMC breached the House Officer Contract, (2) whether the 2017 remediation document

was a contract, and (3) if so, whether Papin had proven UMMC breached the remediation document. The jury found Papin had not proven UMMC breached the House Officer Contract, that the remediation document was a contract, and that Papin had proven UMMC breached the remediation document. ROA.5040. The jury awarded Papin past lost earnings in the amount of $14,651, past pain and suffering, mental suffering, or emotional distress in the amount of $600,000, and future pain and suffering, mental suffering, or emotional distress in the amount of $886,000. ROA.5041.

After hearing argument of counsel on the issue, the District Court instructed the jury on punitive damages. ROA.6400-6427. The jury returned a punitive damages verdict of $5,000,000. ROA.5042.

After trial, UMMC timely filed a renewed motion for judgment as a matter of law. ROA.4775. The District Court found the remediation letter was not an enforceable contract and vacated the jury's verdict in in its entirety because "Dr. Earl – by himself – lacked authority to enter a binding contract with Dr. Papin on UMMC's behalf." ROA.4963. The District Court conditionally denied UMMC's Motion for a New Trial. Papin timely appealed, and UMMC cross-appealed.

## SUMMARY OF THE ARGUMENT

The District Court correctly granted UMMC's post-trial Renewed Motion for Judgment as a Matter of Law. The remediation letter signed by Papin and Dr. Earl was not a valid and binding contract and did not amend Papin's House Officer Contract. Dr. Earl had no authority to bind UMMC, a public institution, to such a contract and never intended to do so. No state law or agency policy authorized such a contract, and apparent authority is not sufficient to make the contract enforceable. The remediation letter also lacked new consideration or sufficiently defined terms to be a valid contract. The letter was merely a written performance improvement plan.

The Court need not consider the remaining issues, as the jury's verdict for Papin was based entirely on its finding that the remediation letter was a contract. However, even if the jury's verdict is reinstated as to liability, the Mississippi Tort Claims Act bars awards of punitive damages against arms of the State for wrongful or tortious acts. This immunity extends to claims for tortious breach of contract. Papin cannot escape this bar by styling his claim as an express breach of contract claim because a claim for punitive damages in a breach of contract claim is necessarily a tortious breach of contract claim – both require proof rising to the level of an independent tort. The proof at trial was insufficient to justify any award of punitive damages under that standard.

Papin did not introduce sufficient proof to support the jury's award of emotional distress damages, and that award should be vacated if the jury's verdict is reinstated. Papin relied solely on his own testimony that he had difficulty communicating, a loss of pride, and felt isolated. Under Mississippi law, those generalized statements are insufficient to support an award of emotional distress damages. Moreover, the District Court correctly held the jury's award of emotional distress damages was excessive and out of line with awards in other cases.

The District Court did not abuse its discretion in excluding evidence of Papin's purported future lost wages. Mississippi law is clear that a plaintiff may not recover lost income in a breach of contract case beyond the fixed term of a contract. Papin sought lost income damages for four future years of residency training and decades of employment as a surgeon, which was speculative and not reasonably foreseeable even in the event of a breach.

The District Court did not err in precluding Papin from introducing evidence related to how UMMC treated other residents with performance issues. The issue before the Court was whether UMMC breached a contract with Papin, not how it treated other employees.

The District Court erred when it allowed Papin to introduce evidence from an electronic "audit trail" generated from UMMC's patient management system. No witness had direct knowledge about the exhibit, had seen it before this

litigation began, or could explain what the information in the document meant. The evidence was unduly prejudicial to UMMC because Papin used it to argue repeatedly that a former UMMC employee who was not present at trial had lied in her deposition.

The District Court also erred when it failed to exclude Papin's testimony that he incurred hundreds of thousands of dollars in expenses for his medical school education before his employment at UMMC and his business school education after his employment at UMMC. While the District Court recognized that proof would not be an appropriate element of damages, it allowed the proof as evidence of Papin's emotional distress. The amount of the jury's verdict made clear that it used those amounts in determining damages.

The District Court also erred in instructing the jury. It did not properly instruct the jury about the limited ability of public employees to contract on behalf of their employers. It improperly instructed the jury it could consider punitive damages. Finally, the District Court failed to properly instruct the jury on the proper standards for emotional distress damages.

# ARGUMENT

## 1.    <u>The remediation letter was not an enforceable contract.</u>

This Court reviews *de novo* a district court's grant or denial of a motion for judgment as a matter of law. *Pasco v. Knoblauch*, 566 F.3d 572, 575 (5th Cir. 2009); *Green v. Adm'rs of the Tulane Educ. Fund*, 284 F.3d 642, 653 (5th Cir. 2002). Judgment as a matter of law after the conclusion of a trial is warranted if "a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have had a legally sufficient evidentiary basis to find for the party on that issue[.]" FED. R. CIV. P. 50(a)(1).

### a.    *Dr. Earl lacked authority to enter a contract on behalf of UMMC.*

In Mississippi, a party generally has the legal capacity to contract on behalf of another if it possesses actual, apparent, or implied authority. *See Newsome v. People Bancshares*, 269 So. 3d 19, 28-32 (Miss. 2018). This principle does not apply, however, to public contracts – where an agent lacks actual authority to enter into an agreement on behalf of a public entity, apparent authority is insufficient to create a contract. *See*, *e.g.*, *Bd. of Trustees v. Peoples Bank of Miss*., 538 So. 2d 361, 366 (Miss. 1989) (reversing trial court ruling that UMMC's director of business administration had apparent authority to sign a lease for copiers which had not been approved by UMMC's purchasing department as required by policy); *Bruner v. Univ. of S. Miss.*, 501 So. 2d 1113, 1115 (Miss. 1987) (rejecting

appellant's argument that Mississippi university's head football coach had apparent authority to enter employment contract with an assistant coach).

The primary – and determinative – question in this appeal is whether Dr. Earl had actual authority to bind UMMC to a contract when he signed the remediation letter with Papin. The District Court correctly held that, because Dr. Earl had no such authority, the remediation letter was not a valid and binding contract and could not support the jury's verdict.

"Where a manner of contracting is prescribed with respect to public contracts, the manner is the measure of power and must be followed to create a valid contract." *Weible v. Univ. of S. Miss.*, 89 So. 3d 51, 61 (Miss. Ct. App. 2011) (*citing Bruner*, 501 So. 2d at 1115) (cleaned up). As the District Court observed, when such a particular manner is prescribed, that manner "is the *only* way to create such a contract." *Bruner*, 501 So. 2d at 1115 (*citing American Book Co. v. Vandiver*, 178 So. 598, 600 (1938)) (emphasis in original). Moreover, a person dealing with an agent of a public institution "must know at his peril the extent of the agent's authority to bind his principal." *Bruner*, 501 So. 2d at 1116 (internal quotation omitted).

UMMC is an arm of the State of Mississippi and one of Mississippi's institutions of higher learning under the control of the Board of Trustees of State Institutions of Higher Learning. *See*, *e.g.*, *Moore v. Univ. Miss. Med. Ctr.*, 719 Fed.

App'x 381, 387, n. 4 (5th Cir. 2018); *Bd. of Trs. v. Peoples Bank of Miss., N.A.*, 538 So. 2d 361, 366 (Miss. 1989). Mississippi law requires the IHL Board to "adopt such bylaws and regulations from time to time as it deems expedient for the proper supervision and control of the several institutions of higher learning," gives it "power and authority to elect the heads of the various institutions of higher learning, and to contract with all deans, professors and other members of the teaching staff, and all administrative employees of said institutions," and provides "it shall be the policy of the board to permit the executive head of each institution to nominate for election by the board all subordinate employees of the institution over which he presides." MISS. CODE ANN. § 37-101-15(c), (f).

IHL Policy provides that "[t]he Institutional Executive Officer of each institution, or a designee as evidenced in writing, is authorized to sign all other official documents for and on behalf of the institution for which he or she is responsible." Policies and Bylaws, § 707.02, Miss. Bd. Trs. State Insts. Higher Learning, (last amended July 20, 2023), http://www.mississippi.edu/board/downloads/policiesandbylaws.pdf (cited in *Weible*, 89 So. 3d at 6). Other IHL policies "empower[] the Commissioner and the Institutional Executive Officers of the several institutions to make all appointments and promotions of faculty and staff," except in certain circumstances, and require each IHL institution to "develop, maintain, and follow written employment and/or

hiring procedures for both faculty and staff." Policies and Bylaws, §§ 401.0102; 801.06.

UMMC's Faculty and Staff Handbook likewise provides that "the chancellor of the University of Mississippi and the vice chancellor for health affairs are the only persons authorized to sign contracts, agreements and other documents for and on behalf of the University of Mississippi Medical Center" absent the vice chancellor's written delegation of such authority. ROA.6706. The Handbook further provides that "[r]ecruitment, screening, and hiring of house officers are responsibilities of the training program director (department head) or designee and are subject to approval by the appropriate budget officers and the associate dean for graduate medical education in the School of Medicine."). ROA.6730.

The District Court found it was unclear which of these IHL and UMMC policies applied policies because some of them were not specific to employment relationships. However, it also correctly found it didn't matter which of those policies applied because:

> the creation of the Remediation Agreement complied with neither policy. If Bylaw 707 applied, then the Vice Chancellor for Health Affairs's signature was required. And if Bylaw 801 applied, the Associate Dean for Graduate Medical Education's signature was required. But only Dr. Earl and Dr. Papin signed the Remediation Agreement. Dr. Papin presented no evidence that either the Vice Chancellor or the Associate Dean for Graduate Medical Education delegated their signatory power to Dr. Earl. Accordingly, Dr. Earl – by himself – lacked authority to enter a binding contract with Dr. Papin on UMMC's behalf.

ROA.4975. The House Officer Contract, on the other hand, was signed by *both* the Vice Chancellor for Health Affairs, "for the Board of Trustees, Institutions of Higher Learning," and the Associate Dean for Graduate Medical Education. ROA.6448. The remediation plan contains no indication it was signed under the authority of the vice chancellor or the IHL Board, and Papin presented no proof that such authority existed.

Papin's arguments ignore the controlling authority in favor of an apparent authority argument clearly foreclosed by Mississippi law. He first claims Dr. Earl admitted at trial that he had authority to bind UMMC when he answered affirmatively to the question "you have authority to enter into remediation agreements with residents; correct?" Br., at 30 [Doc. 45] (citing ROA.6153). Papin's counsel did not ask Dr. Earl whether he was authorized to alter the terms and conditions of Papin's employment contract, and he did not distinguish between a binding contract and a mere performance plan. This argument merely assumes the use of the word "agreement" is the beginning and end of the issue. It is not.

Despite conceding that the "applicable" IHL policy requires a *written* delegation of contractual authority by the chancellor or vice chancellor, Br., at 30 [Doc. 45]; ROA.4898-4899, Papin has pointed to no document signed by the chancellor, the vice chancellor, the associate dean for graduate medical education, or any other UMMC official naming Dr. Earl as a contract signatory. He did not

ask Dr. Earl whether such a document existed, and he did not call any other UMMC officials to dispute Dr. Earl's testimony that no such document existed.

To the contrary, Dr. Earl testified without dispute that he had not been delegated authority to sign contracts on Dr. Woodward's behalf and that he did not have the authority to extend an offer of employment, terminate an employee, or otherwise formally alter or amend the terms and conditions of an employee's employment. He further testified he "specifically meant for [the remediation plan] not to be a contract," that he did not believe it was binding on UMMC, and that he was not involved in creating or changing UMMC's contracts. ROA.6068-70; 6117-20; 6167.

Papin argues Dr. Earl's testimony was "accompanied by additional proof detailing the nature of his authority to make the Remediation Agreement on UMMC's behalf." Br., at 30 [Doc. 45]. However, none of this additional proof included a written designation of contracting authority to Dr. Earl. The two additional UMMC policies he cites, the Guidelines for Academic Remediation and the Evaluation Policy and Grievance Algorithm, do not mention contracting authority at all. The former describes the criteria for placing residents on "remediation plans" and suggests activities for inclusion in that plan. ROA.6600-01. The latter provides that a resident with unsatisfactory performance may "be

asked to function in a remedial role" or be placed on a "remedial program" including reading assignments and conference attendance. ROA.6595-96.

Papin next argues that Dr. Barr's "knowing acceptance" of the fact Dr. Earl had created a remediation plan for Papin "is proof of authority." Brf., at 31 [Doc. 45]. A conversation between two of Papin's superiors, neither of whom had contracting authority for UMMC, is not proof that a written delegation of such authority had been granted to Dr. Earl.

Nor does Papin's assertion that UMMC follows the standards of the Accreditation Council for Graduate Medical Education ("ACGME") prove that Dr. Earl had authority to bind UMMC. Papin does not identify a single ACGME policy or guideline that discusses remediation at all, much less one that requires member institutions to delegate binding contract authority to residency directors. He also does not explain how ACGME could bypass applicable IHL or UMMC policies without those institutions' clear intent to allow it. Dr. James Stewart, UMMC's associate dean for graduate medical education and designated institutional officer, testified that nothing in the "ACGME policies or guidelines that prohibits a member institution or a participant institution from carrying out its own human resource policies." ROA.5409. Papin's own expert witness testified that ACGME guidelines do not displace an institution's own employment policies or restrict their ability to terminate residents. ROA.5455-59.

Papin presented no proof that Dr. Earl had "executed other contracts to bind UMMC," Brf., at 32 [Doc. 45], and Dr. Earl testified to the contrary. ROA.6069. Dr. Earl testified he was ultimately responsible for compiling the rank lists that the general surgery residency program sends to the NRMP during the residency application process. ROA.6057-6060. He did not testify that such lists were binding agreements, and Papin did not introduce any other evidence to prove they were. Papin's status as a UMMC employee was secured by his House Officer Contract, not the application procedure itself. Even if Papin had presented proof that Dr. Earl had been delegated authority to bind UMMC in some contract with NRMP, he has produced nothing to show that authority extended to binding "remediation agreements." In fact, Papin did not even raise this argument before the District Court, either at trial or in response to UMMC's Renewed Motion for Judgment as a Matter of Law.

Papin's arguments, and his next assertion that the District Court's "authority analysis was wrong," all conflate a residency program director's authority to create a remediation plan for a trainee with a state employee's authority to bind the State of Mississippi to a contract. There is no dispute program directors can "remediate" underperforming residents. However, no witness (fact or expert) testified such programs of remediation necessarily involve binding agreements limiting the institution's ability to discipline or terminate a resident. Nor does the fact that such

a plan can be reduced to writing and be labeled as an "agreement," as was the case here, establish that the institution was bound to change the terms of a resident's employment contract. *See MEDS, Inc. v. Miss. Dep't of Emp't Sec.*, 130 So. 3d 148, 154 (Miss. Ct. App. 2014) (holding that "the mere identification of a document as a contract in its heading, or its labeling, does not establish the document as an enforceable employment contract").

The District Court correctly found the remediation letter was not a binding agreement because there was no proof Dr. Earl had authority to bind UMMC to any such agreement, and this Court should affirm.

> **b.    *The remediation letter lacked essential terms of a contract.***

Even if Papin had proven Dr. Earl had the authority to bind UMMC to an amended employment agreement, the remediation document lacks the hallmarks of a legally enforceable contract. Under Mississippi law, a valid contract requires: "(1) two or more contracting parties, (2) consideration, (3) an agreement that is sufficiently definite, (4) parties with legal capacity to make a contract, (5) mutual assent, and (6) no legal prohibition precluding contract formation." *MEDS, Inc. v. Miss. Dep't of Empl. Sec.*, 130 So. 3d 148, 154 (Miss. Ct. App. 2014). A contract is unenforceable if the material terms are not sufficiently defined. *Id*. Moreover, when a subsequent agreement modifies a written contract, the "agreement must be supported by new or additional consideration." *Thompson v. First Am. Nat'l Bank*,

19 So. 3d 784, 787 (Miss. Ct. App. 2009). The District Court correctly held the remediation letter was a mere performance improvement plan and lacked independent consideration to constitute a new agreement, and the Court could affirm the judgment below on that alternative basis.

Papin argues the remediation plan is supported by consideration because, in exchange for his promise to develop an improvement plan, meet with the program director to discuss his progress, and receive acceptable evaluations, UMMC promised him sixty days of continued employment and "special opportunities" to meet with other UMMC officials to discuss his improvement. Br., at 36-37 [Doc. 45]. However, he ignores the fact that he was already subject to all the remediation requirements under existing UMMC policy.

UMMC's Guidelines for Academic Remediation provide that remediation is appropriate when there is a "a need for additional efforts to assist residents or fellows in satisfactorily meeting all competency requirements for graduation and/or to be prepared to pass their applicable board examination." ROA.6600. In other words, the purpose of remediation is to ensure current residents competently carry out duties they've already been assigned. The Guidelines suggest certain of the remedial measures that were in Papin's plan, such as a personal study plan and regular meetings with the program director. ROA.6600-01. Dr. Earl did not "bargain" with Papin for anything outside the scope of Papin's existing

employment. Rather, the remediation letter pointed out deficiencies in Papin's performance and instructed him to correct them.

The cases cited in Papin's brief do not support his argument that consideration exists. *See Green v. Faurecia Auto. Seating, Inc.*, No. 2:11-cv-173, 2012 WL 2367698, at *3 (N.D. Miss. June 21, 2012) (holding that employer's continued employment of an at-will employee without a written term of employment was sufficient consideration to support an arbitration agreement); *Empiregas, Inc. of Kosciusko v. Bain*, 599 So. 2d 971, 977 (Miss. 1992) (holding that employer's continued employment of an at-will employee is sufficient consideration to support a non-compete agreement). These cases deal with a *new* promise on the part of the employee – the promise not to compete or the promise to submit employment-related disputes to arbitration – in exchange for continued employment that had not otherwise been promised). Papin cites no case holding that an employer's timeline for an employee's improvement or remediation constitutes consideration for a new, separate employment contract.

Instead, the District Court was correct that the remediation letter was a mere performance improvement plan. Papin has identified no case in which a written performance improvement plan was found to be a contract that bound an employer to continue to employ a deficient worker for a specified period of time. Courts analyzing performance improvement plans have found they are insufficient to

create a contract because they lack the necessary elements for contract formation,

including consideration. *See also Pierce v. Office Depot, Inc*., 2014 WL 6473630,

*9 (D.S.C. Nov. 18, 2014) (finding performance improvement plan insufficiently

definite to create a contract and noting it also lacked separate consideration, in

addition to continued employment, which would be required to create a contract);

*Oprenchak v. American Family Mutual Ins*., 2013 WL 5918807, *4 (D. Minn.

Nov. 4, 2013); *Ward v. Tranzact Pmt. Serv's, Inc*., 2002 WL 3142660, *2 (N.D. Ill.

2002); *Morrison v. Nana Worleyparsons, LLC*, 314 P.3d 508, 511 (Dec. 13, 2013*);*

*DiBonaventura v. Cons. Rail Corp*., 539 A.2d 865, 870 (Pa. 1988).

However, the District Court erred in finding those terms were sufficiently

clear to support a valid contract. It is unclear how the remediation letter could

function as a contract separate and apart from the House Officer Contract. Papin

claims the remediation letter restricted UMMC's ability to terminate him under the

House Officer Contract, but the remediation letter does not mention the House

Officer Contract and is not signed by any of the UMMC officials who signed that

Contract. Papin's attorney even contended at trial that his success on a claimed

breach of the remediation agreement would "also prove[] the breach of the House

Officer Contract." ROA.6033-34. The jury did not find UMMC had breached the

House Officer Contract because of the termination, but it found the same act was a

breach of the remediation plan. In *Laverson v. Macon Bibb County Hospital*

*Authority*, for example, the Court of Appeals of Georgia held that a "letter offer" that had purportedly been accepted by a medical resident was not a valid contract because it did not contain the essential terms of the parties' purported agreement. 487 S.E.2d 621, 623 (Ga. Ct. App. 1997). The hospital there argued that the document was missing "consideration," and that the "amount of compensation [was] an essential element of an employment contract that must be stated with sufficient definiteness." *Id*. Because the purported agreement there did not provide "a definite, enforceable salary term," the medical resident could not establish the existence of a valid contract." *Id*. at 624

The letter did not promise continued employment or a renewed contract, nor did it state that no disciplinary action would be taken if Papin's performance did improve. It did not even promise that disciplinary action would not be taken for his *past* performance issues. What the document *did* do was place Papin on notice that he was not fulfilling the terms of his existing House Officer Contract, which required him to "fulfill the educational requirements of the program" and "use best efforts to provide safe and effective patient care." ROA.6448. The letter talks about deficiencies Papin's performance in the course and scope of his employment as a resident at UMMC. It discusses his rotations in different departments, the complaints that had been received about him, his subpar semi-annual review, and

Dr. Earl's repeated attempts to counsel him. These are all duties that flow from his employment agreement, the House Officer Contract.

The District Court was correct that the remediation letter was not supported by new consideration and that it was a mere performance improvement plan. That finding should be affirmed. However, the District Court was incorrect that the remediation letter contained sufficiently definite terms to constitute a standalone contract. Even if this Court finds Dr. Earl was authorized to bind UMMC to a new contract and that the remediation letter was supported by new consideration, though, it should affirm the District Court's ruling that no valid contract existed on that alternative basis.

## 2.    **Papin may not collect punitive damages against UMMC.**[1]

### a.    *Punitive damages are not available against the State.*

The Mississippi Tort Claims Act expressly precludes punitive damages against the State for alleged tortious acts:

> No judgment against a governmental entity or its employee for any act or omission for which immunity is waived under this chapter shall include an award for exemplary or punitive damages or for interest prior to judgment, or an award of attorney's fees unless attorney's fees are specifically authorized by law.

---

[1] The Court need not consider UMMC's arguments on punitive damages if it affirms the District's Court's holding that the remediation letter was not a valid and binding contract. The District Court couched its rulings on these arguments as conditional "in case the Fifth Circuit vacates or reverses its finding that the Remediation Agreement is not a contract." ROA.4978.

MISS. CODE ANN. § 11-46-15(2). The District Court correctly held the Tort Claims Act barred Papin's claim for punitive damages because that remedy would require proof of tortious conduct even in the context of a breach of contract claim.[2]

A plaintiff cannot recover punitive damages for a breach of contract unless the breach "is attended by intentional wrong, insult, abuse or such gross negligence *as to constitute an independent tort.*" *Finkelburg v. Luckett*, 608 So. 2d 1214, 1220 (Miss. 1992) (emphasis added). The Tort Claims Act applies to suits brought "on account of any wrongful or tortious act." MISS. CODE ANN. § 11-46-3(1). In other words, any breach of contract case against a governmental entity alleging conduct that could otherwise give rise to an award of punitive damages *necessarily* falls within the terms of the Act, which expressly precludes an award of punitive damages. "The clear intent of the legislature in enacting the Tort Claims Act was to immunize the State and its political subdivisions from any tortious conduct, *including tortious breach of contract*." *Black v. Ansah*, 876 So. 2d 395, 397 (Miss. Ct. App. 2003) (*citing City of Grenada v. Whitten Aviation, Inc.*, 755 So. 2d 1208, 1213 (Miss. Ct. App. 1999)), *overruled on other grounds by City of Jackson v. Est. of Stewart ex rel. Womack*, 908 So. 2d 703 (Miss. 2005) (cleaned up) (emphasis added).

---

[2] *De novo* review applies to this question because it arose from UMMC's Motion for Judgment as a Matter of Law. *Pasco*, 566 F.3d at 575.

As the District Court observed, this is consistent with the "widely recognized policy that plaintiffs should not be allowed to recover punitive damages against government entities." ROA.4984. The Mississippi Supreme Court has observed that:

> Punitive damages are to punish a wrong-doer. In the case of a community hospital, or any other governmental entity for that matter, the "punished" is the taxpayer, as it is their funds that pay the damages, or the insurance coverage for such damages. With that in mind, litigants should not be allowed to obtain punitive damages from the public treasury which is filled only by taxpayers.

*SW. Miss. Reg'l Ctr. v. Lawrence* 684 So. 2d 1257, 1267 (Miss. 1996); *accord Newport v. Fact Concerts*, 453 U.S. 247, 267 (1981) ("[I]t remains true that an award of punitive damages against a municipality 'punishes' only the taxpayers, who took no part in the commission of the tort . . . [d]amages awarded for punitive purposes, therefore, are not sensibly assessed against the governmental entity itself."). Mississippi's Legislature and Judiciary are in lockstep on this question – litigants may not collect punitive damages against the State. Papin has not cited, and UMMC has not located, a single case in which a court awarded or affirmed an award of punitive damages against an arm of the State.

Papin argues the Tort Claims Act does not apply to his claim because he styled it as an *express* breach of contract (which does not fall under the Act) rather than a *tortious* breach of contract (which does). As the District Court correctly recognized, though, a plaintiff who seeks punitive damages for a breach of contract

claim must necessarily prove a claim for tortious breach of contract. *Compare Springer v. Ausbern Constr. Co.*, 231 So. 3d 980, 988 (Miss. 2017) ("In order to constitute tortious breach of contract alleged by a plaintiff, 'some intentional wrong, insult, abuse, or negligence so gross as to constitute an independent tort must exist.'") (*citing Wilson v. GMAC*, 883 So. 2d 56, 66 (Miss. 2004)), *with Eselin-Bullock & Assocs. Ins. Agency, Inc. v. Nat'l Gen. Ins. Co.*, 604 So. 2d 236, 241 (Miss. 1992) ("Punitive damages, although not usually recoverable in breach of contract cases, are available when the breach results from 'an intentional wrong, insult, or abuse as well as from such gross negligence as constitutes an independent tort.'") (*citing Blue Cross & Blue Shield v. Maas*, 516 So. 2d 495, 496 (Miss. 1987)). In either case, the plaintiff must prove tortious conduct, which is covered under the Tort Claims Act.

Papin conceded at trial that the Tort Claims Act would bar his claim for punitive damages if he had instead styled it as a tortious breach of contract claim. ROA.6409. ("If we had styled this as an intentional tort and styled this as a tort, it wouldn't have passed the motion to dismiss stage."). However, courts "look to the substance of the claim, not its label" when determining whether the Tort Claims Act applies. *Jones v. IHL*, 264 So. 3d 9, 27 (Miss. Ct. App. 2018). *See also Alexander v. Taylor*, 928 So.2d 992, 995 (Miss. Ct. App. 2006) ("Efforts to re-label tort suits as something else in order to avoid some part of the [MTCA] are

ineffective."); *Kelley, LLC v. Corinth Pub. Utilities Comm'n*, 200 So. 3d 1107, 1118 (Miss. Ct. App. 2016) (holding that plaintiff pursuing a breach of contract claim against a public entity "can assert a negligence claim under the MTCA, but he cannot avoid the MTCA simply by renaming that claim").

Papin argues that, "if the claim is for breach of a contract's express obligations, the MTCA does not cover it regardless of whether or not the breach is tortious." Brf., at 44 [Doc. 45]. The Mississippi Supreme Court has rejected this argument. *See Whiting v. Univ. of S. Miss.*, 62 So. 3d 907, 916 (Miss. 2011) ("We have interpreted the phrase 'any wrongful or tortious act or omission or breach of implied term or condition of any warranty or contract' to mean that the MTCA covers both tortious breaches of contract and breaches of implied terms and warranties of a contract.") (*citing City of Jackson v. Estate of Stewart*, 908 So. 2d 703, 710 (Miss. 2005)), *overruled in part on other grounds by Springer v. Ausbern Constr. Co.*, 231 So. 3d 980, 982 (Miss. 2017)). Federal courts in Mississippi have acknowledged the same. *See Williams v. Hargrove*, No. 1:16-CV-266-KS-MTP, 2018 WL 310043, at *4 (S.D. Miss. Jan. 5, 2018) ("In interpreting § 11-46-3(1), the Mississippi Supreme Court has held that it provides immunity for tortious breaches of contract.") (*citing Springer*, 231 So. 3d at 986); *Idom v. Natchez-Adams Sch. Dist.*, 115 F. Supp. 3d 792, 806 (S.D. Miss. 2015) (finding that "the MTCA covers both tortious breach of contract and breaches of implied terms and

warranties of a contract") (*quoting Whiting*, 62 So. 3d at 916). The Tort Claims Act covers claims for tortious breach of contract.

Dr. Papin's claim for punitive damages was barred by the Mississippi Tort Claims Act because such a claim necessarily requires proof of tortious conduct, and the Tort Claims Act covers tortious breach of contract claims. The District Court correctly held the award was improper, and that holding should be affirmed.[3]

### b.    *The proof did not support an award of punitive damages.*

Even if an award of punitive damages against the State was permissible under Mississippi law, Papin did not present sufficient proof to support such an award.[4] Punitive damages may only be awarded in a breach of contract action where the breach "is attended by intentional wrong, insult, abuse or such gross negligence *as to constitute an independent tort*." *Finkelburg v. Luckett*, 608 So. 2d 1214, 1220 (Miss. 1992) (emphasis added). "As a general rule, punitive damages are not ordinarily recoverable" in such an action, "and there must enter into the injuries some element of aggression or some coloring of insult, malice, or gross negligence, evincing ruthless disregard for the rights of others, so as to take the

---

[3] At the very least, the jury's award of punitive damages should be reduced to the Tort Claims Act's cap of $500,000 for tort damages against governmental entities. MISS. CODE ANN. § 11-46-15(1)(c). Because the jury's award of damages was tantamount to a finding of "wrongful" conduct, the Tort Claims Act cap should apply and Papin's damages should be reduced.

[4] UMMC raised this argument in its post-trial motion, but the District Court declined to consider it because it had already held punitive damages awards were not allowable under State law. ROA.4985.

case out of the ordinary rule." *Id*. (internal citations omitted). "[T]here is no right to an award of punitive damages and such damages are to be awarded only in extreme cases." *Id*.

Plaintiff presented no proof that UMMC terminated his employment with any intent to harm him or for any reason other than the legitimate reasons articulated by Dr. Earl. ROA.6379. (Papin Closing Argument) ("I wish we knew the motivation."). Dr. Earl contacted the HR department with information about Papin's misbehavior not because he wanted to harm Papin, but rather because he was concerned about patient safety and Dr. Barr told him it was an available course of action. ROA.6118-19. Dr. Earl did not anticipate he would be breaching a contract with Papin because he did not even think he had entered a contract with Papin. ROA.6119-20; 6177. No reasonable jury could have found that UMMC's conduct in terminating his employment after issuing the remediation plan rose to the level of warranting punitive damages. Even if the Court finds an award of such damages was permissible against UMMC, it should affirm the District Court's award of judgment as a matter of law to UMMC on this issue.

3.    <u>**Papin offered insufficient proof for emotional distress damages**</u>.[5]

The District Court erred in holding that Papin had presented legally sufficient evidence to support an award of emotional distress damages. *De novo* review applies to this question because it arose from UMMC's Motion for Judgment as a Matter of Law. *Pasco*, 566 F.3d at 575.

In Mississippi, a plaintiff seeking emotional distress damages in a breach of contract action must show:

> (1) that mental anguish was a foreseeable consequence of the particular breach of contract, and (2) that he or she actually suffered mental anguish. Such generalizations as "it made me feel bad," or "it upset me" are not sufficient. A plaintiff must show specific suffering during a specific time frame.

*Univ. of S. Miss. v. Williams*, 891 So. 2d 160, 173 (Miss. 2004). Papin did not offer proof of either element.

First, Papin cannot show the emotional distress for which he sought recovery was a foreseeable consequence of the particular breach he alleged. The jury did not find UMMC breached the House Officer Contract, Papin's actual employment contract. The only consideration Papin alleges he received from the remediation letter was an additional sixty days to improve his documented poor performance. Even assuming the remediation plan was a binding contract, nothing required Dr.

---

[5] Again, the Court need not consider this argument if it affirms the District Court's holding that the remediation letter was not a valid and binding contract.

Earl to conclude Papin had successfully completed the plan requirements after sixty days. Nothing required UMMC to continue to employ Papin after that sixty-day period. Nothing required UMMC to offer Papin a new contract after his first year. Nothing required UMMC to continue to renew his contract or graduate him from the program.

The "permanent" emotional distress Papin claims he suffered was not the result of UMMC failing to give him a full sixty-day remediation period. Papin would have needed to successfully complete a residency training program to become an independent physician. It is speculative to assume he would have done so if UMMC had given him an additional sixty days to improve, or even the full one-year term of his House Officer Contract. Even in *Williams*, where the plaintiff alleged she was prevented from obtaining a doctorate after prolonged sexual harassment and assaults by a professor, the Court found the award of damages was speculative. 891 So. 2d at 176 ("The law limits speculation and conjecture and imposes duties of mitigation to the injured party.").[6]

This is particularly true with respect to the "reputational" component of Papin's claimed damages. Br., at 47 [Doc. 45]. Papin claims "news of his

---

[6] The facts in *Williams* were extreme, and the Mississippi Supreme Court cautioned that "the decision of this Court reached in this case very fact specific and thus narrowly written and *should not be construed as giving approval to the application of contract theory to circumvent the protection afforded our universities and the employees thereof by the Mississippi Tort Claims Act*." *Id.* (emphasis added).

residency's termination became widely available on the internet." *Id*. at 8.
However, the only online document he cited to the District Court in support of that
assertion was the District Court's summary judgment order in this case.
ROA.4896. Papin had the right to file a lawsuit, but emotional distress due to a
court order published four and a half years after Papin's termination cannot be a
"foreseeable consequence" of UMMC's conduct.

  Papin also failed to demonstrate he actually suffered emotional distress. He
testified generally as to difficulty communicating with family, a period of seeing a
therapist, losses of "pride and accomplishment," and isolation because of fears
people would find his court pleadings on the internet. ROA.5824; 5832-34. These
are classic "'it made me feel bad' or 'it upset me'" generalizations for which no
recovery is permitted. *See Morrison v. Means*, 680 So. 2d 805, 807 (Miss. 1996)
(finding insufficient proof of emotional distress where the plaintiff testified that a
breach of contract "affected [him] emotionally in that [he was] not . . . able to sleep
many nights because [he] felt like [he had] been done wrong . . . [and] cheated out
of money that [he] need[ed] to help support [his] family"); *Strickland v. Rossini*,
589 So. 2d 1275-76 (Miss. 1991) (holding that plaintiff's testimony that he had
been "very depressed," "very upset," "emotional," and "not able to sleep" was
insufficient to support emotional distress damages).

Papin's emotional distress claim was based solely on his own testimony, which consisted only of broad generalizations. He offered no additional testimony from friends or family members, nor did he provide testimony from his therapist or any other mental health professional. Neither Papin's termination nor his alleged emotional distress prevented him from gaining acceptance to or completing another postgraduate degree program or from obtaining and maintaining gainful employment. The District Court erred in finding that he presented sufficient proof to support a claim of emotional distress. In the event the Court reverses the District Court on the breach of contract question, it should also reverse its ruling on the jury's award of emotional distress damages and vacate that award.

4.    **The jury's award of emotional distress damages was excessive.**[7]

The jury's award of more than $1.5 million in emotional distress damages was clearly excessive. Defendant's survey of relevant case law has not located a single case from the Fifth Circuit or Mississippi's appellate courts upholding such a large award of emotional distress damages based on the type of proof Papin presented. The jury's verdict far exceeds any affirmed award of such damages. ROA.4834-36.

---

[7] Papin is correct that, the District Court found the jury's award of emotional distress damages was excessive, it has not yet set a remittitur for his consideration or received briefing from the parties on that issue. UMMC addresses this issue out of an abundance of caution.

In *Parsons v. Walters*, 297 So. 3d 250 (Miss. 2020), the plaintiffs sued their former attorney, who had fabricated a settlement offer without telling them their case had already been dismissed. The plaintiffs testified they experienced anger, stress, self-diagnosed depression, an unspecified number of sleepless nights. After the jury returned an award of $2,850,002 for fraud and emotional distress, the trial court remitted the verdict to $1,134,666.67 and attributed $365,000 to emotional distress. *Id*. at 256. The Mississippi Supreme Court reviewed other cases considering emotional damage awards and found the damages were excessive and unsupported by the record. *Id*. at 263. The court noted "[i]t appears clear that the initial jury verdict was punitive in nature" and that "compensatory damages should be awarded only up to an amount that will compensate the plaintiffs for the injuries they sustained and should not be increased based on the nature of a defendant's conduct." *Id*.

The District Court noted that the highest award to which Papin cited was *Stewart v. Gulf Guar. Life Ins. Co.*, 846 So. 2d 192 (Miss. 2002), in which a jury awarded $500,000 in emotional distress damages to a plaintiff in a claim against an insurance company that denied his disability claim. ROA.4991. In *Stewart*, the plaintiff testified about severe emotional and economic distress caused by the wrongful denial of coverage. This evidence was supported by testimony from his wife and his treating physician, who testified he had developed stress-induced

obsessive-compulsive disorder. 846 So. 2d at 199-200. The District Court noted that *Stewart* was distinguishable both because the plaintiff in that case presented expert medical testimony and because the amount of damages awarded in that case was significantly less than the jury's award here – even though it would translate into more than $860,000 today. ROA.4991-92.

The jury's award of compensatory damages in this case was wildly disproportional to the "harm" Papin claims to have suffered, and, as the Mississippi Supreme Court concluded in *Parsons*, the jury's intent was to punish UMMC. The Court should affirm the District Court's holding that the award of emotional distress damages in this case was clearly excessive.[8]

**5.    The District Court did not err in excluding future lost income damages.**

The District Court correctly precluded Papin from seeking damages for loss of future income beyond the duration of his House Office Contract because "Mississippi law restricts recoverable income damages at the one-year duration of the Contract." ROA.4493. In fact, the jury did not even find UMMC breached Papin's one-year contract. The only time period mentioned in the remediation letter was a sixty-day improvement period.

---

[8] At the very least, the jury's award of emotional distress damages must be reduced to comply with Mississippi's $1 million statutory cap on noneconomic damages. *See* MISS. CODE ANN. § 11-1-60(2)(b).

This Court reviews a district court's evidentiary rulings for abuse of discretion, subject to harmless error review. *U.S. v. Towns*, 718 F.3d 404, 407 (5th Cir. 2013). "A trial court abuses its discretion when its ruling is based on an erroneous view of the law or a clearly erroneous assessment of the evidence." *U.S. v. Jackson*, 636 F.3d 687, 692 (5th Cir. 2011).

In *Harrison v. Walker*, the plaintiff was under a one-year contract with no right of renewal. 91 So. 3d 41, 47 (Miss. Ct. App. 2011). At trial, the plaintiff "put on evidence of his estimated lost income over a ten-year period." *Id*. However, the trial court instructed the jury that "[a] party injured by a breach of contract does not have the right to be placed in a better position than he would have occupied had the contract been performed" and that, "[e]ven if you decide to award damages to Mr. Harrison for breach of that contract, you are instructed that any such damages are limited by the one-year term of the contract." *Id*. at 46-47. The Court of Appeals held this instruction was "an accurate statement of the law." *Id*. at 47. He cites no Mississippi case to the contrary.

The District Court did not, as Papin intimates, hold that plaintiffs in breach of contract cases may not seek consequential damages. Rather, its much narrower holding was that loss of income claims for fixed term employment contracts are limited to the duration of the contract. ROA.4493. Consequential damages are available in such cases, as the *Harrison* Court noted. There, the court held the jury

instructions properly "gave the jury the opportunity to consider consequential

damages, such as the loss of Harrison's home, his chicken houses, and his forty

acres of land …." *Harrison*, 91 So. 3d at 47. Papin conflates consequential

damages with loss of income that could have accrued outside the contractual

period. Mississippi law allows recovery of the former, but not the latter.

While *Harrison* is the controlling authority, the other out-of-circuit cases

Papin cites do not help his argument. In *Rice v. Cmty. Health Ass'n*, 203 F.3d 283,

287 (4th Cir. 2000), the Fourth Circuit held that an emergency room physician

whose employment contract had been breached could *not* recover consequential

damages for lost professional opportunities because he did not allege or prove he

had suffered "identifiable professional opportunities" that would have been

available to him absent the breach. *Id*. at 289. Instead, he had offered "expert

testimony of two doctors who opined generally that an emergency room physician

who was fired for sexual harassment or whose previous employer refused to

comment on his qualifications would experience substantial difficulty obtaining a

full-time position." *Id*.

The Fourth Circuit held that testimony "did nothing more than highlight the

potential problems" the doctor could face in finding future employment." *Id*.

(internal citation omitted) (cleaned up). Such damages were "simply too

speculative and the contracting parties cannot reasonably be presumed to have anticipated such damages at the time they entered into a contract." *Id*.

The plaintiff in *Redgrave v. Boston Symphony Orchestra, Inc.*, 855 F.2d 888 (1st Cir. 1988), did not fare much better. There, Vanessa Redgrave was awarded $100,000 in consequential damages after a jury found the Boston Symphony Orchestra wrongfully terminated a contract with her because of her support for the Palestine Liberation Organization. *Id*. at 890. Redgrave had testified the BSO's breach caused her to lose "a significant number of movie and theater offers that she would ordinarily have received." *Id*. at 892. The First Circuit noted she could recover consequential damages if the breach proximately caused "identifiable professional opportunities" under Massachusetts law, but it ultimately reduced that award to $12,000, the fee she would have earned for performing in a single show. *Id*. at 894; 900.

That Court held the only evidence of such an identifiable loss was the testimony of a single Broadway producer who testified he "would not hire [Redgrave] because of all the events that had happened, the cancellation by the Boston Symphony and the effects that we felt it would have on us by hiring her." *Id*. at 899. While Redgrave testified the BSO breach had led to a drop in the quality of the films she was offered and a drop in the number of offers to perform on Broadway, the First Circuit found she did not provide proof that the decline in film

offers and loss of Broadway offers was caused by the BSO cancellation. *Id*. Even if

Papin had cited a similar rule of law for Mississippi, his proof was similarly

deficient.

An award of lost income for "decades" of practice as a general surgeon – as

Papin seeks – would be necessarily speculative and could not take into account any

other factor that could affect the degree to which he would succeed in that field.

Brf., at 51 [Doc. 45]. First, as noted above, nothing entitled Papin to complete a

five-year residency at UMMC, or even a contract for a second year, much less

"decades of successful medical practice." *Id*. at 51.[9] Even assuming its validity, the

"contract" at issue was for a "term" of only sixty days. He also cites no proof in the

record of an identifiable professional opportunity he lost; rather, he quotes his

counsel's argument in response to UMMC's motion *in limine*. Brf., at 51 [Doc. 45]

(citing ROA.1135-36).

Papin is incorrect that a residency contract is akin to the contracts received

by tenured academic professors, and he cites no authority to support his assertion.

The Georgia case he cites deals with academic tenure at a private Georgia college,

*Wilson v. Clark Atlanta Univ., Inc.*, 794 S.E.2d 422, 425 (Ga. Ct. App. 2016), and

the Supreme Court dicta he cites merely suggests that a college or university may

---

[9] Papin originally sought to introduce expert testimony that he would have suffered between $12.4 million and $14.9 million in diminished earning capacity over a "33.2 year expected working life." ROA.4286. That expert did not testify at trial.

have a de facto system of tenure for its academic faculty. *Perry v. Sindermann*, 408 U.S. 593, 602 (1972). There is no proof in the record that Papin or any other UMMC resident had an entitlement to tenure of any kind. The District Court correctly excluded proof of Papin's alleged lost income past the term of his one-year contract, and the Court should affirm.

Papin also argues the proper remedy for the District Court's alleged error is to leave the jury's award of damages intact (to the extent the Court may reinstate components of that award) and allow him a new trial on the issue of lost future wages alone. Even if the Court finds the District Court should have allowed the jury to consider evidence of the wages Papin allegedly lost over the course of his desired career as a surgeon, it should not order a new trial on that issue alone.

Papin offers no argument as to why the issue of consequential damages is so "distinct and separable" from all other questions of liability and damages in this case so as to justify a new trial on that issue only, except to say, "this is such a case." He also sought damages for emotional distress, and his own description of those damages is inextricably tied to his desire to work as a surgeon in the future. *See* Brf., at 23 ("Deprived of real emotional fulfillment, Dr. Papin is now relegated to a professional life that will always be lacking."). If the jury's award of emotional distress damages stands in any form, it would be inequitable to allow him a second bite at the apple via a new trial on consequential damages only.

6.     **The District Court did not err in excluding irrelevant evidence about other residents.**

The District Court did not err in excluding proof about other UMMC residents.[10] The question for the jury was whether UMMC had cause to terminate Dr. Papin's contract, not whether UMMC had cause to terminate the contracts of other residents. The Mississippi Supreme Court addressed a similar issue in *Hoffman v. Board of Trustees of East Mississippi Junior College*, where the college eventually terminated an employee for cause despite similar past conduct. *Hoffman v. Bd. of Trustees, East Miss. Jun. Coll.*, 567 So.2d 838, 842 (Miss. 1990). On appeal, the employee argued that the college did not have cause to terminate him because it had previously allowed such conduct.

The Mississippi Supreme Court rejected that argument, finding that "[t]he fact that a school district tolerates sub-standard performance under circumstances such as these hardly constitutes a waiver of the district's prerogative to rely on just cause when it exists and terminate an employment contract." *Id*. The proper question instead was "whether [the professor] [was] in substantial breach of material features of his contract, not how long this [had] been so, nor whether his employer [had] failed to act upon similar past deficiencies." *Id*.

---

[10] Abuse of discretion review applies to the District Court's evidentiary rulings. *U.S. v. Towns*, 718 F.3d at 407.

In *Simpson v. Holmes County Board of Education*, the Mississippi Court of Appeals applied that same reasoning to the termination of a superintendent who was terminated after he had been given a contract extension for events that occurred prior to the contract extension. *Simpson v. Holmes Cnty. Bd. of Educ.*, 2 So. 3d 799, 804 (Miss. Ct. App. 2009). Again, the court focused its analysis on whether there was just cause to terminate the employment contract, not peripheral events unrelated to that central issue. *Id*.

These rulings are consistent with other courts regarding arguments of comparison in the context of breach of employment actions. The Seventh Circuit has held in a breach of contract dispute that the sole question is "whether 'just cause' existed for the action of the company in firing the appealing employees.'" *F.W. Woolworth Co. v Misc. Warehousemen's Union*, 629 F.2d 1204, 1218 (7th Cir. 1980). Another state court held, "[a]s a general proposition, 'good cause exists only where a discharge is objectively reasonable.'" *Rath v. Gallup, Inc*., No. A-97-325, 1999 WL 1059758, *39 (Neb. Ct. App. Nov. 2, 1999) (*quoting* 30 C.J.S., § 60 at 104)). "An employer may elect to take advantage of the breach of an employment contract by an employee and discharge the employee for the breach, or the employer may choose to ignore the breach or take advantage of it in another fashion, but that action should not bind the employer to treat other employees in the same fashion for similar conduct." *Id*.

Accordingly, how the employer has treated other employees is generally

irrelevant and inadmissible in the context of a breach of contract action.[11] *Id.*

(noting that the plaintiff was unable to cite any breach of contract cases that

"admit[ted] the treatment of other employees as relevant to the issue of good cause

for discharge under a contract" and that there were "so many reasons that it is

clearly impractical to allow a comparison of the treatment of different employees,

absent an alleged violation of discrimination laws."); *see also Kincaid v. Wells*

*Fargo Secs.*, LLC, No. 10-CV-808, 2012 WL 13186918, *2 (N.D. Okla. May 1,

2012) (finding discovery related to other employees irrelevant under Rule 26

because "Plaintiff's breach of contract action [was] based on Plaintiff's allegations

that he was not fired for 'cause' as that term is defined in Plaintiff's [contract] . . .

These allegations rise or fall on the specific details of [Plaintiff's] case, not those

of other employees."); *Bird v. PSC Holdings I, LLC*, No. 12-CV-1528, 2013 WL

12108106, *12 (S.D. Cal. Apr. 5, 2013) ("It is not apparent how the terms of other

contracts bear on whether Defendants breached Plaintiff's contract or what events

might have taken place before her contract was signed."); *Harstad v. Whiteman*,

338 S.W.3d 804, 816 (Ky. Ct. App. 2011) (affirming trial court's decision to

---

[11] Here, Plaintiff initially pursued a Title VII claim in addition to several others. Comparator evidence could have been relevant for purposes of that claim. *See, e.g., Alkhawaldeh v. Dow Chem. Co.*, 851 F.3d 422, 426 (5th Cir. 2017) (holding that Title VII claimant must "identify at least one coworker outside of his protected class who was treated more favorably under nearly identical circumstances"). Papin is no longer pursuing his Title VII claim.

exclude evidence related to other employees and noting "we conclude, as we have before in another employment contract breach case, that "[e]vidence relating to other contracts would have been irrelevant and confusing.""); *Humana, Inc. v. Fairchild*, 603 S.W.2d 918, 921 (Ky. Ct. App. 1980) ("Evidence relating to other contracts would have been irrelevant and confusing.").

The District Court was correct that the comparator evidence Plaintiff sought to introduce at trial was irrelevant and potentially confusing to the jury. It did not abuse its discretion in excluding that evidence, and the Court should affirm its conditional ruling on this question.

## CROSS APPEAL

While the District Court reached the right result when it granted UMMC's Renewed Motion for Judgment as a Matter of Law, **UMMC cross-appealed to preserve the Motion for a New Trial it pursued alternatively. If the Court reverses the District Court on the Motion for Judgment as a Matter of Law, UMMC is entitled to a new trial.** A district court's ruling on a Rule 59 motion for new trial is reviewed for an abuse of discretion. *Gutierrez v. Excel Corp.,* 106 F.3d 683, 687 (5th Cir. 1997); *see also Wallace v. Texas Tech. Univ.,* 80 F.3d 1042, 1052 (5th Cir. 1996). *Bailey v. Daniel*, 967 F.2d 178, 179-80 (5th Cir. 1992). Abuse of discretion review applies to the District Court's evidentiary rulings. *U.S. v. Towns*, 718 F.3d at 407.

1.     **The District Court erred in admitting certain evidence**

The District Court abused its discretion at trial in allowing Papin to introduce certain evidence. If the Court finds the District Court was incorrect in vacating the verdict, it should order a new trial rather than reinstating the verdict.

   a.     *The District Court erred in admitting an unauthenticated and prejudicial "audit trail"*

The District Court allowed Papin to introduce an "audit trail" document that was compiled by Papin's counsel and about which no witness could testify. This document, designated at trial as Plaintiff's Exhibit 40, consisted of twenty-three pages taken by Papin's attorney from a 3,000-page record. ROA.5657-62; 6968-90. Papin's counsel used the document to argue that certain deposition testimony of Dr. Megan Mahoney, a senior resident who reported Papin's failure to complete assigned tasks and other misconduct, was not truthful. Specifically, Papin argued the audit log showed Dr. Mahoney had accessed the chart of the ulcer patient when she testified in her deposition she had instead relied on Papin's reports to her about the patient's condition. ROA.6316-17.

As this Court recently held in *Weinhoffer v. Davie Shoring, Inc.*, the "standard for authentication is low," but the party offering an exhibit "must produce evidence sufficient to support a finding that the item is what the proponent claims it to be. Where a website or electronic source is concerned, testimony by a witness with direct knowledge of the source, stating that the exhibit fairly and fully

reproduces it, may be enough to authenticate." 23 F.4th 579, 582 (5th Cir. 2021) (quotations omitted). Further, "a qualified witness must testify as to an exhibit's ability to qualify as a business record." *Id*. In *Weinhoffer*, the sponsoring witness had no real familiarity with the website at issue, required assistance to navigate to the appropriate section of the website, and the record had been maintained by another party. The Court therefore found that the sponsoring witness was not a qualified witness to sponsor the document as a business record.

Papin unsuccessfully sought to have the document admitted at trial through Elizabeth Toony, UMMC's former director of clinical risk management. Ms. Toony testified that she knew what an audit trail was, she had seen audit trails generated by the computer charting system UMMC used during Papin's employment, and that P-40 was similar to other audit trail documents she had seen in the past. ROA.5344-45. She was also familiar with the types of information typically found in an audit trail and was able to identify certain categories of information on P-40. *Id.* However, the District Court correctly sustained UMMC's objection to the document's admission then because Ms. Toony was not familiar with the specific document at issue and had no independent knowledge about it. *Id*. at ROA.5346-50.

However, during Papin's own testimony the next day, the District Court allowed P-40 to be introduced into evidence based on his testimony that he had

been shown an "example" of an audit trail during his orientation at UMMC.

ROA.5655-62. Like Ms. Toony, Papin had not seen P-40 (or the larger document

from which it was taken) before filing his lawsuit. ROA.5959. Papin was able to

identify some of the document's contents by simply reading it, but he had received

no specialized training and did not review audit trails as a part of his employment

at UMMC. ROA.5960-62. In fact, the sum and substance of Papin's knowledge

about audit trails was his claim he had seen a *single* example of a *single* page from

an audit trail on a *single* PowerPoint slide during a larger presentation during his

orientation in 2016. ROA.5963-64. Papin ultimately admitted he did not

understand the data reflected on the document:

> Q.    And I'm asking you what do these columns mean? What are we
>       supposed to glean that is going on here from this last column?
>
> **A.    It's like reading a map without a legend. I would need to
>       have, like, the Epic system in front of me to be able to tell
>       you where that is and what that means. *There's not a person
>       on Earth who be able to tell you what note 381219767 means.***

ROA.5962 (emphasis added).

Even if the document did have some probative value, any such value was

substantially outweighed by the unfair prejudice of Papin insisting Dr. Mahoney

was a liar without any meaningful evidence about what the information in the

document meant. Papin and his counsel repeatedly argued Dr. Mahoney had been

dishonest – notwithstanding the fact that she was an out-of-state witness who

testified through deposition designations and they did not ask her about the audit

trail during her deposition:

> I think the fact is, though - - that we can prove is that 73 is greater
> than zero. So the only one of us that lied, seems to me, is Meghan
> Mahoney.

ROA.5993.

> Joe says he did it. Megan Mahoney says he did not tell her. What do
> the records say? Where's more hard proof? The audit trail Exhibit 40.
> Why is this so important? Obviously it's a record that was produced in
> this case it's part of the several thousand page audit trail for this
> patient this record here pulls out the mentions where Megan
> Mahoney's name is pulled into the system, count it up, check my
> math, it's over 70 times it's in there. Remember she was the one in her
> testimony who said I don't really check records. It's an odd statement
> for a doctor to make, but she said it. Go through there and add them
> up by day. Here's what you'll see. December 17th, 8 entries;
> December 12, a Monday, turnover Monday, 17 entries; December
> 15th, 13 entries; December 16th, which is the Kutcher day, he's
> personally examining, 14 entries; December 20th, six entries. The hard
> proof. I know you haven't seen it all yet, but it goes on for pages and
> pages. Check my math, please.

ROA.6316-17. Papin's statement that "73 is greater than zero" shows how

prejudicial this document was to UMMC. Neither Papin nor any other witness

could explain what any of the entries containing Dr. Mahoney's name represented.

He never even published more than the first page of the document to the jury.

Papin's catchphrase had no evidentiary value. The net effect of Papin's incomplete

testimony about the audit trail document and Dr. Mahoney's absence at trial was

undue prejudice to UMMC.

In denying UMMC's Motion for a New Trial on this issue, the District Court found that Papin "testified about the contents of the document in detail" and that the "audit trail made it less probable that Dr. Mahoney's testimony about her interactions with the ulcer patient and Dr. Papin were credible." ROA.4987. These findings were clearly erroneous, and the error was not harmless.

b.    *The District Court should not have admitted evidence of Papin's educational expenses*

The District Court also erred when it allowed Papin to introduce evidence related to his tuition and student loan balances for two graduate degrees. Papin completed medical school at the University of Michigan before he worked at UMMC. Tr. Vol. 3 at 603:14-16. After he left UMMC, he obtained a graduate business degree. ROA.5820-21. Papin testified that each of these degrees cost him around $200,000 and that his student loan balance was more than $600,000. ROA.5828-31. The Court correctly noted that these amounts were not recoverable as economic damages but allowed Papin to discuss them as a component of his claim for emotional distress damages. ROA.6216-17. This ruling was in error, and it was unduly prejudicial to UMMC.

Papin presented no proof UMMC ever agreed to reimburse him for any educational expenses. He made the decision to attend medical school and incur related expenses before he ever thought about working at UMMC. Papin did not choose to attend business school until after he left UMMC. UMMC had no control

over where Papin chose to attend graduate school or how much he was willing to spend for those degrees. Moreover, Papin made no attempt to connect these amounts to his emotional distress. He did not testify that he experienced anxiety about his student loans or that they caused any type of hardship in his life – only that they existed. ROA.5820-21. This testimony was irrelevant to his claim for emotional distress damages.

Papin's discussion of his educational expenses prejudiced UMMC by presenting the jury with a potential quantum of damages to which he was not entitled. Indeed, the jury's award of $600,000 in damages for "past" pain and suffering correlates directly with Papin's testimony about his outstanding student loan debt. ROA.5041. This evidence was irrelevant, and its admission served only to prejudice UMMC. The error was not harmless. UMMC is entitled to a new trial.

## 2.     The District Court incorrectly instructed the jury.

In the event the Court reverses the District Court's ruling on UMMC's Motion for Judgment as a Matter of Law, UMMC is also entitled to a new trial because the District Court incorrectly instructed the jury in a manner that affected the outcome of the case. In evaluating challenges to jury instructions, this Court considers whether the trial court "correctly and adequately instructed the jury as to the law to be followed in deciding the issues." *SED Holdings, LLC v. TM Prop. Sols., LLC*, 6 F.4th 595, 610 (5th Cir. 2021) (cleaned up). The party challenging

the instruction "must demonstrate that the charge as a whole creates substantial and

ineradicable doubt whether the jury has been properly guided in its deliberations."

*Id*.; *see also United States v. Daniels*, 281 F.3d 168, 183 (5th Cir. 2002) (asking

whether the charge "is a correct statement of the law and whether it clearly

instructs jurors as to the principles of law applicable to the factual issues

confronting them.").

> First, the Court instructed the jury as follows:

> But the parties disagree whether the January 10, 2017 remediation
> document is a contract under Mississippi law. Accordingly, during
> your deliberations, you first must decide whether the January 10, 2017
> remediation document is a contract. If you decide it is, you will then
> decide whether UMMC breached that contract.

ROA.4787. As discussed above, the question of whether the remediation

document was a contract should have been decided as a matter of law. Even

if the existence of a contract was an issue of fact, though, the charge did not

inform the jury that the creation of a contract with a public entity requires an

agent with actual authority to contract on behalf of the entity. *See*, *e.g.*,

*Peoples Bank of Miss*., 538 So. 2d at 365 ("In respect to public contracts

'where a particular manner of contracting is prescribed, the manner is the

measure of power and must be followed to create a valid contract.'"). These

errors clearly affected the outcome of the case, as the jury's entire award of

damages was based on its findings that the remediation document was a contract and that UMMC breached it. ROA.5040.

Second, as discussed above, the District Court also erred when it instructed the jury it could consider whether punitive damages should be awarded. ROA.4797.

Third, the District Court erred when it instructed the jury on emotional distress damages. ROA.4791. This instruction was erroneous because, as discussed above, Papin did not provide substantial proof of compensable emotional distress. However, even if the instruction was not improper as a whole, the jury should have been instructed that emotional distress damages requires a showing of "specific suffering during a specific time frame", that "generalizations are not sufficient," and that testimony that "it made me feel bad" or "it upset me" cannot support an award of emotional distress damages, and that such damages must have been foreseeable to the defendant for the alleged breach of contract. *Swartzfager v. Saul*, 213 So.3d 55, 67 (Miss. 2017); *Morris*, 932 So. at 818. UMMC is entitled to a new trial.

## CONCLUSION

The jury rejected Papin's claim that UMMC breached his employment contract. The District Court correctly recognized that the verdict, which was based entirely on a non-binding performance improvement plan, had to be vacated in its

entirety. The damages awarded by the jury were also disallowed and/or excessive under Mississippi law, and the District Court's evidentiary errors unfairly prejudiced UMMC before the jury. This Court should affirm the Judgment of the District Court.

THIS, the 19th day of October 2023.

Respectfully submitted,

UNIVERSITY OF MISSISSIPPI MEDICAL CENTER

*/s/ Paul B. Watkins, Jr.*
PAUL B. WATKINS, JR. (MB NO. 102348)
J. ANDREW MAULDIN (MB NO. 104227)
*Attorneys for Appellee and Cross-Appellant*

OF COUNSEL:

Mayo Mallette PLLC
2094 Old Taylor Road, Suite 200
Oxford, Mississippi 38655
Telephone: (662) 236-0055
Facsimile: (662) 236-0035
pwatkins@mayomallette.com
dmauldin@mayomallette.com

## <u>CERTIFICATE OF COMPLIANCE</u>

This brief complies with the type-volume limitation of FED. R. APP. P. 28.1(e)(2)(B)(i) because this brief contains 12,835 words, excluding the parts of the brief exempted by FED. R. APP. P. 32(f), according to the word count of the word processing system used to prepare the document.  This brief complies with the typeface requirements of FED. R. APP. R. 32(a)(5) and the type style requirements of FED. R. APP. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word for Mac, version 16.78 in Times New Roman font 14-point type face, except for footnotes, which were prepared in Times New Roman 12-point type face.

*/s/ Paul B. Watkins, Jr.*
PAUL B. WATKINS, JR.