No. 23-60316

---

In the United States Court of Appeals for the Fifth Circuit

---

Joseph Papin,

Plaintiff—Appellant,

v.

University of Mississippi Medical Center,

Defendant—Appellee.

---

Appeal from the United States District Court for the
Southern District of Mississippi; No. 3:17-CV-763

---

**Reply Brief of Appellant
and Brief of Cross-Appellee**

---

C. Ryan Morgan
Gregory R. Schmitz
Jolie N. Pavlos
Morgan & Morgan P.A.
20 N. Orange Avenue
15th Floor
Orlando, FL 32801-0000
(407) 204-2170

Chad Flores
Flores Law PLLC
917 Franklin Street, Suite 600
Houston, Texas 77002
(713) 364-6640

Russell S. Post
Beck Redden LLP
1221 McKinney Street, Suite 4500
Houston, TX 77010
(713) 951-6292

## Table of Contents

Table of Contents..................................................................................i

Table of Authorities ........................................................................ iv

Summary of the Argument.............................................................. 1

Argument ......................................................................................... 4

I.    The Court should render a judgment on the verdict for Dr. Papin's
      claim that UMMC breached the Remediation Agreement, including
      the verdict's full amounts of punitive and emotional damages...................... 4

      A.    The Remediation Agreement was a contract. ...................... 4

            1.    Dr. Earl had authority to make the Remediation
                  Agreement. ................................................................ 4

                  i.    Dr. Earl's own testimony sufficed. ................................ 5

                  ii.   UMMC never answers the expert evidence.................... 7

                  iii.  Indirect and circumstantial proof suffices....................... 8

                  iv.   The applicable regulations were met. .............................11

            2.    The backup ruling about consideration was wrong. .................13

            3.    The terms were definite.........................................................16

      B.    Punitive damages are available...........................................17

      C.    The verdict's emotional distress damages should be upheld. ............ 22

            1.    UMMC's cross appeal is meritless. ........................................ 22

            2.    The excessiveness issue is premature. ...................................... 25

            3.    UMMC forfeited footnote 8's statutory cap issue. .................. 26

II.   The Court should reverse the decision to limit Dr. Papin's lost-income damages to year one alone and order a new trial on that issue. ..................... 27

    A.   All foreseeable damages are recoverable. ........................................... 27

    B.   The correct remedy is a new trial on all damages. .............................. 29

III.  Alternatively, the Court should order a new trial on liability that accounts for the wrongly excluded liability evidence about comparable residents. ................................................................................................... 30

    A.   The evidence of comparable residents was highly relevant. ................ 31

        1.   The excluded evidence proved the meaning of "malfeasance, inefficiency, or contumacious conduct." ........... 31

        2.   The excluded evidence proved that UMMC fabricated its given reason for firing Dr. Papin. ............................................. 34

    B.   Confusion concerns did not warrant exclusion. .................................. 35

IV.   UMMC's other cross-appeal challenges are meritless. ............................... 36

    A.   The cross appeal about audit trail admissibility is meritless. .............. 36

        1.   UMMC's authentication complaint is wrong. ......................... 37

        2.   The Rule 403 complaint is wrong. .......................................... 42

    B.   The cross appeal about educational expense evidence admissibility is meritless. ....................................................................... 44

        1.   UMMC failed to object. ............................................................ 44

        2.   The relevance objection was meritless. .................................... 46

        3.   The Rule 403 objection was meritless. .................................... 47

        4.   Proper jury instructions cured any error. ................................ 47

    C.   The issues about charge error are meritless. ...................................... 48

      1.     Actual authority. ........................................................ 48

      2.     Punitive damages ...................................................... 50

      3.     Emotional distress. ................................................... 50

Conclusion ............................................................................ 52

Certificate of Compliance ........................................................ 53

# Table of Authorities

## Cases

*Arbuckle Mountain Ranch of Tex., Inc. v. Chesapeake Energy Corp.*,
    810 F.3d 335 (5th Cir. 2016) ............................................................ 26

*Beaty v. Kansas Athletics, Inc.*, No. CV 19-2137-KHV,
    2020 WL 1862563 (D. Kan. Apr. 14, 2020)................................... 33

*Bird v. PSC Holdings I, LLC*, No. 12-CV-1528 W (NLS),
    2013 WL 12108106 (S.D. Cal. Apr. 5, 2013)................................. 33

*Board of Trustees of State Institutions of Higher Learning v. Peoples Bank of Miss.*,
    538 So.2d 361 (Miss. 1989) (en banc) ..................................... 6, 7, 10

*Black v. Ansah*,
    876 So. 2d 395 (Miss. Ct. App. 2003) ........................................... 21

*Bridas S.A.P.I.C. v. Gov't of Turkmenistan*,
    345 F.3d 347 (5th Cir. 2003) .................................................... 26, 27

*Bruner v. Univ. of S. Mississippi*,
    501 So. 2d 1113 (Miss. 1987)......................................................... 10

*City of Grenada v. Whitten Aviation, Inc.*,
    755 So.2d 1208 (Miss. Ct. App. 1999) .......................................... 20

*City of Jackson v. Estate of Stewart ex rel. Womack*,
    908 So. 2d 703 (Miss. 2005) ......................................................... 20

*DiBonaventura v. Cons. Rail Corp.*,
    539 A.2d 865 (Pa. 1988) ............................................................... 16

*Epperson v. SOUTHBank*,
    93 So. 3d 10 (Miss. 2012) ............................................................. 33

*Falco Lime, Inc. v. Mayor & Aldermen of City of Vicksburg*,
 836 So. 2d 711, 724–25 (Miss. 2002) .............................................. 20

*F.W. Woolworth Co. v Misc. Warehousemen's Union*,
 629 F.2d 1204 (7th Cir. 1980) ........................................................ 32

*Ghane v. Mid-S. Inst. of Self Def. Shooting, Inc.*,
 137 So. 3d 212 (Miss. 2014) ............................................................ 24

*Gil Ramirez Group, L.L.C. v. Marshall*,
 765 F. App'x 970 (5th Cir. 2019) .............................................. 49, 51

*GIC Services, L.L.C. v. Freightplus USA, Inc.*,
 866 F.3d 649 (5th Cir. 2017) ........................................................... 36

*Gross v. GGNSC Southaven, L.L.C.*,
 817 F.3d 169 (5th Cir. 2016) .............................................................. 9

*Harrison v. Walker*,
 91 So. 3d 41 (Miss. Ct. App. 2011) ................................................. 28

*Harstad v. Whiteman*,
 338 S.W.3d 804 (Ky. Ct. App. 2011) .............................................. 32

*Hoffman v. Bd. of Trustees, East Mississippi Junior College*,
 567 So.2d 838 (Miss. 1990) ................................................. 31, 32, 34

*Humana, Inc. v. Fairchild*,
 603 S.W.2d 918 (Ky. Ct. App. 1980) .............................................. 32

*Humphries v. CBOCS W., Inc.*,
 474 F.3d 387 (7th Cir. 2007) ........................................................... 35

*Janvey v. Dillon Gage, Inc. of Dallas*,
 856 F.3d 377 (5th Cir. 2017) ....................................................... 50, 51

*Kim v. Am. Honda Motor Co., Inc.*, No. 22-40790,
 2023 WL 7319044 (5th Cir. Nov. 7, 2023) ....................................... 6

*Kincaid v. Wells Fargo Secs., LLC*, No. 10-CV-808,
    2012 WL 13186912 (N.D. Okla. May 1, 2012) .............................................. 32

*Knight v. Caldwell*,
    970 F.2d 1430 (5th Cir. 1992) ........................................................ 49

*Laverson v. Macon Bibb County Hospital Authority*,
    487 S.E.2d 621 (Ga. Ct. App. 1997) .............................................17

*McFarland v. McFarland*,
    105 So. 3d 1111 (Miss. 2013) .......................................................... 33

*Morrison v. Nana Worleyparsons, LLC*,
    314 P.3d 508 (Alaska 2013) ............................................................. 16

*Morrison v. Means*,
    680 So. 2d 805 (Miss. 1996) ............................................................ 23

*Oprenchak v. American Family Mutual Ins.*,
    2013 WL 5918807 (D. Minn. Nov. 4, 2013) ................................... 16

*Pierce v. Office Depot, Inc.*,
    2014 WL 6473630 (D.S.C. Nov. 18, 2014) .................................... 16

*Pre-Paid Legal Services Inc. v. Gilmer Law Firm*,
    260 F. App'x 731 (5th Cir. 2007) ...................................................... 8

*Primrose Operating Co. v. Nat'l Am. Ins. Co.*,
    382 F.3d 546 (5th Cir. 2004) ................................................... 43, 44

*Pruett v. City of Rosedale*,
    421 So. 2d 1046 (Miss. 1982) ......................................................... 21

*Ramey & Schwaller, L.L.P. v. Zions Bancorporation NA*,
    71 F.4th 257 (5th Cir. 2023) ........................................................... 26

*Rath v. Gallup, Inc.*, No. A-97-325,
    1999 WL 1059758  (Neb. Ct. App. Nov. 2, 1999) .......................... 32

vi

*Redgrave v. Boston Symphony Orchestra, Inc.*,
    855 F.2d 888 (1st Cir. 1988) .................................................. 28, 29

*Reeves v. Sanderson Plumbing Products, Inc.*,
    530 U.S. 133 (2000) ................................................................. 35

*Rice v. Community Health Association*,
    203 F.3d 283 (4th Cir. 2000) ............................................... 28, 29

*Simpson v. Holmes Cnty. Bd. of Educ.*,
    2 So. 3d 799 (Miss. Ct. App. 2009) ........................................ 32

*Stelluti Kerr, L.L.C. v. Mapei Corp.*,
    703 F. App'x 214 (5th Cir. 2017) ............................................ 9

*Strickland v. Rossini*,
    589 So. 2d 1268 (Miss. 1991) ................................................ 23

*Tharp v. Bunge Corp.*,
    641 So. 2d 20 (Miss. 1994) .................................................... 24

*Theriot v. Bay Drilling Corp.*,
    783 F.2d 527 (5th Cir. 1986) ................................................. 40

*Thompson v. First American National Bank*,
    19 So. 3d 784 (Miss. Ct. App. 2009) ..................................... 15

*United States v. Ahmed*, No. 20-40713,
    2022 WL 16914540 (5th Cir. Nov. 14, 2022) ......................... 46

*United States v. Bieganowski*,
    313 F.3d 264 (5th Cir. 2002) ................................................. 48

*United States v. Isiwele*,
    635 F.3d 196 (5th Cir. 2011) ................................................. 41

*United States v. Michalik*,
    5 F.4th 583 (5th Cir. 2021) ................................................... 46

*Univ. of S. Miss. v. Williams*,
    891 So. 2d 160 (Miss. 2004) .......................................................... 23

*USF & G Co. v. Conservatorship of Melson*,
    809 So.2d 647 (Miss.2002) .......................................................... 20

*Ward v. Tranzact Pmt. Serv's, Inc.*,
    2002 WL 3142660 (N.D. Ill. 2002) ............................................. 16

*Weinhoffer v. Davie Shoring, Inc.*,
    23 F.4th 579 (5th Cir. 2022) ........................................................ 41

*Weible v. University of Southern Mississippi*,
    89 So. 3d 51 (Miss. Ct. App. 2011) ............................................. 10

**Statutes**

Mississippi Code § 11-46-3(1) .................................................... 17, 18, 19

**Rules**

Fed. R. Civ. P. 51(d) ................................................................ 48, 49, 51

Fed. R. Civ. P. 61 .......................................................................... 49

Fed. R. Evid. 103 .......................................................................... 46

Fed. R. Evid. 901 .......................................................................... 37

**Secondary Authorities**

Charles A Wright & Arthur R. Miller, et al, Federal Practice and Procedure
(2d ed. West 2023),
    § 5162.1 .................................................................................. 8
    § 5214 ............................................................................... 43, 47
    § 5215 ............................................................................... 43, 47
    § 7102 .................................................................................. 37
    § 7104 ............................................................................... 40, 41

## Summary of the Argument

**I.A.** First and foremost, the Court should address Dr. Papin's main liability theory by rendering a judgment on the verdict for the claim that UMMC breached the Remediation Agreement. These keystone issues have to be decided no matter what.

The district court below held—and UMMC tries to show on appeal—that the Remediation Agreement did not constitute a contract because Dr. Earl lacked UMMC's authority to make that contract. But UMMC still has no effective answer for Dr. Earl's own testimony (as UMMC's corporate representative) on this issue, which openly conceded that he had "authority to enter into remediation agreements with residents." ROA.6153. Nor does UMMC answer the expert testimony proving Dr. Earl's authority; UMMC says literally nothing about that proof. And as the Court will see when sifting through the other four categories of corroborating evidence, Dr. Earl acquired and exercised his authority to make the Remediation Agreement with Dr. Papin in full compliance with all of the bylaws and policies that UMMC cites.

The court below also held—and UMMC also tries to show on appeal—that the Remediation Agreement was not a contract because it lacked consideration. But the whole reason for the Remediation Agreement's existence was to impose upon both Dr. Papin and UMMC legal obligations that did not exist before. These involved both the imposition of new requirements (e.g., the "Personal Study and Action Plan"

that no other resident had to do) and changes to existing requirements (e.g., moving the required score on evaluations up a point). All necessary consideration existed.

**I.B.**   Once the Court upholds UMMC's liability for breaching the Remediation Agreement, it should reverse the district court's decision to bar punitive damages. The court below held—and UMMC tries to show on appeal—that Mississippi's Tort Claims Act immunizes UMMC from this action's punitive damages. But UMMC's statutory construction defies both the statutory text and the key Mississippi case on point, creating absurd results that the legislature never would have intended.

**I.C.**   Once the Court upholds UMMC's liability for breaching the Remediation Agreement, it should leave alone the jury's award of emotional distress damages. The court below started to suggest—but did not actually decide—that the amount of emotional distress damages needed remittitur. Both sides now agree that this Court need not address this unripe issue. Relatedly, though, UMMC now challenges the existence of evidence supporting *any* amount of emotional distress damages. But the district court rightly rejected that because of evidence particular to a "specific time frame" that showed "more than general declarations of emotional distress."

These three arguments continue to represent the critical core of Dr. Papin's appeal. Every decisive aspect of the take-nothing JNOV below was wrong. All of the jury's findings on the Remediation Agreement claim should be upheld.

II.    Assuming that UMMC's liability for breaching the Remediation Agreement is upheld, a separate error requires a new trial as to all of that claim's damages. The court below held—and UMMC tries to show on appeal—that Mississippi law barred Dr. Papin from recovering any lost income beyond year one of his residency. But that damages limitation is false because evidence showed that Dr. Papin's lost-income damages beyond the contract's first year were "reasonably foreseeable." If not for this additional error, the Court could end its consideration of the Remediation Agreement claim by leaving that claim's other damages findings in place. But if this additional point succeeds, the parties are now in agreement about what the proper remedy is: A new trial as to *all* of Dr. Papin's damages—including both his noneconomic damages (emotional distress) and economic damages (lost income).

III.    Alternatively, if the claim about the Remediation Agreement is not upheld, the Court need not reach the preceding damages issues and should instead turn to Dr. Papin's claim that UMMC breached the House Officer Contract. The district court held—and UMMC tries to show now—that evidence about comparable residents' experiences was inadmissible due to being irrelevant and unduly prejudicial. But that was harmful error—the evidence should have been admitted—because it was doubly relevant and not unduly prejudicial. So if the Remediation Agreement claim does not survive, the House Officer Contract claim should be revived for a full new trial.

## Argument

### I. The Court should render a judgment on the verdict for Dr. Papin's claim that UMMC breached the Remediation Agreement, including the verdict's full amounts of punitive and emotional damages.

First and foremost, the district court erred by refusing to uphold the jury's liability findings for Dr. Papin and award the verdict's full amount of damages. Papin Br. at 24, 27-48. The Court should reverse each adverse aspect of the district court's resolution of UMMC's post-trial motion for relief under Rules 50(b) and 59.

#### A. The Remediation Agreement was a contract.

The main liability ruling below held that the Remediation Agreement did not constitute a contract because (1) Dr. Earl lacked UMMC's authority to make the Remediation Agreement, ROA.4969-76, and (2) the Remediation Agreement lacked consideration. ROA.4976-78. Both should be reversed. Papin Br. at 28-37.

##### 1. Dr. Earl had authority to make the Remediation Agreement.

The first Remediation Agreement issue about contract existence is whether Dr. Earl had UMMC's authority to make the Remediation Agreement. The district court refused to accept the jury's finding that Dr. Earl had the requisite authority, ROA.5040, and instead held as a matter of law that he lacked it, ROA.4969-78.

On this issue, the Court should reverse and render a judgment upholding this aspect of the verdict because legally sufficient evidence proved Dr. Earl's authority. Papin Br. at 24, 28-33. Dr. Earl's own testimony proved that he had "authority to enter into remediation agreements with residents," *id.* at 30 (quoting ROA.6153), and five other categories of evidence proved that same fact as well, *id.* at 30-33. That the proof of Dr. Earl's authority was *more* specific than necessary is no fault at all, *id.* at 32, and the authority that Dr. Earl exercised here was fully consistent with all of the relevant state laws and UMMC internal policies, *id.* at 33-35.

### i.     Dr. Earl's own testimony sufficed.

The leading proof of Dr. Earl's authority to enter into the Remediation Agreement came from Dr. Earl himself. He agreed that, as program director, he had UMMC's "authority to enter into remediation agreements with residents":

```
Q.   You are tasked with knowing the ACGME requirements?
A.   I'm tasked with -- I'm tasked with -- yes, I am tasked
with ensuring that the program is compliant with the ACGME.
Q.   And you have authority to enter into remediation
agreements with residents; correct?
A.   I do.
```

ROA.6153. Especially given that Dr. Earl had all of the background and qualifications necessary to give that testimony, his clear and direct answer to a question posing the

exact issue now in dispute is dispositive.  Dr. Earl's testimony also carried extra force

because he was *UMMC's corporate representative*.  *See* ROA.4446.  So he wasn't just

testifying personally that he had authority, he was admitting it on UMMC's behalf.

*See, e.g.*, *Kim v. Am. Honda Motor Co., Inc.*, No. 22-40790, 2023 WL 7319044, at *14

(5th Cir. Nov. 7, 2023) (a corporate representative's trial testimony is an admission).

Standing alone, Dr. Earl's testimony carried the burden of proof.

Apparent authority is a straw man.  UMMC harps on the idea that "apparent

authority is not sufficient to make the contract enforceable." UMMC Br. at 8.  But

no one here has ever disagreed with that.  Dr. Papin knew all along that the law

demanded proof of *actual* authority, which is why he asked Dr. Earl (and others)

about actual and not merely apparent authority. ROA.6153.  The question to Dr. Earl

was whether "you have authority to enter into remediation agreements with

residents," and Dr. Earl answered with an unconditional "I do."  ROA.6153.  That

speaks directly to the actual authority UMMC demands, proving it with clarity.

UMMC's flagship case of *Board of Trustees of State Institutions of Higher

Learning v. Peoples Bank of Mississippi*, 538 So.2d 361 (Miss. 1989) (en banc) (cited by

UMMC at 11), does not hold otherwise.  It supports Dr. Papin's use of Dr. Earl's

direct testimony about "authority."  The issue there was whether actual authority

existed, and the Court relied on "testimony" saying that the person "had no such

authority." *Id.* at 365. ("Likewise, according to the testimony of Ben Walker, representative for Southern Copiers, he knew Norsworthy had no such authority."). Of course the rule goes both ways, applying equally to testimony that someone *has* authority as it does to the opposite. So for the same reason that oral testimony disproved authority in that case, oral testimony proved it here. *See id.*

### ii. UMMC never answers the expert evidence.

To corroborate Dr. Earl's testimony, Dr. Papin supplied five other categories of evidence showing Dr. Earl's authority to enter into the Remediation Agreement. Papin Br. at 30-33. Among those was the expert testimony of Dr. Michael Leitman, who proved that Dr. Earl had authority to enter into the Remediation Agreement by explaining that all ACGME-following institutions gave Program Directors the authority to enter into remediation agreements. *Id.* at 32-33 (citing ROA.6247, ROA.6260-6261, and ROA.6266-67). The expert witness Dr. Leitman was asked whether "program directors have authority to enter into remediation agreements with residents" and answered "Yes, they do." ROA.6247.

UMMC's brief says nothing at all about this evidence, forever forfeiting a challenge to its sufficiency. This too is enough standing alone to sustain the jury's factual finding about Dr. Earl's authority as UMMC's Program Director.

### iii.     Indirect and circumstantial proof suffices.

The law governing *what* Dr. Papin had to prove did not change *how* he had to prove it.  Mississippi law about authority does not try to do this (nor could it under *Erie*, *see, e.g.*, *Pre-Paid Legal Services Inc. v. Gilmer Law Firm*, 260 F. App'x 731, 733 (5th Cir. 2007) ("Whether the evidence presented at trial is sufficient to create an issue of fact for the jury or will permit the court to enter judgment as a matter of law is governed by federal rather than state law.")).  So while it is true that Mississippi's law regarding public contracts requires proof of "actual" authority (as opposed to "apparent"), *see* UMMC Br. at 11, standard federal principles of evidentiary sufficiency determine *how* Dr. Papin had to prove that Dr. Earl possessed that "actual" authority.

Under these standard principles of sufficiency, direct evidence suffices nicely, but circumstantial evidence is "not less probative than direct."  22 Charles A Wright & Arthur R. Miller, et al, Federal Practice and Procedure § 5162.1 (2d ed. 2023) ("We assume few lawyers will fall prey to the common misunderstanding that circumstantial evidence is inherently inferior to direct evidence.").  And where there is competing circumstantial evidence about an aspect of contract formation like authority or consideration, the factual dispute goes to the jury.  *See* Papin Br. at 10.

UMMC has no answer to *Gross v. GGNSC Southaven, L.L.C.*, 817 F.3d 169 (5th Cir. 2016) (cited by Dr. Papin at 10) (applying Mississippi law), which rightly held that "the authority to enter a contract may be conveyed orally and that no formal writing is required as a general rule of Mississippi law." *Id.* at 117. In other words, Mississippi law does not require that authority proof "be of a particular kind— whether a 'formal legal device' or something else." *Id.* Dr. Papin therefore did not need to prove Dr. Earl's authority by introducing any particular exhibit or eliciting testimony uttering special magic words.

UMMC also has no answer *Stelluti Kerr, L.L.C. v. Mapei Corp.*, 703 F. App'x 214 (5th Cir. 2017) (cited by Dr. Papin at 10), which rightly holds that actual authority can be proven by all manner of indirect evidence. That plaintiff there proved authority with things like what "was reasonably understood," and the "conduct" of pertinent people that was "consistent with" the actual authority in question. *Id.* Just like the proof in *Stelluti Kerr*, Dr. Papin's indirect evidence of Dr. Earl's authority cannot be ignored just because it is circumstantial. *See id.*

*Board of Trustees of State Institutions of Higher Learning v. Peoples Bank of Mississippi*, 538 So.2d 361 (Miss. 1989) (en banc) (cited by UMMC at 11), is not to the contrary. It supports Dr. Papin by recognizing that actual authority to contract for UMMC can be supplied *either* directly by a statute *or indirectly* by UMMC's internal

policies that themselves are approved by statute. *Id.* at 366. This is no evasion of the need for legislative approval. It is an application of that rule in light of the fact that UMMC's "policies are authorized by the Board of Trustees by virtue of the authority bestowed upon them by the Legislature." *Id.* Dr. Papin's evidence showed that Dr. Earl's authority came from UMMC's policies, which meets the authority test because the UMMC policies are "prescribed by the Legislature." *Id.* [1]

*Bruner v. Univ. of S. Mississippi*, 501 So. 2d 1113 (Miss. 1987) (cited by UMMC at 11-12), is not to the contrary either because of different legislative prescriptions. The contracting person in *Bruner* was a football coach, and Mississippi doesn't give its football coaches the same policymaking as its hospitals. Whereas UMMC's "policies are authorized by the Board of Trustees by virtue of the authority bestowed upon them by the Legislature," *Board of Trustees*, 538 So.2d at 366, the University of Southern Mississippi football coach's policies have no such legislative backing. It therefore made perfect sense for *Bruner* to hold that the football coach's policies could not supply the requisite contracting authority.

---

[1] This answer applies equally to *Weible v. University of Southern Mississippi*, 89 So. 3d 51 (Miss. Ct. App. 2011) (cited by UMMC at 12), which is just an application of *Board of Trustees of State Institutions of Higher Learning v. Peoples Bank of Mississippi*, 538 So.2d 361.

### iv.    The applicable regulations were met.

Dr. Papin's evidence showed that Dr. Earl's authority to enter into the Remediation Agreement was wholly consistent with UMMC's bylaws and internal policies. Papin Br. at 33-36.  The test for contracting authority is met by whomever UMMC's bylaws and internal policies give that authority to, *see Board of Trustees of State Institutions of Higher Learning*, 538 So.2d 361 (discussed above), and UMMC's bylaws and policies gave Dr. Earl the authority to make the Remediation Agreement on UMMC's behalf.  *Id*.  In particular, the test was met because the Faculty and Staff Handbook qualified as "written employment and/or hiring procedures" for purposes of Bylaw 801, and because that Handbook showed that Dr. Earl had the necessary authorization as "program director."  Papin Br. 33-36 (citing ROA.4974).

UMMC demands (at 15) a "written delegation" of authority.  But that demand was easily met because the Faculty and Staff Handbook that gave Dr. Earl the authority to make the Remediation Agreement was written, ROA.6694-6758, as were the subsidiary policies made pursuant to it, *see, e.g.*, ROA.6595 ("Evaluation Policy" giving the "Program Director" authority to establish "remedial roles"); ROA.6600-6601 ("Guidelines for Academic Remediation" giving the "Program Director" authority over "remediation"); ROA.6607 ("Policy on Evaluation and Promotion and Dismissal of Residents" giving the "Program Director" "dismissal" authority).

UMMC also demands (at 15) a signature by someone other than Dr. Earl, such as the vice chancellor. But the Faculty & Staff Handbook that allowed for the delegation of authority to Dr. Earl *was* signed by the vice chancellor:

*Lou Ann Woodward*

LouAnn Woodward, M .D.
**Vice Chancellor for Health Affairs
and Dean, School of Medicine**

ROA.6694.

Beyond that, nothing in Mississippi law required a writing and signature for each and every link in the chain of delegation. Under the Faculty & Staff Handbook (that was both written and signed by UMMC's vice chancellor), Dr. Earl received authority to make the Remediation Agreement because he was the appropriate UMMC "designee." The Faculty & Staff Handbook gave many of its most important powers to both a primary person *and* their "designees," ROA.6706; ROA.6710; ROA.6721; ROA.6727; ROA.6730; ROA.6731; ROA.6737; ROA.6753; ROA.6756, and UMMC rightly acknowledged below that this delegation scheme included signature authority. *See* ROA.1306 (UMMC's counsel conceding below that the "vice chancellor, though, can delegate signature authority").

## 2.    The backup ruling about consideration was wrong.

The second Remediation Agreement issue about contract existence is whether the Remediation Agreement had consideration.  The district court refused to accept the jury's finding that the Remediation Agreement had consideration, ROA.5040, and instead held as a matter of law that it lacked it, ROA.4969-78.

On this issue, the Court should reverse and render a judgment upholding this aspect of the verdict because the evidence showed the requisite consideration.  Papin Br. at 36-37.  Dr. Papin received UMMC's promise of a sixty-day improvement period and additional resources, and in exchange, UMMC received Dr. Papin's promise to complete additional remedial measures like the "Personal Study and Action Plan."  *Id.*  The House Officer Contract did not already guarantee any of this, which is precisely why all deemed it necessary to codify the new deal in a signed contract.  *Id.*

To deny this, UMMC first says that Dr. Papin "was already subject to all the remediation requirements under existing UMMC policy."  UMMC Br. at 20.  But that would be true only if Dr. Papin was definitely guilty of everything UMMC said he did wrong—a view that no jury finding accepted and that the jury impliedly rejected by finding both that the Remediation Agreement was a contract and that it was breached.  The implied finding that Dr. Papin was *not* guilty of UMMC's alleged poor performance means that Dr. Papin was *not* already required to undergo

remediation at the time of the Remediation Agreement's making.  He did so only because of UMMC's promise to cease its interruption upon completion of remediation.

The Remediation Agreement expressed the deal's if/then conditions in no uncertain terms.  Confirming that the contract entailed new promises on each side, the Remediation Agreement listed "immediate termination" as the first thing that Dr. Papin would avoid by completing his side of the deal's exchange:

> Many of the above behaviors are serious threats to patient safety and therefore grounds for immediate action.  If the improvements required above as determined by the PD are not met within the 60 day remediation period OR any event that seriously threatens patient safety occurs during the remediation period, then any of the following may be implemented, again, at the discretion of the program director:
>
> 1) Referral to HR and GME Office for immediate termination for safety infractions deemed egregious by the PD.
> 2) Non-renewal of contract
> 3) Placement on formal probation
> 4) Requirement to repeat year of training

Program Director    Date                    Resident    Date

ROA.6642.  The Agreement's prior page specified a litany of specific remediation obligations that Dr. Papin did *not* have to otherwise comply with as a resident:

> that we may have serious issues with truthfulness.  Therefore, as we discussed, you are now on formal remediation and have 60 days from today January 10, 2017 to show significant improvement in the areas and competency domains mentioned above.  Significant improvement means:
>
> 1) zero confirmed or highly suspicious reports of lying
> 2) zero episodes of dereliction of duty
> 3) improvement in evaluations mapped to the competencies of SBP, PBLI and PROF, and the majority of all evaluation questions be >3 (as expected).
> 4) Zero reports of unwillingness to complete a task unless concerns over patient safety are raised

Additional requirements:

1) Development and submission of a Personal Study and Action Plan by Jan 17, 2017
2) Bimonthly meetings with the PD to discuss progress and review feedback.

ROA.6641. Item #3 exemplifies the deal's extraordinary nature. Whereas Dr. Papin's preexisting track required him to earn evaluations *at* level "3," the Remediation Agreement substantially elevated that threshold in requiring him to earn *greater than* a "3" on the majority of all evaluations. ROA.6641; *see* ROA.5793-94. That elevated bar was "impossibly high" and not part of the original contract. ROA.5793-94

*Thompson v. First American National Bank*, 19 So. 3d 784 (Miss. Ct. App. 2009) (cited by UMMC at 19-20) is easily distinguished. That agreement failed because the promised performance was already "legally required." *Id.* at 788. Dr. Papin's completion of remediation steps was *not* already legally required because he had not performed as poorly as UMMC was alleging. Despite UMMC's false perceptions and false allegations, he made the Remediation Agreement so as to resolve the controversy as efficiently as possible and carry on his budding career.

Everything in UMMC's page 22 string citation is distinguishable as well. Whereas the Remediation Agreement expressly traded Dr. Papin's promise to complete of the remediation steps for UMMC's promise to not terminate him—the Remediation Agreement expressly promised that UMMC would *not* refer him to HR

for "immediate termination," ROA6641-42—none of the cited cases contained such express guarantees of continued employment.

There were "no such guarantees" in *Pierce v. Office Depot, Inc.*, 2014 WL 6473630 (D.S.C. Nov. 18, 2014) (cited by UMMC at 22).  Nor did they exist in in *Oprenchak v. American Family Mutual Ins.*, 2013 WL 5918807 (D. Minn. Nov. 4, 2013) (cited by UMMC at 22), which had an "express reservation of the right to terminate." *Id.* at *4.  *Ward v. Tranzact Pmt. Serv's, Inc.*, 2002 WL 3142660 (N.D. Ill. 2002) (cited by UMMC at 22), lacked "clear and definite statements" about what the exchange entailed.  *Id.* at *2.  The deal in *Morrison v. Nana Worleyparsons, LLC*, 314 P.3d 508 (Alaska 2013) (cited by UMMC at 22), had no "express promise of continued employment" either.  *Id.* at 511.  The plaintiff in *DiBonaventura v. Cons. Rail Corp.*, 539 A.2d 865 (Pa. 1988) (cited by UMMC at 22), did not even have a new agreement and was instead just relying on preexisting "handbooks and policy manuals." *Id.* at 425.

### 3. The terms were definite.

Apart from issues of authority and consideration, UMMC also argues that the Remediation Agreement did not constitute a contract because its terms were too indefinite.  UMMC Br. at 8, 23-24.  This is UMMC's attempt to have the judgment below upheld on a ground that the district court expressly rejected.  When UMMC

16

made the indefiniteness argument after trial, ROA.4939, the district court rejected it by "find[ing] the agreement terms were sufficiently definite." ROA.4996-97. That was correct. The Remediation Agreement does not suffer from indefiniteness.

A supposedly missing salary is UMMC's only argument here, and the sole citation is to *Laverson v. Macon Bibb County Hospital Authority*, 487 S.E.2d 621 (Ga. Ct. App. 1997) (cited by UMMC at 22-23). But *Laverson* is clearly distinguishable. That agreement was too indefinite because of an " absence of evidence of the amount of . . . salary under the putative contract." *Id.* at 623. The Remediation Agreement does not suffer from that shortcoming because Dr. Papin's salary had already been established (by the House Officer Contract) and was being paid.

### B.    Punitive damages are available.

The first damages issue is whether Dr. Papin can recover punitive damages on his claim regarding the Remediation Agreement. The district court held that he could not because the of immunity given by the Mississippi Tort Claims Act. On this issue, the Court should render a judgment upholding Dr. Papin's award of punitive damages because the MTCA does not apply at all to this claim. Papin Br. at 38-45.

According to both the statute's text, Miss. Code § 11-46-3(1), and the leading state court decision (*City of* Grenada), the MTCA does not apply at all where, as here, the plaintiff's action is for the breach of an *express* contractual term or

condition. Actions for breach of an *implied* contractual provision are different. So are torts. The statute's coverage provision makes the MTCA apply to those actions, and therefore requires an analysis of immunity's scope, waivers, and so forth. But for the contract action Dr. Papin asserts—breach of an *express* term or condition— the statute never applies in the first place and no further analysis is required.

UMMC seeks immunity with a position that makes two critical mistakes. It misconstrues the statute by ignoring its treatment of suits on *express* contractual provisions. And it misconstrues Dr. Papin's contract claim by calling it a tort.

Textually, Mississippi Code § 11-46-3(1) defines the extent of the MCTA's immunity scheme with important limits. As to breach of contract actions, the statute generally covers only actions for "breach of implied term or condition of any . . . contract," subject then to the statute's subsidiary requirements, provisos, and exceptions. Miss. Code § 11-46-3(1). By omission, the statue never covers actions for breach of an *express* term or condition of any contract. Even if such an action were to satisfy the subsidiary requirements, provisos, and exceptions, the MTCA does not supply any immunity whatsoever because it never covers the action in the first place. In this way, § 11-46-3(1) frames the critical question of coverage in terms of what *kind* of contractual provision—express or implied—the suit puts at issue.

UMMC contradicts this important threshold limitation by ignoring it.  *See* UMMC Br. at 8.  Instead of looking to *what was breached* (express provision vs. implied), UMMC's test looks only at *how the breach* occurred (tortiously vs. otherwise).  If the breach occurred by way of "tortious" conduct, UMMC would deem MCTA coverage to exist regardless of *what kind of contract was breached*.  The Court should reject UMMC's expansive statutory construction because it contradicts both the statute's text and the leading state court decision on point.

First, UMMC's construction defies the statute's plain text.  *See* Papin Br. at 39-42.  When Section 11-46-3(1) says that it applies to actions "on account of" a "breach of implied term or condition of any . . . contract," Miss. Code § 11-46-3(1), it means that it does *not* apply to actions for breach of an *express* term or condition.  Ordinary usage sees it that way, and Mississippi law makes ordinary usage control.  UMMC's supposed test of *how the breach occurred* has no textual basis, as the statute never says "tortious breach" or anything like it.

UMMC's construction also creates absurd results.  As to breaches of implied contractual obligations, UMMC sees the statute as granting immunity for tortious breaches *but not giving immunity for non-tortious breaches*.[2]  Yet no legislature would

---

[2] In other words, under UMMC's theory, if the state breached an express, written contract in a regular, non-tortious way, no sovereign immunity would apply.  But if the state egregiously breached an express, written contract then the entire claim is now barred by sovereign immunity?  Such would create an absurd result.

invert incentives like that, rewarding the state with immunity for its more culpable wrongdoing (tortious breaches) while withholding immunity for the state's less culpable wrongdoing (not-tortious breaches). This, in addition to the lack of textual foundation, counsel strongly against UMMC's construction of Section 11-46-3(1). *See, e.g.*, *Falco Lime, Inc. v. Mayor & Aldermen of City of Vicksburg*, 836 So. 2d 711, 724–25 (Miss. 2002) ("this Court will not construe statutes to impute absurd purpose to Legislature" (analyzing *USF & G Co. v. Conservatorship of Melson*, 809 So.2d 647, 660 (Miss.2002))).

Second, UMMC's construction defies the leading state court decision at issue. *See* Papin Br. at 39-42. *City of Grenada v. Whitten Aviation, Inc.*, 755 So.2d 1208 (Miss. Ct. App. 1999), held that the "provisions of MTCA have no application to a pure breach of contract action," *id.* at 1214, and by "pure breach of contract action," *City of Grenada* meant an action for breach of an express contractual provision, *id.*

UMMC has no good answer to *City of Grenada*. The case's holding on this critical point—how the statute covers actions for breach of a contract's *express* provisions—was not overruled by *City of Jackson v. Estate of Stewart ex rel. Womack*, 908 So. 2d 703 (Miss. 2005), because it could not have been. *City of Jackson*'s suit was not for breach of a contract's *express* provisions. It was for breach of a contract's *implied* provisions. *Id.* at 711 ("We therefore hold that Miss.Code Ann. § 11–46–3

grants immunity to the state and its political subdivisions for 'breach of implied term or condition of any warranty or contract.'").

*Black v. Ansah*, 876 So. 2d 395 (Miss. Ct. App. 2003) (cited by UMMC at 25), is distinguishable. Its suit was for either a pure tort or breach of a contract's *implied* term or condition, *id.* at 397 ("There is no claimed breach of any one-year contract that the University entered with her. The alleged wrongful conduct by the defendants was the tortious failure to give her a new contract."), both of which Section 11-46-3(1) covers just fine under the correct textual reading. *Black*'s suit was *not* for breach of a contract's *express* term or condition like Dr. Papin's. So there was no occasion to apply the express/implied distinction that Section 11-46-3(1) draws.

Punitive damages policy arguments appear throughout UMMC's brief. *See e.g.*, UMMC Br. at 26. But the whole point of *Pruett v. City of Rosedale*, 421 So. 2d 1046, 1046-51 (Miss. 1982), and the sea change to follow is that courts no longer have that role for Mississippi law. Punitive damage limitations are *not* a matter of Mississippi common law to be shaped and molded as courts see fit. The Legislature alone now does the job of creating punitive damages policy, and for better or worse, Section 11-46-3(1) does so by totally carving out from the scheme as a whole actions for breach of an express contractual provision.

**C.** **The verdict's emotional distress damages should be upheld.**

The second set of damages issues concerns the jury's award of noneconomic emotional distress damages. Below, UMMC argued both that (1) the evidence did not support any emotional distress damages whatsoever, and that (2) this verdict's particular amount of emotional distress damages was excessive. The district court (1) rejected UMMC's first point, holding that evidence supported some award of emotional damages, ROA.4978-4980, and (2) discussed but did not actually resolve UMMC's second point regarding excessiveness, suggesting that it might in the future identify the acceptable amount of emotional damages and require Dr. Papin to choose between remittitur vs. new trial, ROA.4989-4994. UMMC's cross-appeal resurrects the first point, which was rightly rejected below and should be rejected here. The second issue of excessiveness is premature and need not be addressed.

**1.** **UMMC's cross appeal is meritless.**

The Court should reject UMMC's cross-appeal about emotional distress damages by upholding the district court, which correctly held that Dr. Papin's damages evidence supported some award of emotional distress, ROA.4978-4980. The proof was not too "generalized," as UMMC argues (at 9). It came with all of the particularity that Mississippi law requires.

The key rule requires plaintiffs to give "more than general declarations of emotional distress," *Univ. of S. Miss. v. Williams*, 891 So. 2d 160, 173 (Miss. 2004), and Dr. Papin showed that here, with proof as to both the nature of his "specific suffering" and the suffering's "specific time frame." Papin Br. at 46-47 (citing ROA.5793-5803, ROA.5810-11, ROA.5824, ROA.5832-33). Comparatively, Dr. Papin's proof of emotional distress damages is far more detailed and far more comprehensive than the evidence deemed insufficient by UMMC's favorite cases. Both are easily distinguished.

The plaintiff in *Strickland v. Rossini*, 589 So. 2d 1268 (Miss. 1991) (cited by UMMC at 33), had only a boyfriend's testimony about generalized "stress and worry." *Id.* at 1276. This jury heard distinguishably superior evidence because detailed specifics were testified to directly by Dr. Papin himself.

The plaintiff's proof in *Morrison v. Means*, 680 So. 2d 805, 807 (Miss. 1996) (cited by UMMC at 33), is distinguishable in two separate ways. The harm suffered (just emotional "strain" and some "sleepless nights," *id.* at 806) is categorially less drastic than Dr. Papin's; and just as importantly, the character of the wrongdoing inflicted (neither "intentional" nor "indifferent," *id.*) is far surpassed by UMMC's intentional breach of contract.

UMMC also disputes the foreseeability of Dr. Papin's emotional distress damages, seeking to distinguish harm concerning the House Officer Contract from harm concerning the Remediation Agreement. UMMC Br. at 31. But as a matter of Mississippi law, Dr. Papin did *not* have to show that UMMC's breach of the Remediation Agreement was the *sole* proximate cause of his damages—i.e., he did not have to exclude the House Officer Contract's breach from the analysis. Since Mississippi adheres to the rule that there can be more than one proximate cause of harms like Dr. Papin's, *see, e.g.*, *Ghane v. Mid-S. Inst. of Self Def. Shooting, Inc.*, 137 So. 3d 212, 226 (Miss. 2014); *Tharp v. Bunge Corp.*, 641 So. 2d 20, 24 (Miss. 1994), it was perfectly permissible for the jury to find that UMMC's breach of the Remediation Agreement proximately caused damages that might also have been proximately caused by a breach of the House Officer Contract.

UMMC's damage foreseeability argument also suffers from another key flaw. To dispute the foreseeability of damages, UMMC tries to smuggle back into the case its breach arguments about the Remediation Agreement being indefinite and without new consideration. UMMC says (at 32-33) that the Remediation Agreement's breach did not cause foreseeable damages *because the Remediation Agreement did not promise anything meaningful.* But when analyzing the damages issue at hand, the

Court is to take for granted both that the Remediation Agreement was an enforceable contract and that UMMC breached it.

For example, whereas UMMC's damages argument assumes that "[n]othing required UMMC to continue to employ Papin after that sixty-day period," UMMC Br. at 32, Dr. Papin's successful liability argument already shows the opposite—that the Remediation Agreement promised just that and was obviously breached. Viewing the case as the jury did, the finding about damages due to the Remediation Agreement makes perfect sense.

### 2.    The excessiveness issue is premature.

After the district court rightly held that the evidence supported some award of emotional damages, ROA.4978-4980, it discussed but did not actually resolve UMMC's argument about the awarded amount's excessiveness.  ROA.4989-4994. The Court should not address the excessiveness issue because it is not ripe for review. For although the district court went ahead and suggested part of an excessiveness ruling, footnote 13 of the decision below shows that it did not yet actually pose the critical remittitur-or-new-trial choice that appellate review requires.  *Id.*

The parties agree that this Court should not review the excessiveness question because it is premature.  Dr. Papin took that position in the initial brief, Papin Br. at 25, and UMMC's brief agrees by expressly acknowledging that the district court "has

not yet set a remittitur for his consideration or receiver briefing from the parties on that issue," UMMC Br. at 34. The Court should therefore do as both parties agree is proper and *not* confront the excessiveness issue in the instant proceeding.

### 3.    UMMC forfeited footnote 8's statutory cap issue.

UMMC's footnote 8 addresses an issue regarding statutory caps on certain damages. The point is addressed nowhere else. Footnote 8 is alone and perfunctory:

> At the very least, the jury's award of emotional distress damages must be reduced to comply with Mississippi's $1 million statutory cap on noneconomic damages. See MISS. CODE ANN. § 11-1-60(2)(b).

UMMC Br. at 36. That point is wrong for many substantive reasons. E.g., the cap applies only to medical malpractice actions. But the Court should not reach the point's substance because it is insufficiently briefed. Arguments presented only in perfunctory footnotes are not preserved. They are forfeited (or waived). *See Ramey & Schwaller, L.L.P. v. Zions Bancorporation NA*, 71 F.4th 257, 261 n.3 (5th Cir. 2023) (a matter "relegated to a footnote . . . is . . . forfeited for insufficient briefing"); *Arbuckle Mountain Ranch of Tex., Inc. v. Chesapeake Energy Corp.*, 810 F.3d 335, 339 n.4 (5th Cir. 2016) ("Arguments subordinated in a footnote are "insufficiently addressed in the body of the brief," and thus are waived."); *Bridas S.A.P.I.C. v. Gov't of Turkmenistan*, 345 F.3d 347, 356 (5th Cir. 2003) ("Arguments that are insufficiently

addressed in the body of the brief, however, are waived.").  Due to such insufficient

briefing, UMMC forfeited footnote 8's point about statutory caps.

## II.    The Court should reverse the decision to limit Dr. Papin's lost-income damages to year one alone and order a new trial on that issue.

Once the jury's liability findings are upheld, the Court should correct the

district court's error about the scope of recoverable lost income damages.  The

district court held that Mississippi law barred Dr. Papin from recovering any lost

income beyond year one of his residency. ROA.4490-93; ROA.4965; ROA.5050-51.

On this issue, the Court should reverse and order a new trial without the

erroneous one-year limitation because Mississippi damages law does not limit Dr.

Papin's lost-income damages to the House Officer Contract's first year.  Papin Br. at

26, 48-55.  Mississippi follows the Restatement rules making lost-income damages

available so long as they are "reasonably foreseeable," and the evidence here showed

that Dr. Papin's reasonably foreseeable lost-income damages extended well beyond

the residency's first year. *Id.*

### A.    All foreseeable damages are recoverable.

UMMC's proposed legal rule is at odds with Mississippi's adoption of the

Restatement's "reasonably foreseeable" test.  According to UMMC, Mississippi has

a per-se rule holding that plaintiffs can *never* "recover lost income in a breach of

contract case beyond the fixed term of a contract," regardless of what the proof says about foreseeability  UMMC Br. at 9.  But that is not Mississippi law.

*Harrison v. Walker*, 91 So. 3d 41 (Miss. Ct. App. 2011) (cited by UMMC at 50), does not help.  As a matter of law, it does not deny the Restatement's "reasonably foreseeable" test.  And as a matter of fact, it does not explain about how the plaintiff proved foreseeability beyond the contract's stated duration.  Due to the scant opinion, how *Harrison*'s evidence compares to Dr. Papin's cannot be known.

*Rice v. Community Health Association*, 203 F.3d 283, 287 (4th Cir. 2000) (cited by Papin at 51-52 and UMMC at 38), does indeed support recovery here.  As a matter of law, the legal rule *Rice* upheld is the same one that Dr. Papin utilizes: a plaintiff *can* "recover consequential damages if he has alleged and proved that breach of an employment contract resulted in the loss of future "identifiable professional opportunities." *Id.* at 288-89.  In application, *Rice* came out differently just because of differing pleadings and proof.  Whereas the *Rice* plaintiffs did *not* thread the needle by pleading and proving lost opportunities beyond the contract's stated term, *id.*, Dr. Papin did exactly that with specificity, *see* Papin Br. at (53-54)

Likewise, *Redgrave v. Boston Symphony Orchestra, Inc.*, 855 F.2d 888 (1st Cir. 1988) (cited by Papin at 51-52 and UMMC at 39), continues to support Dr. Papin's recovery beyond the one-year contract term as well.  The legal rule it upholds is the

one in need of application here: "a plaintiff may receive consequential damages if the plaintiff proves with sufficient evidence that a breach of contract proximately caused the loss of identifiable professional opportunities." *Id.* at 89-94. And *Redgrave*'s application shows useful contrast too. Whereas *Redgrave*'s plaintiff failed to show actually "identifiable professional opportunities" in the movie industry, Dr. Papin's evidence was far more concrete. His profession is far more structured and predictable—especially during the five-year residency that his House Officer Contract entailed. *See* Papin Br. at 51-54. Proof also showed that, but for UMMC's wrongdoing, Dr. Papin would have succeeded at plenty of other residencies that had interviewed him originally. *Compare* ROA.5653-54 (multiple residency interviews before selecting UMMC); ROA.5825 (zero interviews after UMMC's termination).

**B.    The correct remedy is a new trial on all damages.**

Dr. Papin's first brief showed that a correct remedy for this error would be a new trial as to the issue of consequential economic damages (lost income), leaving the verdict intact as to both liability and as to direct noneconomic damages (emotional distress). Papin Br. at 54-55 (discussing *Rice v. Community Health Association*, 203 F.3d 283, 287 (4th Cir. 2000)). UMMC does not seriously disagree that this error's remedy should entail a new trial and that the new trial should be limited to actual damages (not liability). But UMMC does disagree about the scope

of actual damages addressed in a new trial.  According to UMMC (at 41), it would be "inequitable" for a new trial to address just Dr. Papin's consequential economic damages and not also address Dr. Papin's direct noneconomic damages.  So UMMC says (at 41) that any new trial should address all of Dr. Papin's actual damages.

In light of this, Dr. Papin now agrees with UMMC about the remedial issue of what a new trial's scope should be.  If the Court holds that the district court erroneously barred Dr. Papin from recovering any lost income beyond year one of his residency, the Court's remedy should leave the jury's liability finding about the Remediation Agreement in place and order a new trial as to all of Dr. Papin's actual damages—including both direct noneconomic damages (emotional distress) and consequential economic damages (lost income).

## III. Alternatively, the Court should order a new trial on liability that accounts for the wrongly excluded liability evidence about comparable residents.

If the Court does not uphold the verdict's findings as to liability for UMMC's breach of the Remediation Agreement, the Court should address the district court's decision to exclude key evidence about liability on the House Officer Contract claim.  On this issue, the Court should reverse and order a new trial on the claim regarding the House Officer Contract because the evidence about comparable residents' specific experiences should have been admitted.  Papin Br. at 26, 55-62.  UMMC's relevance objection did not justify exclusion both because the evidence proved the

meaning of an ambiguous contract term ("malfeasance, inefficiency, or contumacious conduct") and because it proved that that UMMC fabricated its given reason for firing Dr. Papin. *Id.* at 57-59. UMMC's confusion objection did not justify exclusion either, both because it was infected with the relevance error and because the confusion rationale was backwards. *Id.* at 59-62. An inquiry into other residents' specific experiences was no distraction—it was the core of the claim. *Id.*

## A.    The evidence of comparable residents was highly relevant.

The first issue about evidence of comparable residents is relevance. UMMC's relevance objection was the district court's main basis for excluding the evidence. But the relevance objection did not justify exclusion because two separate arguments demonstrating the proof's high relevance. Papin Br. at 56-59.

### 1.    The excluded evidence proved the meaning of "malfeasance, inefficiency, or contumacious conduct."

Dr. Papin first defeated UMMC's relevance objection by showing that the evidence of comparable residents' specific experiences helped prove the meaning of "malfeasance, inefficiency, or contumacious conduct," the ambiguous phrase from the House Officer Contract. Papin Br. at 56-58.

UMMC's main answer is to cite *Hoffman v. Bd. of Trustees, East Mississippi Junior College*, 567 So.2d 838 (Miss. 1990) (cited by UMMC at 42). But *Hoffman* says nothing at all about how to prove a contract's ambiguous terms. It took the key

contractual phrase's meaning for granted and posed a separate inquiry about whether waiver had occurred. *Id.* at 842. The issue of contract ambiguity did not exist there. So there was certainly no adverse holding about how to resolve such ambiguities. If anything, *Hoffman* supports Dr. Papin by recognizing that a key question in cases like this turns on what the "material features of his contract" are, *id.*, which is precisely what Dr. Papin's proffered evidence would have spoken to.

The use of evidence to resolve contractual ambiguity was also not at issue in the other cases UMMC cites. It was not at issue in *Simpson v. Holmes Cnty. Bd. of Educ.*, 2 So. 3d 799, 800 (Miss. Ct. App. 2009) (cited by UMMC at 43), *F.W. Woolworth Co. v Misc. Warehousemen's Union*, 629 F.2d 1204, 1218 (7th Cir. 1980) (cited by UMMC at 43), *Rath v. Gallup, Inc.*, No. A-97-325, 1999 WL 1059758, at *39 (Neb. Ct. App. Nov. 2, 1999) (cited by UMMC at 43), *Kincaid v. Wells Fargo Secs., LLC*, No. 10-CV-808, 2012 WL 13186912 (N.D. Okla. May 1, 2012) (cited by UMMC at 43), *Harstad v. Whiteman*, 338 S.W.3d 804, 816 (Ky. Ct. App. 2011) (cited by UMMC at 44), or *Humana, Inc. v. Fairchild*, 603 S.W.2d 918 (Ky. Ct. App. 1980). All of those cases took for granted that the key contractual provision had a clear meaning. Here that cannot be done because of ambiguity about the House Officer Contract's "malfeasance, inefficiency, or contumacious conduct" phrase that requires extrinsic evidence.

The most apt cases for the legal rule are still *McFarland v. McFarland*, 105 So. 3d 1111, 1119 (Miss. 2013) (cited by Papin at 57), and *Epperson v. SOUTHBank*, 93 So. 3d 10, 17 (Miss. 2012) (same), which stand for the proposition that Mississippi law allows extrinsic evidence to inform an ambiguous contract's meaning. And the most apt specific case is still *Beaty v. Kansas Athletics, Inc.*, No. CV 19-2137-KHV, 2020 WL 1862563, at *1 (D. Kan. Apr. 14, 2020) (cited by Papin at 58), which stands for the proposition that proof about comparable residents' specific experiences was highly relevant to prove the House Officer Contract's meaning. UMMC never contradicts *McFarland* and *Epperson* and never answers *Beaty*.

UMMC cites only one case involving an issue of contractual ambiguity, and it supports Dr. Papin. In *Bird v. PSC Holdings I, LLC*, No. 12-CV-1528 W (NLS), 2013 WL 12108106 (S.D. Cal. Apr. 5, 2013), the court did *not* reject the legal rule allowing extrinsic evidence to inform an ambiguous contract's meaning. It embraced the rule just as Mississippi law does, and rejected the evidence in that particular case only because the plaintiff did not explain its connection to any ambiguous contractual term. *Id.* at *4. Here, Dr. Papin both pinpointed the exact source of contractual ambiguity and showed in full detail how the  evidence of comparable residents' specific experiences helped prove the meaning of "malfeasance, inefficiency, or contumacious conduct," in the House Officer Contract. Papin Br. at 56-58.

### 2. The excluded evidence proved that UMMC fabricated its given reason for firing Dr. Papin.

Dr. Papin also defeated UMMC's relevance objection by showing that the evidence of comparable residents' specific experiences helped prove that UMMC had fabricated its given reason for firing Dr. Papin. Papin Br. at 56-58. UMMC again answers with *Hoffman v. Bd. of Trustees, East Mississippi Junior College*, 567 So.2d 838 (Miss. 1990) (cited by UMMC at 42). But *Hoffman* is again not on point.

Waiver was the key issue in *Hoffman*. Instead of debating whether the employer had actually terminated the employee pursuant to the provision at issue, *Hoffman*'s debate took that for granted and address the separate issue of whether the employer had waived the right to exercise that contractual right. *Hoffman*, 567 So.2d 838 at 842. Not so here.

Unlike the *Hoffman* line of cases, Dr. Papin did *not* proofer the evidence about comparable residents to prove a waiver defense. He is *not* arguing that UMMC had the right to terminate him for "malfeasance, inefficiency, or contumacious conduct" *but waived it by treating other residents differently*. Instead, Dr. Papin proffered evidence about comparable residents to prove that UMMC's firing of him was *not* actually done pursuant to the "malfeasance, inefficiency, or contumacious conduct" clause. *See* Papin Br. at 58-59.

Once the waiver straw man is set aside, Dr. Papin's proffered evidence about UMMC's treatment of comparable residents falls squarely under the rule recognized by *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133 (2000) (cited by Papin at 60-61), and *Humphries v. CBOCS W., Inc.*, 474 F.3d 387, 401 (7th Cir. 2007) (cited by Papin at 59), which rightly deems an employer's lack of investigation into comparable situations relevant proof that the given reason for firing was pretextual. That rule is *not* unique to employment discrimination cases, as UMMC intimates (at 44 & n.11). It represents a "general principle of evidence law," *Reeves*, 530 U.S. at 147, and should have been applied here.

### B.    Confusion concerns did not warrant exclusion.

The second issue about evidence of comparable residents is confusion, a Rule 403 concern that the district court relied on below. *See* Papin Br. at 59-60. But once the Court holds that the evidence in question *was* relevant, the confusion rationale cannot support the judgment for two separate reasons. As demonstrated above, the district court's Rule 403 "confusion" rationale was backwards because an inquiry into the details of residents' specific experiences was no distraction; it was directly relevant. *See* Papin Br. at 60-62. The district court's Rule 403 analysis also cannot support the judgment below for an even clearer reason: The Rule 403 analysis was

infected with the district court's antecedent matter-of-law errors about relevance. *See* Papin Br. at 60.  UMMC never answers either of these contentions.

Last but not least, UMMC says nothing of the jury note: "What is the meaning of contumacious conduct?" ROA.6385.  That demonstrated a felt need for exactly the kind of evidence Dr. Papin had proffered.  The decision to exclude that evidence was therefore both error and clearly harmful.  *See* Papin Br. at 62.

## IV.    UMMC's other cross-appeal challenges are meritless.

### A.    The cross appeal about audit trail admissibility is meritless.

UMMC seeks a new trial by challenging the district court's decision to admit the PX40 "audit trail" document.  UMMC Br. at 9-10, 46-50; *see* ROA.5662 (district court decision admitting PX40); ROA.6967 (PX 40).  According to UMMC, the district court should not have admitted PX40 (1) because it lacked authentication and (2) because of a Rule 403 concern for undue prejudice.  UMMC Br. at 9-10, 46-50.

The Court should reject UMMC's admissibility challenge to PX 40 because the district court correctly rejected both the authentication and Rule 403 objections. Review of admissibility rulings is for abuse of discretion, *see, e.g.*, *GIC Services, L.L.C. v. Freightplus USA, Inc.*, 866 F.3d 649, 672 (5th Cir. 2017), and none occurred here.

### 1. UMMC's authentication complaint is wrong.

To challenge the PX40 audit trail's admissibility on the basis of authentication, UMMC makes several related arguments. All basically posit that the witnesses testifying to authenticity did not know enough about the document. The gist is that "[n]o witness had direct knowledge about the exhibit, had seen it before this litigation began, or could explain what the information in the document meant." UMMC Br. at 9-10. It fails because the witnesses *did* have the requisite knowledge and explanation. And seeing PX40 beforehand was not required. The district court therefore did not abuse its discretion in deeming the item authenticated.

Federal evidence law's authentication requirement demands very little. *See* 31 Charles A. Wright & Arthur R. Miller et al., Federal Practice & Procedure § 7102 (2d ed. West 2023). "To satisfy the requirement of authenticating or identifying an item of evidence, the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is." Fed. R. Evid. 901(a). "The 'sufficient to support a finding' standard is not exacting." Wright & Miller § 7102. "The judge should permit the evidence to go to the jury unless the showing as to authenticity is so weak that no reasonable juror could consider the evidence to be what its proponent claims it to be." *Id.*

For PX 40, the authentication question was simply whether that document was, indeed, the audit trail that Dr. Papin claimed it to be. Proof of that came from several sources, including most prominently the testimony of Dr. Papin himself, ROA.5656-5662; ROA.5739-41, and the testimony of Elizabeth Toony, UMMC's former director of clinical risk management, ROA.5344-49.

First and foremost, Dr. Papin's testimony standing alone authenticated PX 40. *See generally* ROA.5656-5662; ROA.5739-41; ROA.5959-68. When shown PX40 at several different junctures, he testified that it was, indeed, the UMMC "audit trail" that counsel propounded it as. ROA.5657; ROA.5739; ROA.5959-68. The clearest of these several instances establishes what PX 40 was easily:

```
12   Q.   Now, Dr. Papin, this is Exhibit 40, the Epic audit trail
13   for this patient; is that right?
14   A.   That's right.
15   Q.   And you've -- I've shown this to you before today; is
16   that fair to say?
17   A.   It is.
```

ROA.5739. Dr. Papin's testimony also showed that he was fully familiar with UMMC's audit trails and knew all about each distinct facet of PX 40. ROA.5656-5661; ROA.5739; ROA.5959-68. He had personally seen the PX40

document before testifying, ROA.5739, and had reviewed literally every single page of the 3,000-page document:

```
2    Q.    Have you reviewed the whole document?
3    A.    Yes, I have, actually.
4    Q.    You've reviewed all -- if I represent to you it's over
5    3,000 pages, would you agree with that?
6    A.    Yes.
7    Q.    You've reviewed every page of it?
8    A.    I have.
```

ROA.5964.  Given that Dr. Papin had been trained to understand UMMC's audit trails, he had all of the background knowledge necessary to testify that PX40 was indeed one of them.  ROA.5656-5661; ROA.5739-41; ROA.5959-68.  He even went through the spreadsheet column by column, through all eight columns, to explain what each and every key term meant and what was being tracked.  ROA.5656-5661.

PX 40's authenticity was also proven by the testimony of  Elizabeth Toony, which if not sufficient on its own certainly bolstered all that Dr. Papin had proven. *See generally* ROA.5344-49.  She explained key facts about why and how UMMC created and maintained audit trails, ROA.5344-49, all in accordance with what Dr. Papin had learned through his training.  Like Dr. Papin, she was able to go through PX 40 column by column to explain what each part of the spreadsheet represented.

ROA.5345-47. So when it came time to decide whether PX40 was what Dr. Papin's counsel purported it to be, multiple witnesses had supplied the key facts in unison.

That authenticity proof came from *two* witnesses instead of *one* is no problem. Authenticity evidence does not have to come from a single witness. It can be dispersed. Wright & Miller § 7104 ("While authentication is frequently accomplished through the testimony of a single witness, evidence from various witnesses and other sources may be combined to establish authenticity.").

That some proof was circumstantial instead of direct is not a problem either. Authenticity evidence can be either direct *or circumstantial*. Wright & Miller § 7104 ("evidence offered to authenticate a matter may be direct or circumstantial").

Nor is it a problem that Dr. Papin did not himself author PX40. The person testifying to authenticity "need not have been the preparer of the record, nor must he personally attest to the accuracy of the information contained in the records." *Theriot v. Bay Drilling Corp.*, 783 F.2d 527, 533 (5th Cir. 1986).

Beyond those witnesses, authenticity proof can also come from nontestimonial sources. Wright & Miller § 7104. "In fact, where the matter to be authenticated is real evidence, like a gun or a document, the court may look to the face of the very item in question for information bearing on its authenticity." *Id.* So too here, as the face of PX40 itself supplied clear proof of its identity. *See* ROA.6967.

*Weinhoffer v. Davie Shoring, Inc.*, 23 F.4th 579 (5th Cir. 2022) (cited by UMMC at 46-47), does not support reversal. Its proof had two key shortcomings that PX 40's audit trail did not. One pertained to knowledge of the relevant terms (not knowledge of the proffered item itself, but knowledge of terms about the item). Whereas the *Weinhoffer* witness had no knowledge of the "terms applicable to" the proffered item, *id.* at 583, Dr. Papin knew all about the audit trail's terms. Another shortcoming pertained to item familiarity. Whereas the *Weinhoffer* witness was "unfamiliar with" the proffered item, *id.* at 583, Dr. Papin knew all about PX40, having reviewed literally every single page of the 3,000 page exhibit, ROA.5964.

The district court's authentication ruling was therefore correct. And it certainly did not hamper UMMC. Since "the jury retains the power to determine what weight to give evidence in light of any questions concerning its authenticity," UMMC was free to introduce is own "evidence contesting authenticity" and free to ask the jury to "conclude that admitted evidence is not authentic and should be completely disregarded." Wright & Miller § 7104. All of that goes to weight—not admissibility. *See, e.g.*, *United States v. Isiwele*, 635 F.3d 196, 200 (5th Cir. 2011) ("Such flaws go to the weight of the evidence instead of its admissibility." (quoting 5 J. Weinstein & M. Berger, Weinstein's Evidence ¶ 901.02[3], at 901-17 (1985)).

### 2.    The Rule 403 complaint is wrong.

To challenge the audit trail's admissibility on the basis of Rule 403, UMMC argues that the "evidence was unduly prejudicial to UMMC because Papin used it to argue repeatedly that a former UMMC employee who was not present at trial had lied in her deposition." UMMC Br. at 10. The district court's rejection of that argument triggers review for abuse of discretion, and no abuse of discretion occurred.

Dr. Papin used PX40 for two totally orthodox purposes. He used it to both (1) prove how key events leading to his firing had transpired, and (2) impeach one of UMMC's key witnesses. *See, e.g.*, ROA.5960-61 (Dr. Papin's testimony about what PX 40 reveals); ROA.5966-67 (same); ROA.6030 (counsel's jury argument about PX40); ROA.6316-20 (same); ROA.4986 (Dr. Papin's brief to the district court about PX40). A key controversy revolved around whether Dr. Papin was solely responsibility for monitoring a particular patient, as opposed to having shared monitoring responsibility with UMMC's Dr. Megan Mahoney. *Id.* Dr. Papin testified that he shared responsibility with Dr. Mahoney. *Id.* But Dr. Mahoney told UMMC at the time—and testified in a deposition later—that she never reviewed the patient's status and had relied solely on Dr. Papin, who (she said) lied about her having done any of the monitoring. *Id.* By proving that Dr. Mahoney had monitored

this patient over seventy times, PX40 both impeached her deposition testimony and proved that UMMC's reasons for firing Dr. Papin at the time were false. *Id.*

In this context, proof that a key UMMC's witness's failed to tell the truth is not "unduly" prejudicial. Indeed, in it is not "prejudicial" at all. It is probative and legitimately powerful. UMMC cites no contrary case because such tactics are completely fair game. *See generally* 22A Wright & Miller §§ 5214, 5215-5215.6.

PX 40 itself is not the real target of UMMC's Rule 403 argument. UMMC's real target is testimony that Dr. Papin later gave about PX40. *See* UMMC Br. at 48-50. But the testimony UMMC that complains about most—the testimony that UMMC block quotes (at 49) for being most "unduly prejudicial"—was *elicited by UMMC's own counsel. See* ROA.5993. If that was error, it was invited.

Setting that aside, for UMMC to effectively challenge any of Dr. Papin's testimony about PX40, UMMC could and should have objected to that testimony and obtained a ruling. But UMMC made no objection, forfeiting any Rule 403 argument. Instead, UMMC just made jury arguments about evidentiary weight. UMMC's counsel argued to the jury that PX40 deserved little weight because of UMMC's authenticity doubts. ROA.6368-69. None of this was a matter of admissibility. It was all a matter of evidentiary weight. *Cf. Primrose Operating Co. v.*

*Nat'l Am. Ins. Co.*, 382 F.3d 546, 562 (5th Cir. 2004) ("[i]t is the role of the adversarial system, not the court, to highlight weak evidence").

### B. The cross appeal about educational expense evidence admissibility is meritless.

UMMC also seeks a new trial by challenging the district court's decision to admit evidence about Dr. Papin's educational expenses and student loan balance. UMMC Br. at 9-10, 50-51. According to UMMC, Dr. Papin's testimony about what he paid to attend medical and business school, ROA.5828-31, should have been excluded on grounds of irrelevance and Rule 403 "unfair" prejudice. *Id.*

The Court should reject this challenge because it is largely unpreserved. It should also reject the challenge because the district court's ruling was correct and even if erroneous caused no harm.

### 1. UMMC failed to object.

Although UMMC's appeal challenges all of Dr. Papin's testimony about what he paid to attend medical and business school, UMMC in the district court did *not* make Rule 403 and relevance objections to all of the that testimony. Instead, UMMC lodged only a limited objection to just one instance, leaving all others free and clear.

In the first key instance, Dr. Papin testified to his educational expenses for medical school without any Rule 403 objection at ROA.5828 ("Around 200,000."). UMMC made a relevance objection there, but did not mention Rule 403. *Id.*

In the second key instance, Dr. Papin testified to his educational expenses for business school without any objection at ROA.5828 ("And about the same for business school.")  UMMC made no objection at all here, relevance or otherwise.  *Id.* (Nor did UMMC ever assert a "running" or "continuing" objection.)

Third and most importantly, Dr. Papin testified to his educational expenses for both business school and medical school without any objection at ROA.5829-5831 ("I think the most recent total that I looked at was about 630,000 with interest."). Again UMMC made no objection at all, relevance or otherwise.  *Id.*

Elementary preservation rules dictate that UMMC cannot get appellate relief as to testimony that it did not lodge the now-asserted objection to below.  *See* Fed. R. Evid. 103.  So as to the instance where UMMC objected only to relevance—the ROA.5828 testimony about educational expenses for medical school—UMMC cannot now obtain any relief based on Rule 403.  And as to the instances where UMMC made no objection whatsoever—the ROA.5828 testimony about educational expenses for business school and the ROA.5829-5831 testimony about educational expenses for both business and medical school—UMMC cannot now get any appellate relief whatsoever.

Furthermore, UMMC's failure to preserve error as to the ROA.5828 testimony and ROA.5829-5831 testimony renders harmless any error that might have occurred as to the ROA.5828 testimony. A party challenging admissibility decisions can get relief "only if the error affects a substantial right of the party." Fed. R. Evid. 103. But when the same point of fact is proven by both objected-to testimony and *not* objected-to testimony, any error as to the former is harmless. *See United States v. Michalik*, 5 F.4th 583, 591–92 (5th Cir. 2021) ("Where other testimony confirms wrongly admitted testimony, 'the cumulative nature of the evidence militates toward the harmless error conclusion.'"). For these reasons, the Court should reject the challenges regarding educational expense evidence without regard to their merits.

## 2. The relevance objection was meritless.

When UMMC lodged a relevance objection to the ROA.5828 testimony about educational expenses for medical school, the district court rejected it. *Id.* That decision was correct, or at least was not an abuse of discretion. Evidence is relevant when "necessary to complete the story," *United States v. Ahmed*, No. 20-40713, 2022 WL 16914540, at *1 (5th Cir. Nov. 14, 2022), and the district court did not abuse its discretion in determining that Dr. Papin's story would be incomplete without this aspect of his medical school experience.

### 3.     The Rule 403 objection was meritless.

When UMMC lodged its Rule 403 "unduly prejudicial" objection to certain evidence of educational expenses for business school, ROA.5829, the district court rejected it, *id.*  As with the relevance ruling, the district court's Rule 403 ruling was correct, or at least was not an abuse of discretion causing any real harm.

The district court's ruling was correct because this evidence did not meet the Rule 403 threshold for "undue prejudice."  *See generally* 22A Wright & Miller §§ 5214, 5215-5215.6.  True Rule 403 "prejudice" arguments entail evidence triggering *emotional* reactions.  *See id.* § 5215.1.  But the educational expense evidence was totally true and did not trigger any prejudicial emotions at all, let alone undue prejudices.  At worst it was just surplus proof.

### 4.     Proper jury instructions cured any error.

Even if some of Dr. Papin's educational expense evidence should have been excluded, that error warrants no relief because the jury charge cured any error.  *See* Fed. R. Evid. 103.  What UMMC feared is that the jury would wrongly consider the educational expense evidence as proof of Dr. Papin's non-economic damages.  *See* UMMC Br. at 50-51.  But the jury instructions took care of that concern by cabining each measure of damages correctly.  *See* ROA.4789-90 (defining "[a]ctual economic damages" as "money damages for lost income.").  Since educational expenses are

obviously not "lost income," the jury was well informed not to conflate the two. Thus, "because a jury is presumed to follow the court's instructions, instructions such as those given here are generally sufficient to cure the possibility of prejudice." *United States v. Bieganowski*, 313 F.3d 264, 288 (5th Cir. 2002).

### C.    The issues about charge error are meritless.

UMMC next seeks a new trial by arguing that the District Court incorrectly instructed the jury in three respects. UMMC Br. at 10. All of these arguments fail.

### 1.    Actual authority.

First, UMMC argues that the erred because "the charge did not inform the jury that the creation of a contract with a public entity requires an agent with actual authority to contract on behalf of the entity." UMMC Br. at 52. Critically, though, UMMC does *not* contend that the instructions actually given contained any error. The basic contract-formation instruction given below was fully correct. ROA.4787. UMMC's point says that the district court was required—not just allowed, but required—to supplement the standard instruction with a special addendum regarding the authority rule in question. That point is meritless for several reasons.

First, UMMC's argument is unpreserved. To argue that a district court should have given a particular instruction, the complaining needs to have both "properly requested it *and*--unless the court rejected the request in a definitive ruling

on the record--also properly objected." Fed. R. Civ. P. 51(d) (emphasis added); *see, e.g.. Knight v. Caldwell*, 970 F.2d 1430, 1433 (5th Cir. 1992). UMMC did only half of what Rule 51 requires. It objected (barely) to the charge's lack of an instruction about actual authority and Mississippi's law on contracting with state agencies. ROA.6219. But UMMC never "properly requested" the instruction it now says is required. It requested no instruction for this point at all, leaving the first part of Rule 51(d) unmet. UMMC requested instructions on several other issues, ROA.7598-7617, but not this one. Rule 51(d) therefore dictates that UMMC cannot assign this point as error.

On the merits, UMMC's demand for an additional explanatory instruction runs counter to the well-established rule that gives district court's wide discretion in deciding how granular to make jury instructions. "We view jury instructions as a whole, and if they 'are comprehensive, balanced, fundamentally accurate, and not likely to confuse or mislead the jury, the charge will be deemed adequate.'" *Gil Ramirez Group, L.L.C. v. Marshall*, 765 Fed. Appx. 970, 979 (5th Cir. 2019). This charge meets that test. Though the additional instruction about authority was allowed, it was not required

UMMC's unpreserved point also fails for lack harm. *See* Fed. R. Civ. P. 61. The point of jury instructions is to give counsel a hook to make their relevant arguments to the jury, and with the charge as given, UMMC was able to make its no-

authority argument just fine.  *See* ROA.6348 (UMMC's closing).  Any error in not having an extra instruction was therefore harmless.  *See Janvey v. Dillon Gage, Inc. of Dallas*, 856 F.3d 377, 389 (5th Cir. 2017) (charge error is harmless when it "did not impair [the litigant's] presentation of his claim").

### 2.     Punitive damages

Second, UMMC argues that the district court committed charge error because it allowed the jury to "consider whether punitive damages should be awarded." UMMC Br. at 53.  But this is not really an independent argument.  It just follows on UMMC's main point about punitive damages being unavailable.  If punitive damages *were* available as shown above, including them in the charge was not error.

### 3.     Emotional distress.

Finally, UMMC argues (at 53) that the district court committed charge error because "the jury should have been instructed that emotional distress damages requires a showing of 'specific suffering during a specific time frame," that "generalizations are not sufficient,' and that testimony that 'it made me feel bad' or 'it upset me' cannot support an award of emotional distress damages, and that such damages must have been foreseeable to the defendant for the alleged breach of contract."  Here as well, UMMC does *not* say that the given charge did anything affirmatively wrong because it didn't.  *See* ROA.4790-4791.  Everything the charge

said about this aspect of damages was correct.  UMMC's is again demanding that the charge to include an extra instruction—another question of granularity.  The Court should reject this for several reasons.

First, this argument is unpreserved.  Though UMMC objected to the omission of the language it now says is required, ROA.6219-6220, UMMC never submitted an instruction about it.  UMMC therefore left unsatisfied the part of Rule 51(d) that requires the complaining party to have "properly requested" what they now say was wrongly omitted.  *See* Fed. R. Civ. P. 51(d); *Knight*, 970 F.2d at 1433.

Second, UMMC again runs counter to rule giving district court's wide discretion in deciding how granular to make jury instructions. *See, e.g.*, *Gil Ramirez Group, L.L.C.*, 765 F. Appx. at 979.  The given charge was totally correct, and UMMC has no case showing that the decision to keep it simple is an abuse of discretion.

UMMC's last point also fails for lack harm, *see* Fed. R. Civ. P. 61, because the charge as given allowed UMMC plenty of ground to argue against the sufficiency of Dr. Papin's proof of emotional distress.  Here as well, since the given charge did not impair UMMC's ability to make all of these arguments to the jury, any error in not supplying a more granular instruction was harmless.  *See Janvey*, 856 F.3d at, 389.authentication

## Conclusion

The Court should reverse and render a judgment on the verdict for Dr. Papin's claim that UMMC breached the Remediation Agreement and order a new trial as to damages.  Alternatively, if the Court does *not* uphold liability for UMMC's breach of the Remediation Agreement, the Court should order a new trial for the claim regarding the House Officer Contract.

The Court should reject all aspects of UMMC's cross appeal.

Respectfully submitted,

C. Ryan Morgan
Gregory R. Schmitz
Jolie N. Pavlos
Morgan & Morgan P.A.
20 N. Orange Avenue, 15th  Floor
Orlando, FL 32801-0000
(407) 204-2170

/s/ Chad Flores
Chad Flores
cf@chadflores.law
Flores Law PLLC
917 Franklin Street, Suite 600
Houston, Texas 77002
(713) 364-6640

Russell S. Post
Beck Redden LLP
1221 McKinney Street, Suite 4500
Houston, TX 77010
(713) 951-6292

## Certificate of Compliance

This filing complies with the type-volume limitation of Federal Rule of Appellate Procedure 32 because it contains 11,320 not-exempted words.

This filing complies with the typeface and typestyle requirements of Federal Rule of Appellate Procedure 32 and Fifth Circuit Rule 32 because it has been prepared in a proportionally spaced typeface in 14-point font using Microsoft Word for Mac Version 16.74.

/s/ Chad Flores
Chad Flores